339 F.Supp.2d 804 (2004)
In re: DYNEGY, INC. SECURITIES LITIGATION
Pirelli Armstrong Tire Corporation Retiree Medical Benefits Trust, et al.,
v.
Dynegy, Inc., et al.
No. CIV.A. H-02-1571.
United States District Court, S.D. Texas, Houston Division.
October 7, 2004.
*805 *806 *807 *808 *809 *810 *811 *812 *813 William S. Lerach, Helen J. Hodges, John A. Lowther, James I. Jaconette, Alexandra S. Bernay, Lerach, Coughlin, Stoia and Robins, San Diego, CA, Roger B. Greenberg, Schwartz Junell, et al, Houston, TX, Connie Cheung, Patrick J. Coughlin, Azra Z. Mehdi, Milberg Weiss, et al, San Francisco, CA, for plaintiff.
Michael T. Powell, Haynes and Boone, David D. Sterling, Baker Botts LLP, Thomas C, Godbold, Fulbright & Jaworski, Michael M.Wilson, Clements O'Neill, et al, Dennis G. Herlong, Attorney at Law, Mark K. Glasser, Michael W. Youtt, King & Spalding, Houston, TX, Kevin Tod Abikoff, Hughes Hubbard, et al, Washington, DC, Jacalyn D. Scott, Wilshire Scott, et al, Houston, TX, Robyn F. Tarnofsky, Michael E. Gertzman, Brad S. Karp, Julia L. Tarver, Bairbre O'Neill, Paul Weiss, et al, New York, NY, Charles G. King, III, King & Pennington LLP, Houston, TX, Michael J. Chepiga, Attorney at Law, New York, NY, Harrison J. Frahn, IV, Simpson Thacher, et al, Palo Alto, CA, Lynn K. Neuner, Sympson Thacher, et al, New York, NY, C.W. Flynn, IV, Locke Purnell Rain & Harrell, Dallas, TX, Richard W. Clary, Cravath Swaine, et al, New York, NY, Russell "Rusty" Hardin, Jr., Rusty Hardin and Associates, Houston, TX, Richard M. Wyner, Shea & Gardner, Christopher E. Palmer, John D. Aldock, William F. Sheehan, Shea & Gardner, Washington, DC, Roger Brian Cowie, Locke Liddell, et al, Dallas, TX, for defendant.

MEMORANDUM AND ORDER
LAKE, District Judge.

 TABLE OF CONTENTS
 I. Introduction ...............................................................818
 II. Standard of Review ........................................................818
 III. Factual Allegations ......................................................819
 A. Black Thunder ...........................................................819
 B. Project Alpha ...........................................................820
 1. Misrepresentations ...................................................820
 2. Olis Trial ...........................................................820
 C. Improper Accounting Practices ...........................................821
 1. Natural Gas Contracts ................................................822
 2. Forward Power Contracts ..............................................822
 3. Gas Trading Volume ...................................................822
 4. Trading Losses .......................................................823
 D. Debt and Securities Offerings ...........................................823
 E. Disclosures .............................................................823
 1. December of 2001 .....................................................823

*814
 2. March of 2002 ........................................................824
 3. April of 2002 ........................................................824
 4. May of 2002 ..........................................................824
 5. July of 2002 .........................................................824
 6. August of 2002 .......................................................824
 7. February through May of 2003 .........................................824
 IV. Claims Asserted Under the 1933 Securities Act ..............................825
 A. Applicable Law ..........................................................825
 1. Section 11 ...........................................................825
 (a) Elements of a § 11 Claim .........................................826
 (b) Statute of Limitations ...........................................826
 (c) Affirmative Defenses .............................................827
 (d) Pleading Standards ...............................................827
 2. Section 15 ...........................................................828
 (a) Elements of a § 15 Claim .........................................828
 (b) Affirmative Defenses .............................................828
 B. Factual Allegations Specific to 1933 Securities Act Claims...............829
 1. Registration Statement for DHI 6.875% Notes ..........................829
 (a) Factual Particulars ..............................................829
 (b) Misstatements and Omissions ......................................830
 2. Registration Statement Offer for DI Common Stock .....................830
 (a) Factual Particulars ..............................................831
 (b) Misstatements and Omissions ......................................831
 3. Registration Statement for DHI 8.75% Notes ...........................831
 (a) Factual Particulars ..............................................832
 (b) Misstatements and Omissions ......................................832
 C. Defendants' Motions to Dismiss § 11 Claims ..............................832
 1. Certification Requirement ............................................833
 2. Pleading Compliance with Statute of Limitations ......................834
 (a) Applicable Law ...................................................834
 (b) Allegations of Compliance ........................................835
 (c) Analysis .........................................................836
 (1) Debt Security Offerings ......................................836
 (2) Stock Offering ...............................................836
 (d) Conclusions ......................................................837
 3. Limitations Bar ......................................................837
 (a) Assertion of Limitations in Motion to Dismiss ....................838
 (b) Relation Back ....................................................839
 (1) Applicable Law ...............................................839
 (2) Original Pleadings ...........................................839
 (3) Analysis .....................................................840
 (i) New Claims Against Existing Parties: DI, Watson,
 Bergstrom, Doty, and Mott ..............................840
 (A) New Claims Asserted Against Existing
 Defendants by Existing Plaintiff ...................840
 (B) New Claims Asserted Against Existing
 Defendants on Behalf of Newly Proposed
 Plaintiffs .........................................841
 (ii) New Claims Asserted Against DHI .........................843
 (4) Conclusions ..................................................844
 (c) Inquiry Notice ...................................................845
 (1) Applicable Law ...............................................845
 (2) Trigger Dates ................................................847
 (i) March 13, 2002 ..........................................847
 (ii) April 25, 2002 ..........................................849
 (iii) May 2002 ................................................851
 (A) Black Thunder .......................................852
 (B) Project Alpha .......................................852

*815
 (C) Trading Practices ...................................854
 (3) Conclusions ..................................................855
 (i) Trigger Date Conclusions ................................855
 (A) March 13, 2002 ......................................855
 (B) April 25, 2002 ......................................855
 (C) May 2002 ............................................856
 (ii) Application of Trigger Date Conclusions .................856
 (A) March 15, 2001, Debt Offering .......................856
 (B) December 20, 2001, Stock Offering ...................857
 1. DI and the Individuals ...........................858
 2. Director Defendants ..............................858
 3. Arthur Andersen ..................................859
 4. Lehman Brothers Inc...............................861
 (C) February 15, 2002, Debt Offering ....................862
 1. DHI ..............................................862
 2. The 1933 Act Individual Defendants................863
 3. Andersen and Underwriters ........ ...............866
 4. Negative Causation Defense ...........................................867
 (a) Applicable Law ...................................................867
 (b) Hawaii Ironworkers ...............................................868
 (c) The Regents ......................................................870
 5. Non-Issuer Affirmative Defenses ......................................871
 (a) Reasonable Investigation (Due Diligence) .........................871
 (b) Reasonable Reliance on an Expert .................................872
 (1) Individual and Director Defendants ...........................872
 (2) Underwriter and Related Defendants ...........................874
 (c) Conclusions ......................................................875
 D. Defendants' Motions to Dismiss § 15 Claims ..............................876
 1. Dynegy Inc............................................................876
 2. Individual Defendants ................................................876
 3. Underwriters and Related Defendants ..................................877
 E. Conclusions as to Motions to Dismiss 1933 Act Claims ....................877
 V. Claims Asserted Under the 1934 Securities and Exchange Act .................879
 A. Applicable Law ..........................................................879
 1. Section 10(b) and Rule 10b-5 .........................................879
 2. Rule 9(b) and Private Securities Litigation Reform Act................880
 (a) Rule 9(b) ........................................................880
 (b) PSLRA ............................................................880
 3. Pleading Standards ...................................................881
 (a) Misrepresentations and Manipulations .............................882
 (b) Scienter .........................................................882
 (1) Circumstantial Evidence ......................................882
 (2) Motive and Opportunity .......................................883
 (3) Totality of the Circumstances ................................883
 (c) Reliance .........................................................883
 (d) Proximate Cause of Injury ........................................884
 4. Section 20(a) ........................................................885
 B. Companies and Individual Defendants .....................................885
 1. Limitations ..........................................................885
 (a) Claims Asserted Against DI .......................................885
 (b) Claims Asserted Against DHI ......................................885
 (1) Relation Back ................................................886
 (2) Sarbanes-Oxley Act ...........................................887
 (c) Conclusions ......................................................889
 2. Failure to State a Claim for Primary Liability under § 10(b) and
 Rule 10b-5 ..........................................................890
 (a) Misrepresentations ...............................................890
 (1) Black Thunder ................................................891

*816
 (2) Project Alpha ................................................891
 (3) Accounting Practices .........................................892
 (i) Natural Gas Contracts ..................................892
 (ii) Forward Power Contracts ................................892
 (iii) Trading Volume .........................................893
 (iv) Trade Losses ...........................................894
 (4) Conclusions ..................................................894
 (b) Scienter .........................................................895
 (1) Charles L. Watson ............................................895
 (i) Black Thunder ..........................................896
 (ii) Project Alpha ..........................................896
 (iii) Motive and Opportunity .................................898
 (iv) Conclusions ............................................900
 (2) Stephen W. Bergstrom .........................................900
 (i) Black Thunder and Project Alpha ........................900
 (ii) Improper Accounting Practices ..........................901
 (iii) Motive and Opportunity .................................901
 (iv) Conclusions ............................................902
 (3) Robert D. Doty ...............................................902
 (i) Black Thunder ..........................................903
 (ii) Project Alpha ..........................................903
 (iii) Conclusions ............................................904
 (4) Michael R. Mott ..............................................904
 (i) Black Thunder ..........................................905
 (ii) Project Alpha ..........................................905
 (iii) Motive and Opportunity .................................906
 (iv) Conclusions ............................................906
 (5) Matthew K. Schatzman .........................................907
 (i) Gas Trading Volume .....................................907
 (ii) Motive and Opportunity .................................908
 (iii) Conclusions ............................................909
 (6) Louis J. Dorey ...............................................909
 (7) The Companies ................................................909
 (i) Black Thunder ..........................................910
 (ii) Project Alpha ..........................................910
 (iii) Round-trip Trades with CMS .............................911
 (c) Reliance .........................................................911
 (d) Proximate Cause ..................................................912
 3. Failure to State a Claim for Secondary "Control-Person" Liability
 under § 20(a) .......................................................912
 (a) The Companies ....................................................912
 (b) Individuals ......................................................912
 C. Citigroup ...............................................................913
 1. Claim for Primary Liability Against Citigroup and Citibank for
 Structuring, Funding, and Executing Black Thunder and Project
 Alpha ..............................................................914
 (a) Central Bank .....................................................914
 (b) Citibank's Allegedly Manipulative Acts ...........................915
 2. Claim for Primary Liability Against Citigroup and Salomon for
 Issuing False Research Reports .....................................916
 3. Claim for Secondary "Control-Person" Liability Against Citigroup
 for Acts of Citibank and Salomon ...................................918
 D. Conclusions .............................................................919
 1. Conclusions as to Companies and Individuals ..........................919
 (a) Claims Asserted Under § 10(b) and Rule 10b-5 .....................919
 (b) Claims Asserted Under § 20(a) ....................................919
 2. Conclusions as to Citigroup Defendants ...............................919
 (a) Claims Asserted Under § 10(b) and Rule 10b-5 .....................919
 (b) Claims Asserted Under § 20(a) ....................................919

*817
 3. Summary Table ........................................................920
 VI. Plaintiffs' Requests to Amend ..............................................920
 VII. Order ......................................................................922
VIII. Order for Scheduling Conference ............................................923

This action for violation of federal securities law is brought against Dynegy, Inc. (DI), Dynegy Holdings, Inc. (DHI), and others for alleged violations of §§ 11 and 15 of the Securities Act of 1933 (1933 Act), 15 U.S.C. §§ 77k and 77o, during a proposed class period beginning on March 15, 2001, and ending on July 22, 2002, and for alleged violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (1934 Act), 15 U.S.C. §§ 78j(b), 78t(a) and Rule 10b-5, 17 C.F.R. § 240.10b-5, during a proposed class period beginning on January 27, 2000, and ending on July 22, 2002. Pending before the court are thirteen motions to dismiss filed by: (1) Charles L. Watson, former Chairman and Chief Executive Officer (Docket Entry No. 323); (2) Dynegy and Dynegy Holdings Inc. for claims alleged under the 1933 Act (Docket Entry No. 324); (3) Dynegy and Dynegy Holdings Inc. for claims alleged under the 1934 Act (Docket Entry No. 325); (4) Michael R. Mott, former Senior Vice-President and Controller (Docket Entry No. 327); (5)Matthew K. Schatzman, former President of Dynegy's Energy Trading Division, and Louis J. Dorey, former President of Marketing and Origination, interim Chief Financial Officer, and Executive Vice-President of Finance (Docket Entry No. 328); (6) Kenneth E. Randolph, former General Counsel and Secretary (Docket Entry No. 329); (7) Arthur Andersen LLP (Docket Entry No. 332); (8) Robert D. Doty, former Executive Vice-President and Chief Financial Officer (Docket Entry No. 333); (9) Dynegy's Outside Directors, Charles E. Bayless, Darald W. Callahan, Michael D. Capellas, Daniel L. Dienstbier, Jerry L. Johnson, George L. Kirkland, Richard H. Matzke, H. John Riley, Jr., Sheli Z. Rosenberg, Joe J. Stewart, and J. Otis Winters (Docket Entry No. 335); (10) Stephen W. Bergstrom, former President and Chief Operating Officer (Docket Entry No. 338); (11) Lehman Brothers Inc., Lehman Brothers Holding Inc., Merrill, Lynch, Pierce, Fenner & Smith, Inc., and Merrill Lynch & Co., Inc. (Docket Entry No. 339); (12) Certain Underwriter and Related Defendants, ABN AMRO Inc., Banc One Capital Markets, Inc., Bank of America Securities LLC, Commerzbank Capital Markets Corp., Crédit Lyonnais Securities (USA), Inc., Crédit Suisse First Boston LLC (formerly known as Crédit Suisse First Boston Corp.), The Royal Bank of Scotland plc, SG Cowen Securities Corp., TD Securities (USA) Inc., WestLB AG (formerly known as Westdeutsche Landesbank Girozentrale) (together the "Underwriter Defendants"), and ABN AMRO Holding N.V., ABN AMRO Bank N.V., Bank of America Corp., Bank One Corp., Commerzbank AG, Crédit Lyonnais, The Royal Bank of Scotland Group plc, Société Générale Group (Docket Entry No. 342); (13) Citigroup Inc., Salomon Smith Barney Inc., and Citibank, N.A. (Docket Entry No. 347). Also pending is a motion to exceed page limits filed by Lead Plaintiff (Docket Entry No. 379) for its reply to the outside directors' motion to dismiss. For the reasons set forth below, the motion to exceed page limits will be granted, the motions to dismiss filed by Schatzman and Dorey and by Citigroup will be granted, the motion to dismiss filed *818 by the Lehman and Merrill Lynch entities will be denied, and the other motions to dismiss will be granted in part and denied in part as stated in the final section of this Memorandum and Order.

I. Introduction

The twenty-eight actions consolidated into this action were filed between April 26, 2002, and June 25, 2002. The first Order of Consolidation was entered on June 28, 2002 (Docket Entry No. 41).[1] On October 28, 2002, the court entered a Memorandum and Order appointing The Regents of the University of California to serve as Lead Plaintiff (Docket Entry No. 88). On June 6, 2003, Lead Plaintiff filed a Consolidated Complaint for Violations of the Federal Securities Laws (Consolidated Complaint, Docket Entry No. 112). On June 10, 2003, a federal grand jury returned a six-count indictment that charged three Dynegy executives, Jamie Olis, Gene Shannon Foster, and Helen Christine Sharkey, with conspiracy to commit securities fraud, mail fraud, and wire fraud. In August of 2003 Foster and Sharkey pleaded guilty to conspiracy. In November of 2003 Olis was tried and convicted. On January 16, 2004, Lead Plaintiff filed a Motion for Leave to File Amended Complaints (Docket Entry No. 306) to add facts developed at the Olis trial. The court granted Lead Plaintiff's Motion to Amend on January 29, 2004 (Docket Entry No. 309). The First Amended Consolidated Complaint for Violations of the Securities Act of 1933 (SAC, Docket Entry No. 315), and First Amended Consolidated Complaint for Violations of the Securities Exchange Act of 1934 (SEAC, Docket Entry No. 316) were filed on January 30, 2004.

II. Standard of Review

A motion to dismiss for failure to state a claim tests the formal sufficiency of the pleadings and is "appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim." Ramming v. United States, 281 F.3d 158, 161 (5th Cir.2001), cert. denied sub nom. Cloud v. United States, 536 U.S. 960, 122 S.Ct. 2665, 153 L.Ed.2d 839 (2002). The court must accept the factual allegations of the complaint as true, view them in a light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor. Id. "[A] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 122 S.Ct. 992, 998, 152 L.Ed.2d 1 (2002)(quoting Hishon v. King & Spalding, 467 U.S. 69, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984)).
When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.
Id. at 997 (quoting Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974)). See also Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)("[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.").
In deciding a motion to dismiss the court may consider documents attached to or incorporated in the complaint and matters *819 of which judicial notice may be taken. See Lovelace v. Software Spectrum, Inc., 78 F.3d 1015, 1017-1018 (5th Cir.1996). In securities cases courts may take judicial notice of the contents of public disclosure documents that are required by law to be filed with the Securities Exchange Commission (SEC) and are actually filed with the SEC with the caveat that these documents may be considered only for the purpose of determining what statements they contain; not for proving the truth of their contents. Id. at 1018 & n. 1 (citing and adopting rule of Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir.1991)), and explaining that this rule does not apply to other forms of disclosure such as press releases or announcements at shareholder meetings). See also In re Azurix Corp. Sec. Litig., 198 F.Supp.2d 862, 877 (S.D.Tex.2002), aff'd sub nom. Rosenzweig v. Azurix Corp., 332 F.3d 854 (5th Cir.2003). Although defendants bear the burden of pleading and proving affirmative defenses, where facts alleged in plaintiff's pleadings make clear that a claim is barred, dismissal under Rule 12(b)(6) may be granted. See Jones v. Alcoa, Inc., 339 F.3d 359, 366 (5th Cir.2003), cert. denied, ___ U.S. ___, 124 S.Ct. 1173, 157 L.Ed.2d 1206 (Jan. 26, 2004)(citing Kansa Reinsurance Co., Ltd. v. Congressional Mortgage Corp. of Texas, 20 F.3d 1362, 1366-70 (5th Cir.1994)(dismissing claim as time barred under Rule 12(b)(6) where the claim was clearly filed after the applicable statute of limitations had run and the pleadings established that plaintiff was not entitled to the benefit of the discovery rule).

III. Factual Allegations

Plaintiffs allege that in early 2000 when Dynegy was "planning several private and public offerings of equity and debt securities" (SAC ¶ 38; SEAC ¶ 39)[2] defendants "sought by various financial statements and trading book manipulations" (SEAC ¶ 40), to have "market and credit rating agencies perceive Dynegy not just as an energy company that paid steady dividends ... [but also] as a fast-growing, energy-trading and communications company with rapidly growing earnings and a strong balance sheet." (SEAC ¶ 39; SAC ¶ 38) The false and misleading statements for which plaintiffs seek recovery arise from two transactions, "Black Thunder" (SAC ¶¶ 40-52; SEAC ¶¶ 41-58), and "Project Alpha" (SAC ¶¶ 53-58; SEAC ¶¶ 59-88), and a number of allegedly improper accounting practices. (SAC ¶¶ 79-92; SEAC ¶¶ 89-115)
A. Black Thunder
Lead Plaintiff alleges that Black Thunder was an off balance sheet transaction promoted and structured by Citigroup to disguise an $850 million loan to Dynegy as an equity interest investment that closed in June of 2000. (SAC ¶¶ 40-41; SEAC ¶¶ 41, 44) Lead Plaintiff alleges that DI and DHI's 2000 second-fourth quarter Forms 10-Q, and DI and DHI's 2000 and 2001 Forms 10-K misrepresented the Black Thunder transaction by falsely classifying the proceeds as equity instead of debt (SAC ¶ 45; SEAC ¶ 49), and failing to reveal "the repayment obligation, ratings triggers and other key terms" that would have identified Black Thunder as a financing, instead of as an equity transaction. (SAC ¶ 46; SEAC ¶ 50) Lead Plaintiff alleges that the misrepresentations about Black Thunder contained in these filings violated Generally Accepted Accounting Principles (GAAP) and Financial Accounting *820 Standard Forms (FASB).[3] (SAC ¶¶ 73-78)
B. Project Alpha
Plaintiffs allege that Project Alpha was a transaction promoted and structured by Citigroup to disguise a $300 million loan as cash flow from operations and to generate bogus tax savings of $79 million that closed in April of 2001. (SAC ¶¶ 53-54; SEAC ¶¶ 60-63) Plaintiffs allege that the "[c]ash flow from operations bolstered Dynegy's financial statements, which was important because the Company needed to close what was known internally as the `disconnect,' the gap between reported earnings and actual cash flow." (SEAC ¶ 128)
1. Misrepresentations
Plaintiffs allege that Project Alpha was a complex transaction that consisted of three components:
(a) the loan to Dynegy through several intermediaries;
(b) a series of related, off-market natural gas transactions; and
(c) improper basis shifting that resulted in misstated tax losses, which in turn led to the reporting of increased profits.
(SAC ¶ 54; SEAC ¶ 63) Plaintiffs allege that
Project Alpha used a series of phony, manipulative, off-market gas contracts to create the appearance that Dynegy's loan funding and payback was gas trading revenues and losses. The gas contracts were prewired at off-market prices, meaning the contract price had no relation to market prices other than to specifically create a purported profit or loss. Those contracts were underpriced in favor of Dynegy during months 1-9, when it borrowed $300 million, and overpriced against Dynegy in months 10-60, when it repaid the $300 million loan. As designed and executed by Citigroup, the Project Alpha loan was cloaked by ... circular gas contracts.
(SEAC ¶ 73) Plaintiffs allege that beginning with the announcement of earnings for the second quarter of 2001, DI's and DHI's financial statements and other representations concerning results from operations, balance sheet, finances, financial ratios, and financial discipline were false and misleading because they omitted material facts about Project Alpha. (SAC ¶ 56; SEAC ¶ 87) Plaintiffs allege that DI and DHI restated their financial statements to eliminate at least $290 million in cash flow from operations and $79 million of purported tax savings, which reduced DI's and DHI's 2001 net income by 12%. (SAC ¶ 69; SEAC ¶¶ 286)
2. Olis Trial
On June 10, 2003, a federal grand jury returned a six-count indictment arising from Project Alpha that charged three Dynegy executives, Jamie Olis, Gene Shannon Foster, and Helen Christine Sharkey, with conspiracy to commit securities fraud, mail fraud, and wire fraud. In August of 2003 Foster and Sharkey pleaded guilty to conspiracy. In November of 2003 Olis was tried and convicted. (SEAC ¶ 120)
The government charged that Project Alpha was funded with loans that required full repayment, and that Foster, Olis, Sharkey and others concealed from Dynegy's auditor, Arthur Andersen (Andersen), hedging transactions and other "tear-up" agreements designed by Citigroup to eliminate the lenders' risk. Plaintiffs allege *821 that the 100% hedging strategy and "tear-up" agreements structured and executed by Citigroup violated GAAP and, if revealed, would have demonstrated that the transaction had no equity interest or economic substance. Plaintiffs allege that Foster testified at the Olis trail that "[t]he Dynegy co-conspirators ... included [himself] Olis, Sharkey, Tammy Norman ("Norman"), Richard Gould ("Gould"), Wendy Ho ("Ho"), and "CFO Doty." (SEAC ¶ 130) Plaintiffs allege that
Sharkey was a member of Dynegy's Project Alpha team who worked with Andersen to determine the accounting for the transaction and `worked with us to conceal the documents from Arthur Andersen. She actively did that.' [11/11/03 Trial Transcript at 94] Norman dealt with gas purchases, and gas sales on a regular basis. Gould, in the finance department, was responsible for dealing with the banks on Project Alpha and Ho was an in-house counsel who helped draft documents. Id. at 95. Foster told the jury that, ultimately, Project Alpha was CFO Doty's project  Foster reported to Doty, and Olis reported to Foster. Id. at 96.
(SEAC ¶ 130) Plaintiffs allege that
Foster identified the team from Dynegy that participated in the Project Alpha closing session in New York City beginning on March 12, 2001, at the offices of Citigroup's lawyers, Milbank, Tweed, Hadley & McCloy LLP ("Milbank Tweed"): Foster, Olis, Sharkey, Norman, Gould, Ho, and David Roth ("Roth").
(SEAC ¶ 138) Plaintiffs allege that Foster identified the primary equity investors as Deutsche Bank and CSFB, and admitted that "guaranteeing the so-called `equity investors' would get their money back whey they were supposed to invest equity at risk" posed a problem. (SEAC ¶ 139)
Foster testified that he understood that the lenders who put up the bulk of the money in the transaction were going to get an interest return that would be charged against operating margin of the company because the transaction was structured to look like a gas contract... [and] that in the final analysis, hedging and "tear-up" provisions in Project Alpha protected the `equity' investors completely  the equity investors did not have their investment at risk and they were still going to get a premium return for their money, which was described as an `equity' investment nonetheless.
(SEAC ¶ 140) Foster testified that the tear-up provisions were put in amendments that were not given to Andersen (SEAC ¶ 141), that he and Olis informed Doty about the need to hide documents from Andersen (SEAC ¶ 142), and that he, Olis, Sharkey, and Gould worked to limit distribution of the documentation showing that Citigroup and Deutsche Bank had structured and executed impermissible transactions outside the Project Alpha transaction and the purview of Andersen's scrutiny. (SEAC ¶ 144)
C. Improper Accounting Practices
In the 1933 Act Complaint plaintiffs allege that the Companies admitted that during the class period they had
(a) misaccounted for natural gas contracts by failing to reconcile them on a quarterly basis once estimates were found to be incorrect; (b) misaccounted for forward-power contracts by using an unreliable method to calculate income from trades; (c) improperly classified capital leases as operating leases to understate debt and depreciation expense; (d) improperly accounted for implied dividends in a transaction with its largest shareholder (Dynegy); (e) failed to record impairment of an investment on a *822 timely basis; (f) improperly accounted for income taxes; and (g) improperly accounted for acquisitions, thereby overstating income.
(SAC ¶ 5; SEAC ¶ 13) In the 1934 Act Complaint plaintiffs allege that Dynegy falsely portrayed the success of its natural gas and power business by (1) falsely inflating its gas trading volume and revenues with round-trip trades and manipulation of its electronic trading system to double- and triple-count gas and power trades, (2) creating bogus trades, (3) doctoring its trading books to hide losses, and (4) manipulating forward-price curves to falsely increase income. (SEAC ¶ 89) Plaintiffs allege that the fact that DI and DHI restated their financial statements for 1999, 2000, 2001, and 2002 is an admission that the financial statements originally issued were false and that the overstatement of revenues and income was material. (SAC ¶ 93; SEAC ¶¶ 7, 314)
1. Natural Gas Contracts
Plaintiffs allege that DI and DHI overestimated earnings by $125 million from 1998-2002 by improperly estimating the value of natural gas contracts. (SAC ¶ 79; SEAC ¶¶ 90-92) Plaintiffs allege that this overestimate is exemplified by an overstatement of $7 million in DHI's Form 10-Q for the third quarter of 2000, which was incorporated into the registration statement for the March 15, 2001, offering of debt securities. (SAC ¶ 79) Plaintiffs allege that these overestimates were not disclosed until November 14, 2002, when DI and DHI filed their third quarter 2002 Forms 10-Q, which included an after-tax charge of approximately $80 million ($124 million pre-tax) related to their natural gas marketing business. (SAC ¶ 81; SEAC ¶¶ 296-298)
2. Forward Power Contracts
Plaintiffs allege that DI and DHI overestimated earnings by $94 million in 2001 by using their own proprietary model to account for forward power contracts. (SAC ¶ 82; SEAC ¶¶ 91, 99-106) Plaintiffs allege that the proprietary model ("Genesis") was created "to predict forward-price curves, based on economic inputs that considered power-plant constraints, as well as volatility or mergers and acquisitions data." (SEAC ¶ 105) Plaintiffs allege that Dynegy's "use of forward-price curve models, in conjunction with mark-to-market accounting, was a recipe to manufacture earnings." (SEAC ¶ 103) Plaintiffs allege that the economic factors in Dynegy's forward-price curve were "knobs and dials" created to meet "whatever predetermined deal outcome was required." (SEAC ¶ 106) Plaintiffs allege that in the amended 2001 Form 10-K filed on April 11, 2003, DI admitted that beginning in the third-quarter of 2001 its prior forward power curve methodology failed to appropriately reflect the value of its long-term power contracts. (SAC ¶ 83) Plaintiffs allege that DI and DHI reduced income by $25 million in the quarter ended September 30, 2001, and by $69 million in the quarter ended December 31, 2001, based on these improprieties and that the false Forms 10-Q for the third-quarter of 2001 were incorporated into DHI's offering of debt securities on February 15, 2002. (SAC ¶ 84)
3. Gas Trading Volume
Plaintiffs allege that Dynegy falsely inflated its gas trading volume and revenues by round-trip trading and manipulating the electronic trading system to double- and triple-count gas and power trades. (SEAC ¶¶ 94, 109) Plaintiffs allege that during 2000 the creator of a management reporting system called the "Executive Dashboard," which was designed, inter alia, to incorporate all reported trades between Dynegy's business *823 units, discovered that Dynegy was double- and triple-counting gas and energy deal counts, trade volumes, and values and that Dynegy's Abacus program was duplicating intra-company trades, and triple-counting trades involving Canadian operations. (SAC ¶ 57; SEAC ¶ 109) Plaintiffs allege that the double- and triple-counted trades materially inflated the value of transactions reported for Dynegydirect, an internet-based, commission-free business-to-business trading site for energy and communications commodities, and that Dynegy's 2001 10-K form falsely stated that it included "immaterial amounts of inter-affiliate gas sales." (SEAC ¶ 111)
Plaintiffs allege that on November 15, 2001, Dynegy entered into two round-trip trades of electricity with CMS Energy Corporation ("CMS"), on Dynegydirect. (SEAC ¶ 94) Plaintiffs allege that the round-trip trades in which Dynegy simultaneously bought and sold power at the same price, terms, and volume, resulted in neither profit nor loss to either transacting party, but instead involved the simultaneous purchase and sale of electricity. Plaintiffs allege that in its fourth-quarter 2001 earnings release DI reported $13 billion in trading value of which $1.7 billion was attributable to the two round-trip trades. Plaintiffs allege that in its first quarter 2002 earnings release DI reported 89.7 million MWH hours of electricity traded of which approximately 5 million MWH hours were the product of round-trip trades. In that same press release DI improperly reported $236 million in revenue from the round-trip trades. (SEAC ¶ 95) Plaintiffs allege that when in April of 2002 the market questioned Dynegy and its officers about the round-trip trades, Bergstrom falsely attributed the trades to stress testing. (SEAC ¶¶ 96-98)
4. Trading Losses
Plaintiffs allege that Dynegy improperly accounted for losses by declaring trading losses as hedges after the losses occurred. (SEAC ¶¶ 107-108) Plaintiffs allege that this "book doctoring" occurred in February of 2001 when Dynegy executives became aware that 10 trades had resulted in a loss of $2 million, but the reported loss was reduced to $500,000 by classifying the trades as hedges. (SEAC ¶ 108)
D. Debt and Securities Offerings
Plaintiffs allege that Dynegy's market manipulations caused credit-rating agencies to rate Dynegy favorably, and that Dynegy's favorable credit rating caused its stock price to rise from $10 per share in early 2000 to over $50 per share in late 2000 and, even in the wake of a declining market, to remain above $40 per share for most of 2001. (SEAC ¶ 116) Plaintiffs allege that while Dynegy stock was inflated DI and DHI raised close to three billion dollars through the following offerings (SEAC ¶ 116):

----------------------------------------------------------------
 Offering Date Proceeds
----------------------------------------------------------------
Debt Offering 3/2000 $300 million
----------------------------------------------------------------
Secondary Stock Offering 4/2000 $467.5 million
----------------------------------------------------------------
Secondary Stock Offering 10/2000 $528.8 million
----------------------------------------------------------------
Debt Offering 3/15/2001 $500 million
----------------------------------------------------------------
Secondary Stock Offering 12/20/2001 $518.75 million
----------------------------------------------------------------
Debt Offering 2/15/2002 $500 million
----------------------------------------------------------------

Plaintiffs' 1933 Act claims arise from the offerings made in 2001 and 2002.
E. Disclosures
1. December of 2001
The December 4, 2001, Wall Street Journal examined the importance of energy companies' cash flow from operations and questioned the quality of Dynegy's earnings by noting that unrealized gains accounted for nearly half of its pretax *824 profit in 1999 and 2000. (SEAC ¶¶ 218, 244-248)
2. March of 2002
On March 13, 2002, DI filed its 2001 first-quarter Form 10-K that disclosed Black Thunder's debt ratings trigger. (SAC ¶ 47; SEAC ¶¶ 51, 242) On March 22, 2002, DHI filed its 2001 Form 10-K, which contained similar disclosures about Black Thunder, including that DI and DHI were obligated to create a $270 million sinking fund and that a cash flow trigger could cost them an additional $60 million. (SAC ¶ 47; SEAC ¶ 51) Plaintiffs allege that these filings "still neglected to portray [DI] and [DHI] as obligated to repay the $850 million borrowed, only that they have an `option' to acquire the `investor's interest.'" (SAC ¶ 47; SEAC ¶ 51)
3. April of 2002
The April 3, 2002, Wall Street Journal questioned Project Alpha. (SAC ¶ 142; SEAC ¶ 244) On April 25, 2002, DI and DHI issued a press release announcing that they would file 8-K forms to disclose a change in the presentation of cash flow associated with a natural gas supply transaction (Project Alpha), and that the transaction would be the subject of an informal review by the SEC. (SEAC ¶¶ 251-252) On April 26, 2002, the first of twenty-eight actions now consolidated in this action was filed (Docket Entry No. 1).
4. May of 2002
On May 7, 2002, The Wall Street Journal named Dynegy as a company identified by internal Enron memoranda as having mimicked Enron's practice of manipulating energy trades. (SEAC ¶ 261) On May 14, 2002, The New York Times described the Black Thunder transaction as a financing. (SAC ¶ 150; SEAC ¶ 263) On May 15, 2002, DI filed its 2002 first-quarter Form 10-Q, which contained information about Black Thunder but continued to refer to DI's option instead of obligation to pay off the Black Thunder debt. (SAC ¶ 151; SEAC ¶ 54)
5. July of 2002
On July 23, 2002, the Companies issued a press release announcing that cash flow from operations would be 30%-40% lower than prior estimates and canceling a bond sale. (SEAC ¶ 270) DI stock dropped 60% in one day from $3.38 to as low as $0.84 before closing at $1.23. (SAC ¶ 3; SEAC ¶ 271)
6. August of 2002
In August of 2002 the Companies filed 2002 second-quarter Forms 10-Q in which they disclosed that the Black Thunder transaction had been amended in June of 2002 to include mortgages on Dynegy's Illinova power generation assets. The amendment caused the transaction to be reclassified as debt instead of equity. (SAC ¶ 50; SEAC ¶ 56)
7. February through May of 2003
In February of 2003 DI amended its 2001 Form 10-K to disclose additional features of Black Thunder. DHI made the same disclosures in an amended 2001 Form 10-K filed in April of 2003. (SAC ¶ 48; SEAC ¶ 52) In May of 2003 DI and DHI filed second amended second quarter 2002 Forms 10-Q in which references to an optional June 2005 due date for the Black Thunder loan were changed to reflect a firm June 2005 due date. (SAC ¶ 51; SEAC ¶ 57) Plaintiffs allege that these and other disclosures made in DI's 2002 Form 10-K show that Black Thunder was debt from the outset and that its original presentation as equity was untrue. (SAC ¶ 52)

*825 IV. Claims Asserted Under the 1933 Securities Act

Lead Plaintiff's claims for violation of the 1933 Act are brought on behalf of purchasers of publicly traded equity and debt securities for violation of §§ 11 and 15 codified at 15 U.S.C. §§ 77k and 77o, during a proposed class period beginning on March 15, 2001, and ending on July 22, 2002, against DI and DHI (together "the Companies"), Charles L. Watson, Robert D. Doty, Stephen W. Bergstrom, Michael R. Mott, and Kenneth E. Randolph (together "the 1933 Act Individual Defendants"), Charles E. Bayless, Darald W. Callahan, Michael D. Capellas, Daniel L. Dienstbier, Jerry L. Johnson, George L. Kirkland, Richard H. Matzke, H. John Riley, Jr., Sheli Z. Rosenberg, Joe J. Stewart, and J. Otis Winters (together "the Director Defendants"), outside accountant and auditor, Arthur Andersen LLP (Andersen), and Lehman Brothers Inc., Lehman Brothers Holding Inc., Merrill, Lynch, Pierce, Fenner & Smith, Inc., and Merrill Lynch & Co., Inc. ABN AMRO Inc., ABN AMRO Holding N.V., ABN AMRO Bank N.V., Banc One Capital Markets, Inc., Bank One Corp., Bank of America Securities LLC, Bank of America Corp., Commerzbank Capital Markets Corp., Commerzbank AG, Crédit Lyonnais Securities (USA), Inc., Credit Lyonnais, Credit Suisse First Boston LLC (CSFB, formerly known as Credit Suisse First Boston Corp.), The Royal Bank of Scotland plc, The Royal Bank of Scotland Group, SG Cowen Securities Corp., Société Générale Group, TD Securities (USA) Inc., TD Bank Financial Group, and WestLB AG (formerly known as Westdeutsche Landesbank Girozentrale) (together "the Underwriting and Related Defendants"). Lead Plaintiff's claims for violation of the 1933 Act arise from the Companies' alleged false statements about their finances and operating performance that were incorporated into the registration statements underlying DI's offering of Class A Common Stock on December 20, 2001, and DHI's offering of debt securities on March 15, 2001, and February 15, 2002. (SAC ¶¶ 1, 131, 164)
A. Applicable Law
1. Section 11
"Section 11 of the 1933 Act allows purchasers of a registered security to sue certain enumerated parties in a registered offering when false or misleading information is included in a registration statement."[4]Herman & MacLean v. Huddleston, *826 459 U.S. 375, 103 S.Ct. 683, 687, 74 L.Ed.2d 548 (1983). In Herman & MacLean, 103 S.Ct. at 687, the Court explained that § 11
was designed to assure compliance with the disclosure provisions of the [Securities] Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering. If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case. Liability against the issuer of a security is virtually absolute, even for innocent misstatements.
(a) Elements of a § 11 Claim
The elements of a claim under § 11 are: (1) an omission or misstatement, (2) of a material fact required to be stated or necessary to make other statements made not misleading. Krim v. BancTexas Group, Inc., 989 F.2d 1435, 1445 (5th Cir.1993). "A `material' fact is one which a reasonable investor would consider significant in the decision whether to invest, such that it alters the `total mix' of information available about the proposed investment." Id.See also Kapps v. Torch Offshore, Inc., 379 F.3d 207, 213-214 (5th Cir.2004) ("A fact is material `if there is a substantial likelihood that a reasonable shareholder would consider it important' in making an investment decision.") (quoting Basic Inc. v. Levinson, 485 U.S. 224, 108 S.Ct. 978, 983, 985, 99 L.Ed.2d 194 (1988)). Actual knowledge of falsity is not an element of a § 11 claim, and the § 11 plaintiff generally does not have to establish scienter.[5]Herman & MacLean, 103 S.Ct. at 687 (citing Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 1388, 47 L.Ed.2d 668 (1976)).
(b) Statute of Limitations
The statute of limitations for § 11 actions is provided by § 13 of the 1933 Act, 15 U.S.C. § 77m. Section 13 states that
[n]o action shall be maintained to enforce any liability created under section 77k [§ 11] ... of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence... In no event shall any such action be brought to enforce a liability created under section 77k ... of this title more than three years after the security was bona fide offered to the public.
15 U.S.C. § 77m. Under § 13 the limitations period begins to run when the plaintiff has actual knowledge of the facts giving rise to his claims or has notice of facts that in the exercise of reasonable diligence should have led to such knowledge. See Topalian v. Ehrman, 954 F.2d 1125, 1133 (5th Cir.), cert. denied, 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992) ("The controlling date for purposes of the running of the respective statutes of limitations is when a purchaser of securities knew  or in the exercise of reasonable diligence, should have known  of the alleged wrongdoing."). See also Jensen v. Snellings, 841 F.2d 600, 606 (5th Cir.1988) ("[u]nder federal law, the limitations period commences *827 when `the aggrieved party has either knowledge of the violation or notice of facts which, in the exercise of due diligence, would have led to actual knowledge,' thereof") (quoting Vigman v. Community National Bank & Trust Co., 635 F.2d 455, 459 (5th Cir.1981)).
(c) Affirmative Defenses
All defendants may assert affirmative defenses based on limitations, § 13, 15 U.S.C. § 77m, and proof that defendants' misconduct did not cause the investors' loss, § 11(e), 15 U.S.C. § 77k(e). All defendants except an issuer may assert certain statutorily recognized affirmative defenses, i.e., (1) the person conducted a reasonable investigation, § 11(b)(3)(A)-(B)(the due diligence defense), 15 U.S.C. § 77k(b)(3)(A)-(B); and (2) the person reasonably relied on the opinion of an expert, § 11(b)(3)(C), 15 U.S.C. § 77k(b)(3)(C). Defendants bear the burden of proof for affirmative defenses. See Fed.R.Civ.P. 8(c), and 15 U.S.C. 77k(b). Affirmative defenses may support dismissal under Rule 12(b)(6) where facts alleged in plaintiffs' complaint clearly establish that the action is barred. See Jones, 339 F.3d at 366 (recognizing that certain affirmative defenses that clearly appear on the face of the plaintiff's complaint  most commonly that the limitations period has run  may properly be asserted in a Rule 12(b)(6)) motion to dismiss; Kansa, 20 F.3d at 1366-1370 (same).
(d) Pleading Standards
When § 11 claims are grounded in negligence and not in fraud there is no scienter requirement, and the plaintiff need only satisfy the liberal pleading requirements of Rule 8(a). See Lone Star Ladies Inv. Club v. Schlotzsky's Inc., 238 F.3d 363, 368 (5th Cir.2001). See also Kapps, 379 F.3d at 210. When § 11 claims sound in fraud instead of negligence, the plaintiff is required to plead the circumstances constituting the alleged fraud with particularity to satisfy Rule 9(b). See Melder v. Morris, 27 F.3d 1097, 1100 n. 6 (5th Cir.1994).[6]
Lead Plaintiff's 1933 claims are "solely strict liability and negligence claims." (SAC ¶ 1) "Plaintiffs do not assert that defendants are liable for fraudulent or intentional conduct and disavow and disclaim any allegation of fraud." (SAC ¶ 163) Because Lead Plaintiff has alleged that the § 11 claims asserted in this action sound only in strict liability and negligence, they are only subject to the notice pleading standard of Rule 8(a), which "substitute [d] the requirement of `a short and plain statement of the claim showing that the pleader is entitled to relief' for the technical formula, such as `facts constituting a cause of action,' which typified the preexisting codes." Heimann v. National Elevator Industry Pension Fund, 187 F.3d 493, 509 (5th Cir.1999), overruled on other grounds by Arana v. Ochsner Health Plan, 338 F.3d 433 (5th Cir.2003), cert. denied, ___ U.S. ___, 124 S.Ct. 1044, 157 L.Ed.2d 889 (2004). See also Swierkiewicz, 122 S.Ct. at 998 (Rule 8 is a simplified notice pleading standard that applies to all civil actions with limited exceptions, i.e., those enumerated in Rule 9(b), and requires only a *828 statement that gives "the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."). "However, mere conclusory allegations will not suffice to prevent a motion to dismiss." Kapps, 379 F.3d at 210 (citing Kane Enterprises v. MacGregor (USA) Inc., 322 F.3d 371, 374 (5th Cir.2003) (asserting that a plaintiff must plead specific facts not mere conclusions)).
2. Section 15
Section 15 of the Securities Act defines controlling person liability. It provides that
Every person who, by or through stock ownership, agency, or otherwise ... controls any person liable under section[ ] 77k ... shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.
15 U.S.C. § 77o. "The term `control' means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. Although worded differently, the control person liability provisions of § 15 of the 1933 Act and § 20(a) of the 1934 Act are interpreted in the same manner. See Abbott v. Equity Group, Inc., 2 F.3d 613, 619 n. 15 (5th Cir.1993), cert. denied sub nom. Turnbull v. Home Insurance Co., 510 U.S. 1177, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994).
(a) Elements of a § 15 Claim
To state a claim for control person liability a plaintiff must allege that a primary violation was committed and that the defendant directly or indirectly controlled the violator. See Kapps, 379 F.3d at 221 (citing Klein v. General Nutrition Companies, Inc., 186 F.3d 338, 344 (3d Cir.1999)). Control can be established by demonstrating that the defendant possessed the power to direct or cause the direction of the management and policies of ... a person through ownership of voting securities, by contract, business relationships, interlocking directors, family relations, or the power to influence and control the activities of another. See Ellison v. American Image Motor Co. Inc., 36 F.Supp.2d 628, 638-639 (S.D.N.Y.1999) (applying same test to 1933 Securities Act § 15 claims and 1934 Exchange Act § 20(a) claims, 15 U.S.C. § 78t(a)). In this circuit plaintiffs need not allege that the controlling person actually participated in the underlying primary violation to state claim for control person liability. See G.A. Thompson & Co. Inc. v. Partridge, 636 F.2d 945, 958 (5th Cir.1981) (rejecting as a requirement for a prima facie case an allegation that the controlling person actually participated in the underlying primary violation). Nevertheless, a plaintiff needs to allege some facts beyond a defendant's position or title that show the defendant had actual power or control over the controlled person. Dennis v. General Imaging, Inc., 918 F.2d 496, 509-510 (5th Cir.1990).
(b) Affirmative Defenses
Good faith constitutes an affirmative defense for one charged with controlling person liability. See 15 U.S.C. § 77o (liability under § 15 attaches unless "the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist"). The plaintiff bears the burden of establishing control, and the defendant bears the *829 burden of establishing good faith. Thompson, 636 F.2d at 958 & n. 23.
B. Factual Allegations Specific to 1933 Securities Act Claims
Lead Plaintiff alleges that the registration statements for DI's offering of Class A Common Stock on December 20, 2001, and DHI's offering of debt securities on March 15, 2001, and February 15, 2002, violate the 1933 Act because they incorporate the Companies' false financial statements for 1999-2001. (SAC ¶¶ 1, 131) Lead Plaintiff alleges that the Companies' financial statements for 1999-2001 were false because they understated debt and taxes, overstated net income, earnings per share, and cash flows from operations, and assert that they were prepared in accordance with GAAP and SEC rules when, in fact, they were not. (SAC ¶¶ 1, 4-6, 59-63, 109) Lead Plaintiff alleges that the Companies' financial statements for 1999-2001 omitted material facts about the Black Thunder and Project Alpha transactions, and Dynegy's energy trading business that, if disclosed, would have revealed that the financial statements overstated income and understated debt and taxes. (SAC ¶ 165) Because both DI and DHI have amended their financial statements for 1999-2001 to correct material misstatements and omissions, Lead Plaintiff alleges that both companies have admitted that their financial statements for 1999-2001 that were incorporated into the challenged registration statements contained false statements and omissions of fact that were material. (SAC ¶ 93) Lead Plaintiff alleges that each of the representative plaintiffs and the class members purchased securities traceable to a false and misleading registration statement and suffered substantial damages as a result of their purchases. (SAC ¶ 173)
1. Registration Statement for DHI 6.875% Notes[7]
Lead Plaintiff alleges that proposed Class Representative Hawaii Ironworkers Annuity Trust Fund (Hawaii Ironworkers) "purchased $220,000 par value of Dynegy Holdings' 6.875% Notes due April 1, 2011, as reflected in the Certification previously filed in this action, and that it was damaged thereby."[8] (SAC ¶ 14) The Certification demonstrates that Hawaii Ironworkers purchased DHI notes on April 17, 2001, for $99.76 each and sold them a month later, on May 16, 2001, for $97.56 each.[9]
(a) Factual Particulars
Lead Plaintiff alleges that the 6.875% notes were issued pursuant to a registration statement dated September 26, 2000 (SAC ¶ 131), signed by Bergstrom, Doty, Randolph, and Watson (SAC ¶ 164).[10] Lead Plaintiff alleges that the offering date was March 15, 2001, the underwriters were Lehman Brothers Inc., ABN AMRO Inc., Commerzbank Capital Markets Corp., CSFB, and Merrill Lynch, and that the controlling underwriters were Lehman Brothers Holding, Inc., ABN AMRO Holding N.V., ABN AMRO Bank N.V., Commerzbank AG, CSFB, and Merrill Lynch & Co., Inc. (SAC ¶ 164)
*830 (b) Misstatements and Omissions
Lead Plaintiff alleges generally that the registration statement for DHI's 6.875% notes was "false and misleading ... [because it] omitted to state facts necessary to make the statements made not misleading and failed to adequately disclose material facts." (SAC ¶ 165) Lead Plaintiff alleges specifically that the registration statement for the 6.875% notes contained false statements and omissions of material fact because it incorporated the Companies' 1999 Forms 10-K (SAC ¶ 131), as well as their first(SAC ¶ 131) and second(SAC ¶ 46) quarter 2000 Forms 10-Q (SAC ¶ 46). Lead Plaintiff also alleges that this registration statement incorporated by reference all documents filed pursuant to § 13(a) of the Exchange Act prior to the offering (SAC ¶ 133), including the Companies' third-quarter 2000 Forms 10-Q (SAC ¶¶ 79, 131) and 2000 Forms 10-K (SAC ¶ 46) because these forms were filed prior to the March 15, 2001, offering.
Lead Plaintiff alleges that DHI's 1999 Form 10-K overstated net income by $2 million due to improper accounting for tax matters (SAC ¶¶ 89-90), and by $19 million due to various accounting misstatements (SAC ¶ 91). Lead Plaintiff alleges that DHI's third-quarter 2000 Form 10-Q overstated net income by $7 million due to improper accounting for natural gas contracts (SAC ¶ 79). Lead Plaintiff alleges that DHI's 2000 Form 10-K overstated net income by $48 million (SAC ¶ 134),[11] $2 million of which is attributable to improper accounting for tax matters (SAC ¶¶ 89-90), understated liabilities by $1 billion, understated liabilities from risk management activities by $1.2 billion (SAC ¶ 134), omitted key terms of the Black Thunder transaction, including triggers that could, and ultimately did, cause DHI to put up cash collateral of $270 million (SAC ¶¶ 46, 134), and repeated errors stated in DHI's 1999 Form 10-K (SAC ¶ 91) that resulted in an overstatement of net income for 1999 of $15 million (SAC ¶ 134).[12]
2. Registration Statement Offer for DI Common Stock
Lead Plaintiff alleges that proposed class representative, The Regents of the University of California (The Regents)
purchased more than four million shares of Dynegy's common stock during the Class Period, including 50,000 shares purchased in the December 20, 2001 offering of Dynegy stock, on December 20, 2001, at offering price of $20.75 per share, as described in the Certification previously filed in this action and was damaged thereby.[13]
(SAC ¶ 12) The Amended Certification filed by Lead Plaintiff on July 20, 2004, states that The Regents made additional purchases of DI common stock on May 6 and May 7, 2002, and sold all of its DI common stock between May 21 and June 28, 2002.[14]
*831 (a) Factual Particulars
Lead Plaintiff alleges that the DI Class A common stock that it purchased on December 20, 2001, was offered pursuant to a registration statement dated July 27, 2001 (SAC ¶ 131), for which the responsible individuals were officers Bergstrom, Doty, Mott, and Watson, and outside directors, Bayless, Winters, Dienstbier, Kirkland, Callahan, Matzke, Capellas, Johnson, Riley, Rosenberg, and Stewart (SAC ¶ 164). Lead Plaintiff alleges that the offering date for the Class A Common Stock was December 20, 2001, the underwriter was Lehman Brothers Inc., and the controlling underwriter was Lehman Brothers Holding, Inc. (SAC ¶ 164)
(b) Misstatements and Omissions
Lead Plaintiff alleges generally that the registration statement was "false and misleading ... [because it] omitted to state facts necessary to make the statements made not misleading and failed to adequately disclose material facts." (SAC ¶ 165) Lead Plaintiff alleges specifically that the registration statement for the December 20, 2001, stock offering incorporated the Companies' 2000 Forms 10-K (SAC ¶ 131) as well as their first(SAC ¶ 131) and second(SAC ¶ 56) quarter 2001 Forms 10-Q. Lead Plaintiff also alleges that this registration statement incorporated by reference all documents filed pursuant to § 13(a) of the Exchange Act prior to the offering date, including the Companies' subsequently filed third-quarter 2001 Forms 10-Q because they were issued prior to the December 20, 2001, offering. (SAC ¶¶ 131, 133)[15]
Lead Plaintiff alleges that the Companies' 2000 Forms 10-K omitted key terms of the Black Thunder transaction (SAC ¶ 46), and overstated net income for DI by $12 million and for DHI by $2 million due to errors in accounting for tax matters (SAC ¶¶ 89-90). Lead Plaintiff alleges that the second-quarter 2001 Form 10-Q contained false statements about earnings and cash flow from operations due to improper accounting for Project Alpha (SAC ¶ 56), and that the third-quarter 2001 Form 10-Q overstated cash flow from operations for the nine months ended September 30, 2001, by $182 million due to improper accounting for Project Alpha (SAC ¶¶ 136-137).[16] Lead Plaintiff also alleges that "beginning with the third quarter 2001, ... [Dynegy's] prior forward power curve methodology failed to appropriately reflect the value of its long-term power contracts" (SAC ¶ 83), and that when in January of 2003 Dynegy corrected this methodology the correction "resulted in a $94 million ... reduction to previously reported 2001 net income." (SAC ¶ 83) Lead Plaintiff also alleges that DI's reported earnings for 2000 and 2001 would have been materially lower had DI correctly recorded impairments to its telecommunication assets and goodwill; impairments that were eventually reported in their 2002 Forms 10-K filed in April of 2003 when the write-off of $897 million in goodwill associated with the Wholesale Energy Network segment was announced (SAC ¶ 100).
3. Registration Statement for DHI *832 8.75% Notes[17]
Lead Plaintiff alleges that proposed Class Representative "West Virginia Investment Management Board (WVIMB) purchased $2,340,000 par value of Dynegy Holdings' 8.75% Notes due February 15, 2012, as reflected in the Certification previously filed in this action, and was damaged thereby."[18] (SAC ¶ 13) The Certification demonstrates that WVIMB purchased DHI notes on February 15, March 1, April 25, and April 29, 2002. [19]
(a) Factual Particulars
Lead Plaintiff alleges that the 8.75% notes were offered pursuant to a registration statement dated July 27, 2001 (SAC ¶ 131), signed by Bergstrom, Doty, Mott, Randolph, and Watson (SAC ¶ 164).[20] Lead Plaintiff alleges that the offering date was February 15, 2002, the underwriters were Banc of America Securities LLC, CSFB, ABN AMRO Inc., Banc One Capital Markets Inc., Commerzbank Capital Markets Corp., Credit Lyonnais Securities (USA) Inc., SG Cowen Securities Corp., The Royal Bank of Scotland plc, TD Securities (USA) Inc., and Westdeutsche Landesbank Girozentrale (West LB AG), and the controlling underwriters were Bank of America Corp., ABN AMRO Holding N.V., ABN AMRO Bank N.V., Banc One Corp., Commerzbank AG, Credit Lyonnais, Société Générale Group, and The Royal Bank of Scotland Group plc. (SAC ¶ 164)
(b) Misstatements and Omissions
Lead Plaintiff alleges generally that the registration statement was "false and misleading as ... [it] omitted to state facts necessary to make the statements made not misleading and failed to adequately disclose material facts." (SAC ¶ 165) Because the registration statement for the DHI debt securities offered on February 15, 2002, bears the same date as the registration statement for the DI common stock offered on December 20, 2001, Lead Plaintiff's specific allegations concerning the false statements and omissions incorporated in the registration statement for the 8.75% notes, and the reasons for their falsity, are identical to those asserted in relation to the registration statement for the common stock offered on December 20, 2001. [21]
C. Defendants' Motions to Dismiss § 11 Claims
Defendants argue that the claims alleged in the 1933 Act Complaint should be dismissed under Rule 12(b)(6) because Lead Plaintiff failed to file the certification *833 required by § 27, 15 U.S.C. § 77z-1, because Lead Plaintiff failed to plead compliance with the statute of limitations, § 13, 15 U.S.C. § 77m, and because the facts pleaded in the 1933 Act Complaint establish that plaintiffs' claims are barred by limitations, that plaintiffs' claims are subject to the negative causation defense, and that the non-issuer defendants are entitled to one or more affirmative defenses.
1. Certification Requirement
Five defendants, Andersen, Lehman Brothers, Inc. and Lehman Brothers Holdings, Inc. (Lehman entities), Merrill Lynch, Pierce, Fenner & Smith Inc., and Merrill Lynch & Co., Inc. (Merrill Lynch entities), argue that the § 11 claims asserted against them should be dismissed because Lead Plaintiff did not file a certification as required by § 27 of the 1933 Act, 15 U.S.C. § 77z-1.[22] Section 27 requires "[e]ach plaintiff seeking to serve as a representative party on behalf of a class" to "provide a sworn certification, which shall be personally signed by such plaintiff and filed with the complaint" that states among other things "the plaintiff has reviewed the complaint and authorized its filing," and set forth "all of the transactions of the plaintiff in the security that is the subject of the complaint during the class period specified in the complaint." 15 U.S.C. § 77z-1(a)(2)(A)(i) and (iv). Section 21D of the 1934 Act, 15 U.S.C. § 78u-4, contains an identical requirement for securities fraud claims.
Citing In re Eaton Vance Corp. Sec. Litig., 219 F.R.D. 38 (D.Mass.2003), Andersen, the Lehman entities, and the Merrill Lynch entities argue that the § 11 claims arising from the offering of DI common stock should be dismissed because Lead Plaintiff, the only plaintiff with standing to assert those claims, has not filed a certification as required by § 27. Defendants argue that although Lead Plaintiff filed a certification in satisfaction of § 21D of the 1934 Act together with the complaint that it filed in Civil Action H-02-2374 on June 25, 2002, in which it asserted 1934 Act claims against other defendants (i.e., DI, Watson, Doty, and Bergstrom), Lead Plaintiff failed to file a certification in satisfaction of § 27 together with the Consolidated Complaint that it filed in this action on June 6, 2003 (Docket Entry No. 112), or either of the two First Amended Consolidated Complaints that were filed on January 30, 2004 (Docket Entry Nos. 315 and 316). These defendants argue that because the certification filed with the 2002 complaint states only that Lead Plaintiff reviewed the 1934 Act claims asserted therein against other parties, that certification "cannot possibly serve as a certification for a Securities Act complaint filed against Andersen [and other previously unnamed defendants] almost two years later [in this action]."[23]
On July 20, 2004, Lead Plaintiff filed amended certifications for both its 1933 and 1934 Act complaints.[24] In relevant part the amended certification states, "[p]laintiff reviewed the First Amended Consolidated Complaint for Violations of the Securities Act of 1933 filed in In re *834 Dynegy Inc. Sec. Litig., No. H-02-1571 (S.D.Tex.) and authorized its filing."[25] Because Lead Plaintiff has now filed an amended certification, and because the defendants challenging Lead Plaintiff's failure to file an amended certification do not argue that they have been prejudiced by Lead Plaintiff's failure to file the certification earlier, the court concludes that the issue of whether the § 11 claims asserted against Andersen and the Lehman and Merrill Lynch entities should be dismissed because Lead Plaintiff failed to file an amended certification is moot.
2. Pleading Compliance with Statute of Limitations
The Companies and the 1933 Act Individual Defendants argue that Lead Plaintiff's allegations of compliance with § 13 are insufficient to state a claim arising from the registration statements challenged in this action because they do not allege when plaintiffs became aware of misstatements or omissions in those registration statements.[26] Then defendants assert that "[d]espite having devoted an eighteen-paragraph section of the [19]33 Act Complaint to purported compliance with the statute of limitations, [Lead] Plaintiff fails to plead the three required allegations,"[27]i.e.,
(1) the time and circumstances of the discovery of the fraudulent statement; (2) the reasons why it was not discovered earlier (if more than one year has lapsed); and (3) the diligent efforts which plaintiff undertook in making or seeking such discovery. [28]
These defendants assert that because compliance with § 13's statute of limitations is "`an essential substantive ingredient' of a Section 11 cause of action ... `not merely an affirmative defense to be raised by defendants,'"[29] compliance with § 13 must be affirmatively plead with specificity.[30] Lead Plaintiff responds that it has sufficiently alleged compliance with § 13 and that the defendants' argument that such pleadings are subject to a specific and demanding standard is based on authority that is not binding on this court.[31] The court agrees.
(a) Applicable Law
The cases cited by defendants that require plaintiffs to affirmatively plead facts showing compliance with the statute of limitations reason that compliance with § 13 is an essential element of the rights created under § 11. See, e.g., Auslender v. Energy Management Corp., 832 F.2d 354, 356 (6th Cir.1987) (1933 Act plaintiff filing suit more than one year after alleged misstatements were made must affirmatively *835 plead compliance with the statute of limitations); Davidson v. Wilson, 973 F.2d 1391, 1402 n. 8 (8th Cir.1992)("Because the timeliness requirement is substantive, a plaintiff must affirmatively plead facts indicating the action has been timely brought."); Toombs v. Leone, 777 F.2d 465, 468 (9th Cir.1985) ("In asserting a violation of [the Securities Act]... the plaintiff must affirmatively plead sufficient facts in his complaint to demonstrate conformity with the statute of limitations."); Steiner v. Southmark Corp., 734 F.Supp. 269, 278, clarified on other grounds, 739 F.Supp. 1087 (N.D.Tex.1990) ("Plaintiffs who sue on the basis of § 11 must allege compliance with § 13 as part of their claim."); McMerty v. Burtness, 72 F.R.D. 450, 453 (D.Minn.1976) (requiring affirmative pleading of compliance with limitations provision because limitation period for securities claims differs from "normal" limitation period, but asserting that remedy for failure to plead compliance is only dismissal without prejudice to amend).
Because Lead Plaintiff's 1933 claims are "solely strict liability and negligence claims" (SAC ¶ 1), and because "[p]laintiffs do not assert that defendants are liable for fraudulent or intentional conduct and disavow and disclaim any allegation of fraud" (SAC ¶ 163), the § 11 claims asserted in this action are subject to the notice pleading standard of Rule 8(a). Lone Star Ladies, 238 F.3d at 369 (averments that defendants made untrue statements of material facts and omitted to state material facts in violation of § 11 are not claims that sound in fraud and cannot be dismissed for failure to satisfy Rule 9(b)'s heightened pleading requirements); Kapps, 379 F.3d at 210, ("[§] 11 only requires notice pleading under Fed.R.Civ.P. 8 rather than the detailed pleading mandated by Fed.R.Civ.P. 9(b) or the [PSLRA]"); In re Electronic Data Systems Corp. "ERISA" Litigation, 305 F.Supp.2d 658, 677 (E.D.Tex.2004)(rejecting argument that plaintiffs failed to state a claim simply because they did not affirmatively plead compliance with the statute of limitations).
(b) Allegations of Compliance
Lead Plaintiff alleges that "[n]ot until July 2002 did the Companies disclose, and did plaintiffs who purchased Dynegy Holdings' notes become aware ... [that], Dynegy Holdings' financial condition and credit were seriously compromised." (SAC ¶ 139) Lead Plaintiff alleges that "[w]hile [it] became aware of its potential claims concerning its stock purchases sooner than July 2002,[32] the plaintiffs who purchased Dynegy Holdings' notes (and the class) could not have learned of their potential claims sooner, due to certain defendants' false and misleading statements." (SAC ¶ 142) Lead Plaintiff also alleges that it executed a tolling agreement with DI that states any action against it is deemed to have been commenced no later than March 24, 2003 (SAC ¶ 155), and that it executed tolling agreements with some of the Individual and Underwriting and Related Defendants that state any action against them is deemed to have commenced on dates no later than March 26, 2003. (SAC ¶ 154) Lead Plaintiff alleges that the tolling agreements were entered on behalf of it and the putative class and toll the applicable statutes of limitations (and similar *836 defenses) for any claim asserted in this litigation. (SAC ¶ 154)
(c) Analysis
The limitations period for 1933 Act claims is provided by § 13, 15 U.S.C. § 77m. Under § 13 the limitations period begins when the plaintiff has actual knowledge of the facts giving rise to his claims or has notice of facts that in the exercise of reasonable diligence should have led to such knowledge (inquiry notice). See Topalian, 954 F.2d at 1133; Jensen, 841 F.2d at 606.
(1) Debt Security Offerings
Defendants argue that Lead Plaintiff's allegations are insufficient to plead compliance with the statute of limitations for claims based on misrepresentations in the registration statements for DHI's debt security offerings because plaintiffs' allegation that they became aware that DHI's financial condition and debt were seriously compromised in July of 2002 does not allege when plaintiffs became aware of misstatements and omissions in the registration statements. The court disagrees because, as explained in Jensen, 841 F.2d at 606, the limitations period is triggered when plaintiffs become aware of facts forming the basis of their cause of action, not the existence of the cause of action itself.
When read as a whole the complaint makes clear that Lead Plaintiff alleges that plaintiffs did not discover facts forming the basis of the § 11 claims against DHI and those responsible for the registration statements issued for the DHI debt securities offered on March 15, 2001, and February 15, 2002, until July of 2002 when "Dynegy was forced to cancel a $325 million debt offering that was critical to its finances, and its stock plunged 60% overnight." (SAC ¶ 139)[33] The underlying facts are alleged in greater detail elsewhere in the complaint:
[o]n July 23, 2002, prior to the market opening, the Company admitted its 2002 cash flows from operations would be 30%-40% lower than prior estimates and it cancelled a bond sale. Dynegy's precarious financial situation had been exposed, and Dynegy Holdings' notes plummeted in value.
(SAC ¶ 3) Lead Plaintiff alleges that plaintiffs became aware of facts underlying the § 11 claims arising from DHI's debt security offerings on July 23, 2002, less than one year before Lead Plaintiff filed its Consolidated Complaint on June 6, 2003. The court concludes that these allegations are sufficient to plead compliance with the statute of limitations for claims arising from the registration statements for DHI's debt securities offered on March 15, 2001, and February 15, 2002, because they give defendants fair notice of what plaintiffs' claim for compliance is and the grounds on which it rests. See Swierkiewicz, 122 S.Ct. at 998.
(2) Stock Offering
Lead Plaintiff alleges that it became aware of its potential claims concerning its stock purchases sooner than July of 2002. (SAC ¶ 142) Lead Plaintiff also alleges that it executed a tolling agreement with DI that recognizes March 24, 2003, as the filing date for its Consolidated Complaint. (SAC ¶¶ 154-155) When the complaint is read as a whole these allegations make clear that Lead Plaintiff contends that it discovered facts giving rise to the 1933 Act claims arising from the registration *837 statement issued for DI's common stock offered on December 20, 2001, earlier than July of 2002 but not earlier than March 24, 2002, the date one year before the effective date of the tolling agreement entered with DI. (SAC ¶ 155) The court concludes that these allegations are sufficient to plead compliance with § 13 for the 1933 Act claims arising from the registration statement for DI's stock offering because they give defendants fair notice of what Lead Plaintiff's claim for compliance is and the grounds on which it rests. See Swierkiewicz, 122 S.Ct. at 998.
(d) Conclusions
Although defendants argue that it is "preposterous" to think that plaintiffs could have become aware of claims based on the registration statements issued for DI's offering of common stock and DHI's offering of debt securities at different times, i.e., July of 2002 for the DHI-related registration statements and "sooner than July of 2002" for the DI-related registration statement, the court is not persuaded that this allegation is necessarily "preposterous." As the defendants themselves argue, DI and DHI are individual corporate entities and distinct registered issuers with the SEC.[34] Because the offerings all occurred on different dates, each registration statement is alleged to have incorporated different sets of allegedly false financial statements. For example, as defendants recognize, the registration statement for the DHI debt securities offered on March 15, 2001, could not have incorporated false statements and omissions about Project Alpha because Project Alpha was not consummated until after that offering occurred. [35] Because the court has concluded that Lead Plaintiff has sufficiently pleaded compliance with the statute of limitations for all three of the registration statements challenged in this action, the motions urged by the Companies and the 1933 Act Individual Defendants to dismiss on grounds that Lead Plaintiff has not sufficiently pleaded compliance with the statute of limitations will be denied.
3. Limitations Bar
The Companies,[36] the 1933 Act Individual Defendants, [37] the Director Defendants,[38] *838 Andersen, [39] and the Underwriting and Related Defendants,[40] press a number of arguments, some in common, many not, why the § 11 claims asserted against them are barred by limitations. Generally, they argue that the facts pleaded in the 1933 Act Complaint establish that plaintiffs were on inquiry notice of the § 11 claims for more than a year before June 6, 2003, the filing date of the Consolidated Complaint (Docket Entry No. 112).[41] Defendants also argue that plaintiffs' reliance
on certain tolling agreements does not overcome the limitations bar given that (i) the agreements are inapplicable to Dynegy Holdings and Dynegy Holdings' debt offerings, and (ii) the statute of limitations as to all three challenged offerings had run before the tolling agreements became effective.[42]
Lead Plaintiff responds that limitations is not properly asserted under Rule 12(b)(6), that the 1933 Act claims asserted against defendants named in its original complaint relate back to that complaint, and that the § 11 claims asserted against defendants not named in its original complaint are not barred by limitations.[43]
(a) Assertion of Limitations in Motion to Dismiss
Citing Rule 8(c) and United States v. Retirement Services Group, 302 F.3d 425, 430 (5th Cir.2002), Lead Plaintiff argues that limitations is an affirmative defense that defendants must plead and prove. See Fed.R.Civ.P. 8(c) ("Affirmative Defenses. In pleading to a preceding pleading, a party shall set forth affirmatively ... statute of limitations."). In Retirement Services the court stated that "[a] *839 statute of limitations defense is an affirmative defense, Fed.R.Civ.P. 8(c), and thus the burden [is] on the [defendants] to create a genuine issue of material fact regarding when [the plaintiff] had sufficient knowledge to start the limitations period running." 302 F.3d at 430. See also Jensen, 841 F.2d at 606 (recognizing assertion of limitations bar to federal securities claim as affirmative defense for which defendants bear the burden of proof). Nevertheless, the law in this circuit has long been that limitations may support dismissal under Rule 12(b)(6) where it is evident from the pleadings that the action is barred and the pleadings fail to raise a basis for tolling. Jones, 339 F.3d at 366, Kansa, 20 F.3d at 1366-1370.
(b) Relation Back
Lead Plaintiff argues that the 1933 Act claims asserted against defendants named in its original complaint and against DHI are not barred by limitations because they relate back to the date on which Lead Plaintiff filed its original complaint. [44]
(1) Applicable Law
Relation back of amendments is governed by Federal Rule of Civil Procedure 15(c).
An amendment of a pleading relates back to the date of the original pleading when
(1) relation back is permitted by the law that provides the statute of limitations applicable to the actions, or
(2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, or
(3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and, within the period provided by Rule 4(m) for service of the summons and complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.
Fed.R.Civ.P. 15(c). While the text of Rule 15(c) speaks only to the addition of new defendants, courts have also applied it to the addition of new plaintiffs. See Young v. Lepone, 305 F.3d 1, 14 (1st Cir.2002) ("Although the text of Rule 15(c)(3) seems to contemplate changes in the identity of defendants, we have recognized that the rule can be applied to amendments that change the identity of plaintiffs" (emphasis in original).). See also Fed.R.Civ.P. advisory committee note (1966) (emphasizing that Rule 15(c)(3) "extends by analogy to amendments changing plaintiffs").
(2) Original Pleadings
The original complaint filed by Lead Plaintiff on June 25, 2002, in Civil Action No. H-02-2374, asserted claims for violation of the 1934 Act and Rule 10b-5 against DI, Watson, Doty, and Bergstrom.[45] In addition to these four parties, original complaints filed during April, May, and June of 2002 in cases that are now *840 consolidated into this action named Mott as a defendant,[46] and the clerk's files in several of these cases contain timely executed returns of service on him.[47] While all of the consolidated complaints allege claims for violation of the 1934 Act and Rule 10b-5, one of them also alleged a claim for violation of the 1933 Act in relation to an offering of common stock by DI.[48]
(3) Analysis
The Companies' opposition to Lead Plaintiff's relation back argument challenges only the § 11 claims arising from the registration statements for DHI's offering of debt securities on March 15, 2001, and February 15, 2002. Because the only § 11 claim that Lead Plaintiff has asserted against DI arises from the registration statement for its stock offering, the court construes DI's failure to challenge Lead Plaintiff's argument that this claim relates back to its original complaint as a lack of opposition to Lead Plaintiff's relation back argument, and a demonstration that DI is neither surprised nor prejudiced by the addition of the § 11 stock offering claim against it. Since the various individual defendants have adopted the Companies' briefing on this and other issues related to the 1933 Act claims, they likewise oppose the relation back of § 11 claims that arise from misrepresentations included in registration statements for DHI's debt offerings but do not oppose the relation back of § 11 claims that arise from misrepresentations included in the registration statement for DI's stock offering. The court also construes the Individual Defendants' lack of opposition to the § 11 claims arising from the stock offering as a demonstration that they are neither surprised nor prejudiced by the addition of these claims.
(i) New Claims Against Existing Parties: DI, Watson, Bergstrom, Doty, and Mott
Under Rule 15(c)(2) new claims asserted against existing parties relate back to the original complaint if the "claim ... asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Fed.R.Civ.P. 15(c)(2). Section 11 claims that Lead Plaintiff has asserted against existing parties fall into two categories: (A) new claims asserted against existing defendants by an existing plaintiff; and (B) new claims asserted against existing defendants on behalf of newly proposed plaintiffs.
(A) New Claims Asserted Against Existing Defendants by Existing Plaintiff
The new claims that Lead Plaintiff asserts on its own behalf and as named plaintiff and putative class representative are claims for misrepresentations in the registration statement for DI's December 20, 2001, stock offering asserted against existing defendants, DI, Watson, Bergstrom, Doty, and Mott. Citing the Eighth *841 Circuit case Alpern v. UtiliCorp United, Inc., 84 F.3d 1525 (8th Cir.1996), Lead Plaintiff argues that the new § 11 claims that it seeks to assert against these existing defendants are not barred by limitations because they relate back to the date on which its original complaint was filed, June 25, 2002. [49] In Alpern, as in this case, the plaintiff's original complaint alleged § 10(b) and Rule 10b-5 violations based on misleading financial statements, and the plaintiff later amended his complaint to add a § 11 claim based on the same misleading financial statements. Id. at 1543. Concluding that the § 11 claim added in the amended complaint related back to the original complaint, the court reasoned that "[s]ince Alpern was a DRIP plan purchaser, UtiliCorp also should not have been surprised that Alpern sought to hold it accountable for its statements related to the DRIP prospectus." Id. at 1543-1544.
Because Lead Plaintiff was a stock purchaser and the claims that it has asserted on its own behalf and behalf of a putative class in both its original and consolidated complaints are based on purchases of DI common stock, and because the class period alleged in its original complaint (January 23, 2001, to May 15, 2002) encompass both July 27, 2001  the alleged date of the registration statement  and December 20, 2001  the alleged date of the stock offering underlying the new § 11 claims asserted against the previously named defendants, DI, Watson, Bergstrom, Doty, and Mott  the court concludes that the § 11 claims asserted against these defendants arising from that stock offering share the same factual basis as the claims asserted in the original complaints now consolidated into this action, i.e., that Lead Plaintiff and members of the putative class purchased the common stock of DI at prices that were inflated by DI's allegedly false financial statements. The court also concludes that the original pleadings brought that factual basis to the attention of these defendants, and that their failure to oppose Lead Plaintiff's relation back argument demonstrates that they are neither surprised nor prejudiced by the addition of plaintiffs' new § 11 claims. See Federal Deposit Ins. Corp. v. Bennett, 898 F.2d 477, 480 (5th Cir.1990) (a complaint properly relates back to the filing of the original complaint even where the theory of recovery is wholly different if the factual situation upon which the action depends remains the same and has been brought to defendant's attention by the original pleading).
Accordingly, the court concludes that the § 11 claims arising from misrepresentations in the registration statement for the December 20, 2001, stock offering asserted against DI, Watson, Bergstrom, and Doty relate back to the filing date of Lead Plaintiff's original complaint, and that this § 11 claim asserted against Mott relates back to the filing date of another original complaint now consolidated in this action. The court also concludes that the § 11 claims asserted against these defendants  DI, Watson, Bergstrom, Doty, and Mott  arising from the registration statement for DI's December 20, 2001, stock offering are not barred by limitations because the original complaints to which they relate back were all filed less than one year after any of the dates on which defendants argue plaintiffs were placed on inquiry notice.
(B) New Claims Asserted Against Existing Defendants on Behalf of Newly Proposed Plaintiffs
The new claims that Lead Plaintiff asserts on behalf of newly proposed named *842 plaintiffs and class representatives, Hawaii Ironworkers and WVIMB, are claims for misrepresentations included in the registration statements for DHI's two debt security offerings made on March 15, 2001, and February 15, 2002. Claims based on the March 15, 2001, offering are asserted against existing defendants Watson, Bergstrom, and Doty, and claims based on the February 15, 2002, offering are asserted against existing defendants, Watson, Bergstrom, Doty, and Mott. Because these existing defendants have adopted the arguments asserted by the Companies, and because DHI has challenged the relation back argument as applied to the same debt offering claims asserted against it, the court construes the Individual Defendants' adoption of the Companies' arguments to mean that they oppose the relation back of § 11 claims that arise from misrepresentations included in registration statements for DHI's debt offerings.
Under Rule 15(c)(3) amendments to add new parties relate back to the date of the original pleading when (a) the claim arises from the same conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, (b) the new party received notice of the original action, and (c) the new party knew or should have known that but for a mistake concerning the identity of the proper party, the original action would have been brought against it. Fed.R.Civ.P. 15(c)(3). While the text of Rule 15(c) speaks only to the addition of new defendants, courts have also applied it to the addition of new plaintiffs. See Fed.R.Civ.P. advisory committee note (1966) (emphasizing that Rule 15(c)(3) "extends by analogy to amendments changing plaintiffs"). See also Young, 305 F.3d at 14.
Citing Young, 305 F.3d at 15, the existing defendants argue that the court should not allow the addition of new plaintiffs unless Lead Plaintiff can demonstrate an identity of interest between it and the proposed new plaintiffs. Although recognizing that Rule 15(c)(3) is not readily transferrable to the addition of new plaintiffs, the Young court nevertheless concluded that when a new plaintiff attempts to enter a pending action under its aegis, courts should require substantial identity of interests to ensure that the defendant is not called upon to defend against new facts and issues.
We, like other courts, flatly reject the proposition that relation back is available merely because a new plaintiff's claims arise from the same transaction or occurrence as the original plaintiff's claims. See In re Syntex Corp. Sec. Litig., 95 F.3d 922, 935 (9th Cir.1996) (disallowing relation back for newly proposed investor plaintiffs who bought stock at different values and after different disclosures and statements than original plaintiffs).
Id. at 16. In Syntex the Ninth Circuit explained that an amendment adding a party plaintiff relates back to the date of the original pleading only when: (1) the original complaint gave the defendant adequate notice of the claims of the newly proposed plaintiffs; (2) the relation back does not unfairly prejudice the defendant; and (3) there is an identity of interests between the original and the newly-proposed plaintiffs. See In re Syntex, 95 F.3d at 935.
Citing the court's directive "to `vigorously pursue all available causes of action against all possible defendants under all available legal theories'"[50] Lead Plaintiff argues that "it is not necessary to relate *843 back plaintiffs." [51] Lead Plaintiff cites a recent opinion issued in In re Enron Corp. Sec., Derivative & "ERISA" Litig., 2004 WL 405886, *21 (S.D.Tex. February 25, 2004), in which the court stated that
[a] modification of the general rule [prohibiting raising a third party's legal rights] is necessary where a Lead Plaintiff, preferably an institution with the largest financial interest in the action selected pursuant to the criteria of the PSLRA of 1995, is authorized by statute to bring suit on behalf of the whole class even though it may not have purchased every type of security that others in the class hold, as long as a representative plaintiff with standing to sue on each class or subclass can be designated at class certification time.
Because the passage cited from In re Enron addresses the issue of standing, and not the issue of limitations, Lead Plaintiff's reliance on it in this context is misplaced. While in Enron the court allowed a new plaintiff, Imperial County Employees Retirement System (ICERS), to intervene into an existing class action lawsuit and to adopt the existing complaint, the court allowed the intervention only after determining that Lead Plaintiff had timely investigated and asserted within the limitations period the claims for which ICERS sought intervention. Id. at *7-*21. The facts in Enron are distinguishable from the facts of this case because unlike the lead plaintiff in Enron, Lead Plaintiff in this action has not previously asserted claims based on the purchase of DHI debt securities that it now seeks to add in the names of Hawaii Ironworkers and WVIMB and assert against existing individual defendants. Because Lead Plaintiff has not alleged that there is any identity of interest between it and either Hawaii Ironworkers or WVIMB, and because the court finds none, the court concludes that the claims that Lead Plaintiff seeks to add on behalf of Hawaii Ironworkers or WVIMB against existing individual defendants, Watson, Doty, Bergstrom, and Mott, do not relate back to the date of its original complaint. See Young, 305 F.3d at 15-16, and Syntex, 95 F.3d at 935-936 (same).
(ii) New Claims Asserted Against DHI
Lead Plaintiff argues that the 1933 Act claims asserted against DHI relate back to the date of its original filing because those claims arise from the same conduct, transaction, or occurrence set forth in its original pleading, because DHI received sufficient notice of this action through its identity of interest with DI, and because naming DHI corrects a mistake of factual identity caused by the similarity of names between the parent (DI) and the subsidiary (DHI).[52] DHI argues that Lead Plaintiff's relation back argument fails because the § 11 claims based on the registration statements for DHI's debt securities do not arise from the same conduct, transaction, or occurrence set forth in Lead Plaintiff's original pleadings, because there is no identity of interest between the Lead Plaintiff and the newly proposed class representatives, Hawaii Ironworkers and WVIMB, and because Lead Plaintiff's explanation of mistake in not naming DHI in its original complaint is disingenuous.[53] The court agrees with DHI that the new claims asserted against it do not relate back to Lead Plaintiff's original complaint because even assuming without deciding that the claims arise from *844 the same conduct and that DHI received timely notice of this action, naming DHI does not correct a mistake of factual identity.
Lead Plaintiff argues that the § 11 claims asserted against DHI relate back to the filing date of its original complaint because DHI knew or should have known that but for a mistake concerning DHI's identity as a proper party, the original action would have been brought against it. Lead Plaintiff argues that when it "filed its initial complaint, it misidentified [DI] as the issuer of the [March 15, 2001] notes subject to the challenged registration statements."[54] Because it is undisputed that the claims asserted in Lead Plaintiff's original complaint were based solely on stock purchases and not on note purchases, and that Lead Plaintiff could not have asserted claims for note purchases in its original complaint because it was not a note purchaser, the court is not persuaded that DHI knew or should have known that but for a mistake concerning the identity of the proper party the original action would have been brought against it.
(4) Conclusions
Because the 1933 Act claims asserted in Lead Plaintiff's original complaint and in the original complaints consolidated into this action share the same factual basis as the 1934 Act claims that Lead Plaintiff now seeks to assert against the defendants named in the original complaints, and because the original complaints brought that factual basis to the attention of the originally named defendants, the court concludes that the 1933 Act claims asserted against those defendants  DI, Watson, Doty, Bergstrom, and Mott  arising from misrepresentations contained in the registration statement for DI's offering of common stock on December 20, 2001, relate back to the filing dates of those complaints. This conclusion means that the 1933 Act claims asserted against DI, Watson, Bergstrom, Doty, and Mott arising from the registration statement for DI's offering of common stock on December 20, 2001, may proceed because even if, as defendants argue, Lead Plaintiff was on inquiry notice of them by March, April, or May of 2002 these claims are not time barred since the claims asserted against DI, Watson, Bergstrom, and Doty, relate back to the filing date of Lead Plaintiff's original complaint (i.e., June 25, 2002), and the claims asserted against Mott relate back to the filing date of the earliest original complaint in which he was named as a defendant (i.e., Original Complaint filed on April 30, 2002, in Civil Action No. H-02-1604).
Because Lead Plaintiff has not shown that there is any identity of interest between it and either Hawaii Ironworkers or WVIMB, and because the court is not persuaded that DHI knew or should have known that but for a mistake concerning its identity as a proper party, Lead Plaintiff's original action would have been brought against it, the court concludes that the 1933 Act claims that Lead Plaintiff now seeks to assert against DHI and Watson, Bergstrom, Doty, and Randolph on behalf of Hawaii Ironworkers and against DHI, Watson, Bergstrom, Doty, and Mott on behalf of WVIMB do not relate back to the filing date of any of the original complaints in this consolidated action. This conclusion means that the 1933 Act claims asserted against DHI and various individual *845 defendants arising from the registration statements for DHI's offering of debt securities on March 15, 2001, and February 15, 2002, do not relate back to the filing date of any original complaint filed in this action and may be barred by limitations if, as defendants argue, facts alleged in the pleadings establish that plaintiffs were on inquiry notice of those claims over a year before the Consolidated Complaint was filed on June 6, 2003.
(c) Inquiry Notice
All of the defendants argue that the 1933 Act claims asserted against them are time barred because Lead Plaintiff was on inquiry notice of the claims for more than a year before the Consolidated Complaint was filed on June 6, 2003. Because the court has already concluded that the 1933 Act claims asserted against DI, Watson, Bergstrom, Doty, and Mott, arising from misrepresentations contained in the registration statement for DI's December 20, 2001, offering of common stock relate back to the filing dates of original complaints filed in this action, the 1933 Act claims asserted against them arising from that registration statement are not barred by limitations even if Lead Plaintiff was on inquiry notice of those claims for more than a year before the Consolidated Complaint was filed. Consequently, the following discussion pertains only to arguments asserted by DHI, various individual defendants charged with violations of the 1933 Act arising from registration statements for DHI debt securities offered on March 15, 2001, and February 15, 2002, the Director Defendants, Andersen, and the Underwriting and Related Defendants. For purposes of the following discussion the court has reviewed all of the motions and briefing submitted on the issue of inquiry notice.
(1) Applicable Law
Section 13 provides that suit must be "brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence...." 15 U.S.C. § 77m. To determine when the limitation period begins to run courts apply the doctrine of constructive or inquiry notice. Under this doctrine the statute begins to run when the plaintiff has actual knowledge of the facts giving rise to his claims or has notice of facts that in the exercise of reasonable diligence should have led to such knowledge. See Topalian, 954 F.2d at 1133 ("The controlling date for purposes of the running of the respective statutes of limitations is when a purchaser of securities knew  or in the exercise of reasonable diligence, should have known  of the alleged wrongdoing."). See also Jensen, 841 F.2d at 606 ("[u]nder federal law, the [applicable] limitations period commences when `the aggrieved party has either knowledge of the violation or notice of facts which, in the exercise of due diligence, would have led to actual knowledge,' thereof"). In Jensen the Fifth Circuit described the test for determining when a securities action has accrued.
A plaintiff who has learned of facts which would cause a reasonable person to inquire further must proceed with a reasonable and diligent investigation, and is charged with knowledge of all facts such an investigation would have disclosed. Investors are not free to ignore "storm warnings" which would alert a reasonable investor to the possibility of fraudulent statements or omissions in his securities transactions.
Id. at 607 (citations omitted). See also Marks v. CDW Computer Centers, Inc., 122 F.3d 363, 367 (7th Cir.1997) ("[N]ot only must the investor be on notice of the *846 need to conduct further inquiry, but the investor also must be able to learn the facts underlying the claim with the exercise of reasonable diligence."); In re Beef Industry Antitrust Litig., 600 F.2d 1148, 1171 (5th Cir.1979), cert. denied, 449 U.S. 905, 101 S.Ct. 280, 66 L.Ed.2d 137 (1980).
The term "storm warnings" is used by courts to describe circumstances that trigger the duty of inquiry because they should suggest to an investor of ordinary intelligence that he has been wronged.
Whether the plaintiffs, in the exercise of reasonable diligence, should have known of the basis for their claims depends on whether they had sufficient information of possible wrongdoing to place them on "inquiry notice" or to excite "storm warnings" of culpable activity.... The test for "storm warnings" is an objective one, based on whether a "reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm warning."
In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1325 (3d Cir.2002). See also Young, 305 F.3d at 10.
Courts do not agree on precisely what constitutes a storm warning. Among the circumstances found to constitute a storm warning are disclosures in the media,[55] a sudden drop in stock price,[56] filing for bankruptcy,[57] an SEC investigation,[58] and warnings in a prospectus.[59] An investor does not "have to have notice of the entire [wrong] being perpetrated to be on inquiry notice." Dodds v. Cigna Securities, Inc., 12 F.3d 346, 352 (2d Cir.1993), cert. denied, 511 U.S. 1019, 114 S.Ct. 1401, 128 L.Ed.2d 74 (1994). Nevertheless, "the facts relied upon to support inquiry notice must rise to a level of more than mere suspicion; they must instead be `sufficiently confirmed or substantiated' to a point at which the victims are incited to investigate." Ritchey v. Horner, 244 F.3d 635, 640-641 (8th Cir.2001) (quoting Fujisawa Pharmaceutical Co., Ltd. v. Kapoor, 115 F.3d 1332, 1335 (7th Cir.1997)). Moreover, the information constituting storm warnings must "be such that it relates directly to the misrepresentations and omissions the [p]laintiffs later allege in their action against the defendants." Newman v. Warnaco Group, Inc., 335 F.3d 187, 193 (2d Cir.2003).
Because deciding when a plaintiff is on inquiry notice requires the development of facts, and even then courts may weigh facts differently, the determination is "often inappropriate for resolution on a motion to dismiss under Rule 12(b)(6)." Marks, 122 F.3d at 367. Nevertheless,
*847 [w]here ... the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of [wrongdoing] can be gleaned from the complaint and papers such as the prospectuses and disclosure forms that are integral to the complaint, resolution of the issue on a motion to dismiss is appropriate.
Dodds, 12 F.3d at 352 n. 3. See also In re WorldCom. Inc. Securities Litigation, 294 F.Supp.2d 431, 445 (S.D.N.Y.2003) (asserting that the Second Circuit has resolved the question of inquiry notice on a motion to dismiss "in a vast number of cases").
[In the context of dismissal,] defendants bear a heavy burden in establishing that the plaintiff was on inquiry notice as a matter of law... Inquiry notice exists only when uncontroverted evidence irrefutably demonstrates when plaintiff discovered or should have discovered the fraudulent conduct.
Nivram Corp. v. Harcourt Brace Jovanovich, Inc., 840 F.Supp. 243, 249 (S.D.N.Y.1993).
(2) Trigger Dates
Defendants argue that the § 11 claims should be dismissed because the allegations contained in the 1933 Act complaint demonstrate that plaintiffs were on inquiry notice of them by March 13, 2002, when facts concerning the Black Thunder transaction were revealed, by April 25, 2002, when facts concerning the Project Alpha transaction were publicized, or by May of 2002 when additional facts about Black Thunder and Project Alpha, as well as facts about irregularities in Dynegy's natural gas and power trading business, were disclosed. Lead Plaintiff argues that "defendants' repeated proclamations that Dynegy's disclosures were sound and conduct was appropriate militate against triggering the limitations period" on these dates. [60]
(i) March 13, 2002
Defendants argue that facts pleaded in Lead Plaintiff's 1933 Act complaint establish that plaintiffs were on inquiry notice of facts underlying their 1933 Act claims no later than March 13, 2002, when Lead Plaintiff alleges that DI filed its 2001 Form 10-K, which revealed facts about the Black Thunder transaction.[61] Defendants argue that Lead Plaintiff's § 11 claims are grounded on allegations that DI and DHI inappropriately classified the proceeds of the Black Thunder transaction as equity instead of debt, and failed to disclose features of the transaction that would have revealed the transaction to be a loan (SAC ¶¶ 40-48). Defendants argue that among the allegedly undisclosed features were *848 credit ratings and cash flow triggers that ultimately required Dynegy to put up $270 and $60 million, respectively, in cash collateral when its credit ratings fell below investment grade and its cash flow lagged. (SAC ¶ 7) Defendants argue that because Lead Plaintiff's 1933 Act complaint alleges that the credit ratings trigger was disclosed in "late 2001" (SAC ¶ 7), and again in the 2001 Form 10-K that DI filed on March 13, 2002 (SAC ¶ 47), facts pleaded in the complaint establish that plaintiffs were on inquiry notice of allegedly false statements and omissions regarding Black Thunder at least by then, if not earlier.[62]
Lead Plaintiff responds that the credit ratings triggers disclosed in the 2001 Form 10-K filed on March 13, 2002, did not constitute storm warnings sufficient to place plaintiffs on inquiry notice because the Form 10-K did not identify the transaction by name and did not cause analysts to question its propriety. Lead Plaintiff also argues that inquiry notice could not have been triggered by disclosures made in the 2001 Form 10-K because it too contained statements that were false and misleading. As examples of false statements contained therein, Lead Plaintiff points to the statement that Dynegy had an option to buy out the Black Thunder investor before 2010, and alleges that this statement was false because Dynegy was, in fact, obligated to pay off the Black Thunder investor in 2005, a fact that Lead Plaintiff alleges Dynegy failed to disclose until May 15, 2003, when the SEC forced it to do so in an amended 2001 Form 10-K.[63]
Although Lead Plaintiff's 1933 Act complaint alleges that the 2001 Form 10-K filed on March 13, 2001, disclosed some truth about the Black Thunder transaction (SAC ¶ 46), defendants do not argue that the facts about Black Thunder disclosed therein were sufficient to alert an investor of ordinary intelligence to conclude either that Black Thunder was not as Dynegy represented, an equity transaction, or, as plaintiffs now allege, an $850 million loan secured by Dynegy's Illinova power plants. Because the disclosures of March 13, 2002, did not name the Black Thunder transaction, did not elicit questions about it from analysts, and did not reveal that the option to acquire the Black Thunder investor's interest was not an option but, instead, an obligation to pay off an $850 million loan, the court is not persuaded that Dynegy's disclosure on March 13, 2002  that an unnamed transaction had credit ratings and cash flow triggers  constituted storm warnings sufficient either to excite an investor of ordinary intelligence to inquire or, upon inquiry, to discover facts showing that financial statements incorporated into any of the three challenged registration statements overstated revenue and understated debt and liabilities due to Dynegy's failure to properly account for the Black Thunder transaction. Accordingly, the court is not persuaded to conclude as a matter of law either that the March 13, 2002, disclosures placed plaintiffs on inquiry notice or that the statute of limitations on plaintiff's 1933 Act claims arising from *849 misrepresentations about Black Thunder began to run on that date. See Topalian, 954 F.2d at 1133; Jensen, 841 F.2d at 607.
(ii) April 25, 2002
Defendants argue that facts pleaded in Lead Plaintiff's 1933 Act complaint establish that plaintiffs were on inquiry notice of facts underlying their 1933 Act claims no later than April 25, 2002.[64] In support of this argument defendants cite an article published in The Wall Street Journal on April 3, 2002, that disclosed the existence of Project Alpha,[65] a press release and a Form 8-K filed by DI on April 25, 2002, that announced cash flow from Project Alpha would be reclassified as cash flow from financing instead of cash flow from operations and that Project Alpha would be subject to an informal investigation by the SEC,[66] and a Form 8-K filed by DI on April 29, 2002, that announced the filing of lawsuits for securities fraud against Dynegy. [67] Citing In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 289 F.Supp.2d 429, 433 (S.D.N.Y.2003), defendants argue that the date of inquiry notice was not changed by denials of wrongdoing asserted by various Dynegy representatives because these denials were insufficient to negate the revelations that put plaintiffs on inquiry notice in the first place. [68] Citing In re Tyco Intern., Ltd., Sec. Litig., 185 F.Supp.2d 102, 116 (D.N.H.2002), in which a 1933 Act plaintiff was found to be on inquiry notice from the date on which other plaintiffs had filed 1934 Act claims based on the "same allegedly improper accounting scheme," defendants argue that the filing of multiple complaints asserting 1934 Act claims based on revelations made in April of 2002 within months (and in many cases, days) of those disclosures dispels any notion that plaintiffs lacked sufficient information to bring their § 11 claims within one year of those disclosures.[69]
Lead Plaintiff responds that the disclosures about Project Alpha made in April of 2002 were insufficient to trigger inquiry notice because they were accompanied by words of comfort issued by Dynegy's management that relieved investors of the duty to inquire. Lead Plaintiff argues that on April 3, 2002, The Wall Street Journal cited Doty, Dynegy's then-CFO, as stating that Alpha's primary purpose was to ensure a stable supply of natural gas, and that throughout the month of April Dynegy's *850 managers continued to defend Project Alpha in both the press and conference calls with analysts as a "solid deal" intended to ensure a stable supply of natural gas. Lead Plaintiff also alleges that on May 1, 2002, The Wall Street Journal published an article about that defense and investors' reactions to it titled, "Investors Smile At Dynegy Even On Report of Loss." (SAC ¶¶ 142-147)
Although the facts pleaded in the 1933 Act Complaint allege that some of the truth about Project Alpha was revealed in April of 2002, i.e., that Project Alpha's cash flow was from financing and not from operations as originally reported, and that the reclassification of Project Alpha's cash flow precipitated an informal investigation by the SEC, for the reasons explained below the court is not persuaded to conclude as a matter of law either that these disclosures placed plaintiffs on inquiry notice or that the statute of limitations on plaintiffs' 1933 Act claims arising from misrepresentations about Project Alpha began to run in April of 2002.
Investors are not placed on inquiry notice when "the warning signs are accompanied by reliable words of comfort from management." LC Capital Partners, LP v. Frontier Ins. Group, Inc., 318 F.3d 148, 155 (2d Cir.2003). Although the existence of words of comfort has been held to prevent or dissipate the duty to inquire "only if an investor of ordinary intelligence would reasonably rely on the statements to allay the investor's concern," id.,
[w]hether reassuring statements justify reasonable reliance that apparent storm warnings have dissipated ... depend[s] in large part on how significant the company's disclosed problems are, how likely they are of a recurring nature, and how substantial are the `reassuring' steps announced to avoid their recurrence.
Id. While defendants may ultimately be able to prove that plaintiffs should not have relied on Dynegy's words of comfort and should, instead, have undertaken an inquiry in April of 2002 that would have led to the discovery of false statements about revenue and tax savings derived from Project Alpha that had been incorporated into registration statements challenged in the 1933 Act Complaint, the court is not persuaded that this determination can be made on defendants' motions to dismiss because, in addition to the words of comfort cited by Lead Plaintiff, a close reading of the April 3, 2002, Wall Street Journal article, the April 25, 2002, press release and Form 8-K, and the April 29, 2002, Form 8-K shows that they each contained statements that may reasonably have lulled investors to inaction.
Although the April 3, 2002, Wall Street Journal article described Project Alpha as "aimed to boost Dynegy's reported cash flow from operations by $300 million ... [and to] cut Dynegy's tax bill by some $80 million," it also stated that "[a]part from that, the project has little impact on the company's net income."[70] It stated that "Arthur Andersen LLP, Dynegy's auditor until last month, blessed the benefits created by Project Alpha ... [and that] Dynegy officials say its new auditor, PricewaterhouseCoopers, has since concluded that the accounting and disclosure of Alpha were appropriate." [71] It quoted Dynegy's then-CFO, Doty, as saying that "Alpha is the only arrangement of its kind that Dynegy has made," [72] and it stated that
*851 Dynegy's stock has held up this year in an energy sector darkened by Enron's downfall. Unlike some of Enron's controversial transactions, there is no indication that Dynegy executives owned any interest in the partnership at the center of Alpha. The arrangement is reflected in Dynegy's financial statements, although discerning the references is difficult.[73]
Although the April 25, 2002, press release announced that Dynegy had decided to present the cash flow associated with Project Alpha as financing activity in its consolidated statement of cash flows, it also stated that "[m]anagement believes that the change in cash flow presentation will not alter the tax benefit recognized in 2001."[74]
Although the Form 8-K filed on April 25, 2002, disclosed that changes related to Project Alpha would "reduce operating cash flow for the year ended December 31, 2001 from $811 million to approximately $511 million, with a corresponding increase in financing cash flow from $2.7 billion to approximately $3 billion,"[75] it also stated that "Dynegy's consolidated balance sheet, consolidated statement of operations and consolidated statement of changes in stockholders' equity are unaffected by the cash flow statement change."[76]
And finally, although the Form 8-K filed on April 29, 2002, announced that Dynegy had
become aware of the public announcement of several class action lawsuits that have been commenced on behalf of purchasers of publicly traded securities of Dynegy generally during the period between April 2001 and April 2002 ... [based on its] accounting treatment and disclosure of the natural gas supply transaction that was entered into by Dynegy in April 2001 and the subject of ... the Form 8-K filed on April 25, 2002, [77]
i.e., Project Alpha, it also stated that "based on its current understanding, [Dynegy] believes these allegations are without merit and intends to vigorously defend against them."[78]
Defendants argue that Lead Plaintiff should at least have alleged facts showing that following the disclosures about Project Alpha made in April of 2002 it undertook diligent efforts to uncover the falsity of Dynegy's statements. Since the disclosures concerned a single transaction that investors could reasonably have believed was not likely to recur, and was not likely to have a significant impact on the company's overall financial performance, the court is not persuaded to conclude as a matter of law that these disclosures triggered the limitations period for the 1933 Act claims arising from misrepresentations about Project Alpha. See LC Capital, 318 F.3d at 155.
(iii) May 2002
Defendants argue that Lead Plaintiff's 1933 Act claims should be dismissed because facts pleaded in the consolidated complaints establish that plaintiffs were on inquiry notice of facts underlying their 1933 Act claims by May of 2002 when additional facts about Black Thunder and *852 Project Alpha and facts about Dynegy's energy trading practices were disclosed. [79]
(A) Black Thunder
In support of the argument that Lead Plaintiff was placed on inquiry notice of claims arising from misrepresentations about Black Thunder by additional disclosures made in May of 2002, defendants cite Lead Plaintiff's allegation that on May 14, 2002, The New York Times published an article about Black Thunder that described some of its features, compared it to transactions that Enron had conducted, and quoted analysts as calling it "a financing." (SAC ¶ 150; SEAC ¶ 263) Lead Plaintiff argues that the disclosures about Black Thunder made in May of 2002 were insufficient to trigger inquiry notice because they were accompanied by words of comfort issued by Dynegy's management that relieved investors of the duty to inquire. Lead Plaintiff argues that Mott defended the accounting for Black Thunder by asserting that it had "an equity interest and an equity like participation" (SAC ¶ 150; SEAC ¶¶ 55, 263). Lead Plaintiff also asserts that on May 15, 2002, DI filed its Form 10-Q for the first quarter of 2002, which contained more information about the ratings trigger, but continued to refer to the Companies' option, instead of obligation, to pay off Black Thunder's debt. (SAC ¶ 151; SEAC ¶¶ 54)
Although Lead Plaintiff's allegations demonstrate that in May of 2002 a newspaper article appeared that questioned Dynegy's accounting for the Black Thunder transaction, and that the Companies disclosed additional information about the transactions' ratings triggers, the court is not persuaded to conclude as a matter of law that these disclosures were sufficient to place plaintiffs on inquiry notice either that the Black Thunder transaction was a financing or that registration statements for DI's offering of common stock on December 20, 2001, or for DHI's offerings of debt securities on March 15, 2001, and/or February 15, 2002, incorporated financial statements falsified by misrepresentations about Black Thunder. While the disclosures made in May of 2002 may have been sufficient to raise a suspicion that the registration statements challenged in this action were falsified by misrepresentations about Black Thunder, the court is not persuaded that the disclosures in May of 2002 were "`sufficiently confirmed or substantiated' to a point at which the victims [were] incited to investigate," Ritchey, 244 F.3d at 640-641, or that even if the victims were so excited they would have been able to discover facts sufficient to support the filing of a complaint for violation of the securities laws. See Marks, 122 F.3d at 367 ("[N]ot only must the investor be on inquiry notice of the need to conduct further inquiry, but the investor must also be able to learn the facts underlying the claim with the exercise of reasonable diligence.").
(B) Project Alpha
In support of the argument that Lead Plaintiff was placed on inquiry notice of claims arising from misrepresentations about Project Alpha in May of 2002 defendants point to the Form 10-Q filed by DI on May 15, 2002, in which Dynegy disclosed (1) that after consultation with the SEC it had decided to present the approximately $300 million of cash flow attributed *853 to Project Alpha as cash flow from financing instead of cash flow from operations, (2) that as a result of this decision Dynegy would restate its 2001 results for operations, stockholders' equity, and cash flow, (3) that Dynegy's previously issued financial statements for 2001 and the auditors' report therefor were not reliable, and (4) that the SEC had decided to seek a formal order of investigation in connection with the previously announced informal inquiry into the facts and circumstances of Project Alpha.
Although neither the SAC nor the SEAC contain allegations regarding disclosures about Project Alpha made in May of 2002, they each cite the Form 10-Q filed by DI on May 15, 2002, for the disclosures it contained about the Black Thunder transaction. [80] (SAC ¶ 151; SEAC ¶ 54) Moreover, Lead Plaintiff's original complaint contained a long quote from that 10-Q that cited each of the disclosures now relied upon by the defendants in support of their argument that Lead Plaintiff was placed on inquiry notice of the 1933 Act claims arising from misrepresentations about Project Alpha no later than May of 2002. Lead Plaintiff's original complaint specifically alleged that
32. On May 15, 2002, the Company ... filed its 10-Q for the quarter ended March 31, 2002, with the SEC restating Dynegy's 2001 results for operations, shareholders' equity and cash flow.
In April 2001, Dynegy entered into a structured natural gas transaction ("Project Alpha") involving two unrelated special purpose entities, NGAI Funding LLC and ABG Gas Supply LLC, and a newly created partnership, DMT Supply LP ... On April 25, 2002, Dynegy filed a Current Report on Form 8-K discussing Project Alpha (the "Form 8-K"). As described in the Form 8-K, Dynegy has decided, after consultation with the Staff of the SEC, to present the cash flow associated with the gas supply contract as a financing activity in its Consolidated Statement of Cash Flows in 2001. The change will reduce operating cash flow for the year ended December 31, 2001 from the $811 million previously reported to approximately $511 million, with a corresponding increase in financing cash flow from the $2.7 billion previously reported to approximately $3 billion. [The Company's Consolidated Statement of Cash Flows in this and all future Exchange Act filings will reflect all cash flows associated with the gas contract as financing activities.]

. . . . .
As a result of this decision, Retained Earnings at December 31, 2001 will be reduced by $79 million and Deferred Income Tax Liability will be correspondingly increased in relation to the balances previously reported by the Company in the Form 10-K. Eliminating the financial statement recognition of the income tax benefit reduces previously reported 2001 net income by approximately $79 million, or $0.23 per diluted share. Restated reported net income for the year ended December 31, 2001 is $569 million, *854 or $1.67 per diluted share, as compared to previously reported amounts of $648 million and $1.90 per diluted share, respectively...
Accordingly, the Company will restate its 2001 results of operations, stockholders' equity and cash flow to reflect this change in upcoming amendments to its Form 10-K and its June 30, 2001 and September 30, 2001 Quarterly Reports on Form 10-Q. As a result, the previously issued financial statements for the year ended December 31, 2001, and the auditors' report thereon, should no longer be relied upon as it relates to this item ...
Dynegy has been advised by the Staff of the SEC that it intends to seek a formal order of investigation in connection with the previously announced inquiry into the facts and circumstances surrounding Project Alpha.
33. On this news, Dynegy stock collapsed to as low as $7.61 per share on volume of 20.6 million shares.[81]
Unlike the disclosures about Black Thunder, these disclosures about Project Alpha that Dynegy would restate its cash flow as cash flow from financing and that the restatement of cash flow required Dynegy to restate its financial results for 2001, invalidated its previously filed auditors' report for 2001, and precipitated a formal investigation by the SEC raised more than a mere suspicion that the registration statements for debt and equity offerings that had been issued since Project Alpha's inception contained misrepresentations about Project Alpha. See Ritchey, 244 F.3d at 640-641.
Because the disclosures about Project Alpha contained in the Form 10-Q filed on May 15, 2002, were "`sufficiently confirmed or substantiated' to a point at which the victims [should have been] incited to investigate," id., the court concludes that they triggered the duty of inquiry notice for claims arising from misrepresentations about Project Alpha. Because these disclosures precipitated the filing of numerous lawsuits against Dynegy, including the one filed by Lead Plaintiff on June 25, 2002, and because the complaint filed by Lead Plaintiff on June 25, 2002, references both the March 15, 2001, debt security offering and the December 20, 2001, stock offering in the section titled "False and Misleading Statements," the court concludes that the disclosures about Project Alpha made in the Form 10-Q filed on May 15, 2002, were sufficient not only to place plaintiffs on inquiry notice of its 1933 Act claims arising from misrepresentations about Project Alpha, but also to trigger the statute of limitations since these disclosures form the factual basis for the 1933 Act claims that Lead Plaintiff now asserts in the 1933 Act Complaint.
(C) Trading Practices
Defendants argue that allegations contained in the 1934 Act Complaint show that plaintiffs were on inquiry notice of facts underlying claims arising from the round-trip trades with CMS by April or May of 2002.[82] Assuming without deciding that plaintiffs were on inquiry notice of these facts by May of 2002, such notice would not bar any of Lead Plaintiff's 1933 Act claims.
*855 Investors are not placed on inquiry notice and the limitations period does not begin to run unless the information alleged to constitute the storm warning "relates directly to the misrepresentations and omissions that [p]laintiffs later allege in their action against the defendants." Newman, 335 F.3d at 193. In the 1934 Act Complaint Lead Plaintiff alleges that the CMS trade occurred on November 15, 2001. (SEAC ¶ 93) The 1933 Act claims are based on registration statements that are all alleged to have had been dated before that date, i.e., the registration statement for the DHI debt securities offered on March 15, 2001, is allegedly dated September 26, 2000, and the registration statements for the DI common stock offered on December 20, 2001, and the DHI debt securities offered on February 15, 2002, are both allegedly dated July 27, 2001. (SAC ¶ 131) Although Lead Plaintiff alleges that these registration statements incorporated by reference all subsequent documents filed with the SEC prior to the respective offerings, including the Companies' Forms 10-Q (SAC ¶ 133), and expressly alleges that subsequently filed documents incorporated into the registration statements dated July 27, 2001, included the Companies' second- and third-quarter 2001 Forms 10-Q (SAC ¶¶ 131), Lead Plaintiff does not allege that any of these subsequently filed documents included false statements based on the CMS round-trip trades that are alleged to have occurred on November 15, 2001, i.e., during the fourth-quarter of 2001. Because the information alleged to constitute storm warnings must "be such that it relates directly to the misrepresentations and omissions the [p]laintiffs later allege in their action against the defendants," Newman, 335 F.3d at 193, the court concludes that disclosures about the CMS round-trip trades did not constitute storm warnings capable of triggering the inquiry notice period for plaintiffs' 1933 Act claims since the CMS trades did not occur until the fourth-quarter of 2001, and the last Form 10-Qs allegedly incorporated into the registration statements underlying the 1933 Act claims are those from the second- and third-quarters of 2001.
(3) Conclusions
(i) Trigger Date Conclusions
(A) March 13, 2002
Defendants argue that information disclosed on March 13, 2002, placed plaintiffs on inquiry notice of facts underlying the 1933 Act claims asserted in this action because that information included credit features of the Black Thunder transaction. The court is not persuaded that the information disclosed on March 13, 2002, was sufficient to place plaintiffs on inquiry notice that the registration statements challenged in this action incorporated financial statements that were falsified by misrepresentations about Black Thunder. Because the disclosures did not identify Black Thunder by name, and did not cause analysts to question its propriety, they were not sufficient to allow an investor of ordinary intelligence to conclude either that Black Thunder was not as Dynegy represented, an equity transaction, or as plaintiffs now allege, an $850 million loan secured by Dynegy's Illinova power plants.
(B) April 25, 2002
Defendants argue that information disclosed in April of 2002 placed Lead Plaintiff on inquiry notice of facts underlying the 1933 Act claims asserted in this action because that information disclosed details about Project Alpha. The court is not persuaded that this information was sufficient to place plaintiffs on inquiry notice that the registration statements challenged in this action incorporated financial *856 statements falsified by misrepresentations about Project Alpha because those disclosures were accompanied by words of comfort from management and were not sufficiently confirmed or substantiated to trigger the duty to inquire.
(C) May 2002
Defendants argue that information disclosed in May of 2002 placed Lead Plaintiff on inquiry notice of facts underlying the 1933 Act claims asserted in this action because that information disclosed additional features of the Black Thunder and Project Alpha transactions, as well as information about Dynegy's improper energy trading practices. Although the court is not persuaded that this information was sufficient to place plaintiffs on inquiry notice that the registration statements challenged in this action incorporated financial statements falsified by misrepresentations about Black Thunder or Dynegy's energy trading practices, the court is persuaded that disclosures made in May of 2002 placed plaintiffs on inquiry notice that the registration statements challenged in this action incorporated financial statements falsified by misrepresentations about Project Alpha. Disclosures made in the Form 10-Q filed on May 15, 2002, were sufficient to place plaintiffs on inquiry notice that two of the registration statements challenged in this action were falsified by misrepresentations about Project Alpha because those disclosures revealed in undisputable fashion that cash flow from Project Alpha was cash flow from financing instead of cash flow from operations as originally presented, that the revenue for 2001 was $300 million less than originally reported, that the Companies' 2001 financial statements would be restated, that the auditor's report for 2001 was unreliable, and that Project Alpha would be subject to a formal investigation by the SEC.[83]See Nivram, 840 F.Supp. at 249 ("Inquiry notice exists ... when uncontroverted evidence irrefutably demonstrates when plaintiff discovered or should have discovered the fraudulent conduct.").
(ii) Application of Trigger Date Conclusions
Lead Plaintiff alleges that the registration statements for DI's offering of Class A Common Stock on December 20, 2001, and DHI's offering of debt securities on March 15, 2001, and February 15, 2002, violate the 1933 Act because they incorporate the Companies' false financial statements for 1999-2001. (SAC ¶¶ 1, 131) Lead Plaintiff alleges that the Companies' financial statements for 1999-2001 omitted material facts about the Black Thunder and Project Alpha transactions and Dynegy's energy trading business that, if disclosed, would have revealed that the financial statements overstated income and understated debt and taxes. (SAC ¶¶ 132-133, 165)
(A) March 15, 2001, Debt Offering
Lead Plaintiff alleges that the DHI debt securities offered on March 15, 2001, were offered pursuant to a registration statement dated September 26, 2000 (SAC ¶ 131). Lead Plaintiff has asserted claims arising from misstatements included in this registration statement against DHI, individual defendants Bergstrom, Doty, *857 Randolph, and Watson (SAC ¶ 164), Andersen, and underwriting defendants Lehman Brothers Inc., ABN AMRO Inc., Commerzbank Capital Markets Corp., CSFB, and Merrill Lynch, and their corporate parents. Lead Plaintiff alleges that this registration statement contained false statements and omissions of material fact because it incorporated the Companies' 1999-2000 Forms 10-K (SAC ¶¶ 46, 131) and 2000 Forms 10-Q that contained misrepresentations about, inter alia, Black Thunder.[84] (SAC ¶¶ 46, 79, 131)
All defendants sued for this registration statement argue that the § 11 claims asserted against them should be dismissed because facts pleaded in the SAC establish as a matter of law that plaintiffs were on inquiry notice of facts underlying the alleged misrepresentations about Black Thunder in either March or May of 2002, i.e., more than one year before the Consolidated Complaint was filed on June 6, 2002 (Docket Entry No. 112). For the reasons explained above, the court has concluded that facts pleaded in the SAC do not establish as a matter of law that plaintiffs were on inquiry notice of facts underlying the 1933 Act claims arising from misrepresentations about Black Thunder in either March or May of 2002. Accordingly, the court concludes that the claims asserted against the above-listed defendants for misrepresentations contained in the registration statement for DHI's debt security offering of March 15, 2001, are not barred by limitations.
(B) December 20, 2001, Stock Offering
Lead Plaintiff alleges that the DI Class A Common Stock offered on December 20, 2001, was offered pursuant to a registration statement dated July 27, 2001 (SAC ¶ 131). Lead Plaintiff has asserted claims arising from misstatements included in this registration statement against DI, individual defendants Watson, Bergstrom, Doty, and Mott, the Director Defendants, DI's auditor Arthur Andersen, and underwriter Lehman Brothers Inc. and Lehman Brothers Holding Inc. (SAC ¶ 164) Lead Plaintiff alleges that this registration statement contained false statements and omissions of material fact because it incorporated the Companies' 2000 Forms 10-K (SAC ¶ 131), and first through third quarter 2001 Forms 10-Q (SAC ¶¶ 56, 131, 133) that contained misrepresentations about, inter alia, Project Alpha.
All these defendants argue that the § 11 claims asserted against them should be dismissed because facts pleaded in the SAC establish as a matter of law that plaintiffs were on inquiry notice of facts underlying the alleged misrepresentations about Project Alpha in either April or May of 2002, i.e., more than one year before the Consolidated Complaint was filed on June 6, 2003. For the reasons explained above in § IV.C.3.(c).(2).(ii)-(iii).(B), the court has concluded that Lead Plaintiff's pleadings do not establish as a matter of law that plaintiffs were on inquiry notice of facts underlying the § 11 claims arising from misrepresentations about Project Alpha in April of 2002, but were on inquiry notice of them beginning on May 15, 2002, when DI filed its first-quarter 2002 Form 10-Q with the SEC. Accordingly, the court concludes that the claims arising from misrepresentations contained in this registration statement are barred by limitations unless they relate back to an earlier filed complaint or are otherwise tolled.
*858 1. DI and the Individuals
For the reasons explained above in § IV.C.3.(b).(3).(i), the court has already concluded that the § 11 claims arising from the July 27, 2001, registration statement for DI's stock offering of December 20, 2001, asserted against DI and individual defendants Watson, Bergstrom, Doty, and Mott, relate back to an earlier filed complaint. Accordingly, the court has already concluded that the § 11 claims asserted against these defendants arising from the registration statement for DI's stock offering are not barred by limitations.
2. Director Defendants
Lead Plaintiff has alleged that the § 11 claims asserted against director defendants Bayless, Callahan, Dienstbier, Kirkland, Matzke, Rosenberg, Stewart, and Winters are not barred by limitations because these defendants executed a tolling agreement pursuant to which the Consolidated Complaint is deemed to have been filed no later than March 24, 2003. (SAC ¶ 154) Director defendants Capellas, Johnson, and Riley argue that the § 11 claims asserted against them are barred by limitations because Lead Plaintiff has not alleged that they executed a tolling agreement.[85] Because Lead Plaintiff concedes that Capellas, Johnson, and Riley are not bound by a tolling agreement, the court concludes that the § 11 claims asserted against them are barred by limitations. [86] Although the remaining Director Defendants argue that the tolling agreement they executed is incapable of salvaging plaintiffs' § 11 claims because those claims were already stale by the agreement's effective date and because as a matter of law § 11 claims cannot be tolled by agreement, the court is not persuaded by these arguments.
Asserting that "it is elementary that parties cannot revive an otherwise time-barred claim by agreement,"[87] the remaining Director Defendants argue that the March 24, 2003, agreement is not effective because it was executed more than one year after plaintiffs were placed on inquiry notice of their § 11 claims by information about Black Thunder disclosed in DI's Form 10-K filed on March 13, 2002. Because the court has already concluded that plaintiffs were not placed on inquiry notice by the disclosures of March 13, 2002, see above § IV.C.3.(3).(c).(2).(i), the court is not persuaded that plaintiff's § 11 claims were already stale when the tolling agreement was executed on March 24, 2003.
Citing Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 111 S.Ct. 2773, 2782, 115 L.Ed.2d 321 (1991), the remaining Director Defendants argue that the tolling agreement is ineffective with respect to the § 11 claims because § 11 claims cannot be equitably *859 tolled.[88] Although Lampf concerned the statute of limitations for securities fraud claims asserted under § 10(b), because the statutes of limitations applicable to both § 11 and § 10(b) actions are essentially the same, the Director Defendants argue that the Court's holding in Lampf controls this case. In Lampf the Court concluded that the equitable tolling doctrine is fundamentally inconsistent with the statute of limitations which by its terms "begins after discovery of the facts constituting the violation, making tolling unnecessary." Id. Citing ESI Montgomery County, Inc. v. Montenay Intern. Corp., 899 F.Supp. 1061 (S.D.N.Y.1995), plaintiffs argue that Lampf is inapposite because they do not argue that the statute of limitations is equitably tolled but, instead, that defendants have expressly waived all defenses based on the statute of limitations.[89] In ESI the court concluded that Lampf applies to situations where parties invoke the doctrine of equitable tolling, but does not apply to situations where plaintiffs rely, instead, on express waivers of limitations. Id. at 1066. In ESI the court relied on a letter agreement in which the parties had expressly agreed to waive the statute of limitations defense. Id. Although defendants attempt to distinguish ESI on grounds that it involved a § 10(b) instead of a § 11 claim, the court concludes that this is a distinction without meaning because the Lampf case on which defendants rely was also a § 10(b) case.[90]
The ability of parties to enter agreements to waive the assertion of defenses based on limitations has long been recognized in this circuit. See, e.g., Baris v. Sulpicio Lines, Inc., 932 F.2d 1540, 1551 (5th Cir.), cert. denied, 502 U.S. 963, 112 S.Ct. 430, 116 L.Ed.2d 449 (1991). The court concludes that express agreements pursuant to which defendants waive their right to assert limitations-based defenses to § 11 claims are not ineffective as a matter of law. See Rowe v. Marietta Corp., 955 F.Supp. 836, 841 (W.D.Tenn.1997) (recognizing ability of parties to execute written agreement to extend the one-year limitations period for 1933 Act claims).
Lead Plaintiff has alleged that the remaining Director Defendants are bound by written agreement not to assert limitations-based defenses to claims filed in this action. Because the court has concluded that the § 11 claims asserted against these defendants were not stale on March 24, 2003, the date the written agreement is alleged to have taken effect, and because the court has concluded that such agreements are not ineffective as a matter of law, the court concludes that the motion to dismiss the § 11 claims asserted against the remaining Director Defendants as barred by limitations must be denied. See Jones, 339 F.3d at 366; Kansa, 20 F.3d at 1366-1370 (dismissal of claims as barred by limitations is not appropriate when plaintiff's pleadings raise a basis for tolling).
3. Arthur Andersen
Lead Plaintiff argues that the § 11 claims asserted against Andersen, including those arising from the July 27, 2001, registration statement for DI's stock offer of December 20, 2001, are not barred by limitations because "plaintiffs did not have notice of their claims against Andersen until Dynegy informed the investing *860 public that Andersen's audit should no longer be relied upon"[91] and because Andersen executed a tolling agreement.[92] In support of their argument that they "did not have notice of their claims against Andersen until Dynegy informed the investing public that Andersen's audit should no longer be relied upon," [93] plaintiffs allege that the earliest disclosure naming Andersen came in August of 2002 when Dynegy
revealed it had hired PricewaterhouseCoopers to "reaudit" its 1999-2001 consolidated financial statements, announced it "intend[ed] to file amended reports" to its publicly reported financials and declared Andersen's 2001 audit opinion "should no longer be relied upon."
(SAC ¶ 139)
Because DI informed the investing public that Andersen's audit should no longer be relied upon in its 2002 first-quarter Form 10-Q filed on May 15, 2002, the court concludes that plaintiffs were placed on inquiry notice of their claims against Andersen on that date.[94] Because May 15, 2002, is more than one year before June 6, 2003, the date on which Lead Plaintiff filed its Consolidated Complaint, the court concludes that the § 11 claims asserted against Andersen arising from the registration statements for DI's stock offering of December 20, 2001, are barred by limitations unless subject to a tolling agreement because those claims are based on misrepresentations about Project Alpha.
Lead Plaintiff asserts that Andersen executed a tolling agreement, and Andersen's reply makes clear that it did, in fact, execute a tolling agreement with Lead Plaintiff.[95] Because Lead Plaintiff is not required to plead facts that negate affirmative defenses like the statute of limitations, the court is not persuaded that Lead Plaintiff's failure to allege the existence of a specific tolling agreement in its complaint precludes plaintiffs from relying upon such an agreement to defeat a defendant's assertion of limitations as an affirmative defense. See Fed.R.Civ.P. 8(c) (requiring defendants to plead and prove affirmative defenses, including limitations).
Andersen also argues that the § 11 claims asserted against it, including those claims arising from the July 27, 2001, registration statement for DI's stock offering of December 20, 2001, should be dismissed as barred by limitations because the statute of limitations had already run at the time the tolling agreement was executed *861 and because Lead Plaintiff failed to perform its sole duty thereunder. [96] Andersen argues that the statute of limitation had already expired when the tolling agreement was signed on March 31, 2003, because plaintiffs were placed on inquiry notice of their 1933 Act claims on March 13, 2002, when DI filed its 2001 Form 10-K with the SEC.[97] Because the court has already concluded that plaintiffs were not placed on inquiry notice of their 1933 Act claims by disclosures made on March 13, 2002, see § IV.C.3.(c).(2).(i), the court is not persuaded that the tolling agreement is unenforceable because the statute of limitations had already run when it was signed.
Andersen asserts that the agreement required Lead Plaintiff to give Andersen thirty days' notice prior to filing claims against it, but that because Lead Plaintiff did not give Andersen thirty days' notice prior to asserting its § 11 claims, Andersen is relieved of its duty to perform the agreement, and Lead Plaintiff is barred from seeking to enforce it.[98] This argument raises questions of fact that cannot be resolved on the pleadings alone. Because the court is not persuaded that the limitations period had expired when Andersen executed its tolling agreement, and because Andersen's assertion that Lead Plaintiff failed to perform the agreement raises questions of fact, the court concludes that Andersen's motion to dismiss the § 11 claim asserted against it arising from misrepresentations incorporated into the registration statement for DI's stock offering of December 20, 2001, on grounds that this claim is barred by limitations must be denied. See Jones, 339 F.3d at 366; Kansa, 20 F.3d at 1366-1370.
4. Lehman Brothers Inc.
Lehman Brothers Inc.
expressly adopt[s] and incorporate[s] by reference the argument in Part II of the Motion of Defendants Dynegy Inc. and Dynegy Holdings Inc. To Dismiss First Amended Consolidated Complaint For Violations of Securities Act Of 1933, that Plaintiffs' claims are barred by the statute of limitations and are unaffected by any tolling agreements. The Lehman entities entered into their tolling agreement with the Regents on March 24, 2003, and the Merrill entities entered into their tolling agreement with the Regents on March 25, 2003.[99]
Because ¶ 154 of the SAC alleges that "[p]laintiffs executed tolling agreements with ... Dynegy's underwriters," because Lehman admits in its motion to dismiss that it executed a tolling agreement with plaintiffs,[100] and because the court has already concluded that the limitations period did not begin to run on March 13, 2002, as argued by DI, DHI, and the other defendants, *862 the court concludes that the motion to dismiss the § 11 claim asserted against Lehman Brothers Inc. arising from its service as underwriter of DI's stock offering of December 20, 2001, as barred by limitations must be denied.
(C) February 15, 2002, Debt Offering
Lead Plaintiff alleges that the DHI debt securities offered on February 15, 2002, were offered pursuant to a registration statement dated July 27, 2001. (SAC ¶ 131) Lead Plaintiff has asserted claims arising from misstatements included in this registration statement against DHI, the 1933 Act Individual Defendants (SAC ¶ 164), DHI's auditor Arthur Andersen, and underwriters Banc of America Securities LLC, CSFB, ABN AMRO Inc., Banc One Capital Markets Inc., Commerzbank Capital Markets Corp., Credit Lyonnais Securities (USA) Inc., SG Cowen Securities Corp., The Royal Bank of Scotland plc, TD Securities (USA) Inc., and Westdeutsche Landesbank Girozentrale (West LB AG), and their corporate parents. (SAC ¶ 164) Lead Plaintiff alleges that this registration statement contained false statements and omissions of material fact because it incorporated the Companies' 2000 Forms 10-K (SAC ¶ 131) that contained misrepresentations about Black Thunder, and first-through-third-quarter 2001 Forms 10-Q (SAC ¶¶ 56, 131, 133) that contained misrepresentations about, inter alia, Project Alpha.
All the defendants against whom Lead Plaintiff has asserted claims based on misrepresentations contained in the July 27, 2001, registration statement for DHI's debt security offering of February 15, 2002, have argued that these claims should be dismissed because Lead Plaintiff's pleadings establish that plaintiffs were on inquiry notice of facts underlying the alleged misrepresentations about Black Thunder in March of 2002, and about Project Alpha in either April or May of 2002, i.e., more than one year before the Consolidated Complaint was filed on June 6, 2002. For the reasons explained above in § IV.C.3.(2).(i)-(iii), the court has concluded that Lead Plaintiff's pleadings do not establish as a matter of law that plaintiffs were on inquiry notice of facts underlying the § 11 claims arising from misrepresentations about Black Thunder in March of 2002 or about Project Alpha in April of 2002, but were on inquiry notice of misrepresentations about Project Alpha by May 15, 2002, when DI filed its first-quarter 2002 Form 10-Q with the SEC. Accordingly, the court concludes that the § 11 claims arising from misrepresentations contained in the July 27, 2001, registration statement for DHI's debt security offering of February 15, 2001, are barred by limitations unless they relate back to an earlier filed complaint or are otherwise tolled.
1. DHI
For the reasons explained above in § IV.C.3.(b).(3).(ii), the court has already concluded that the § 11 claims asserted against DHI do not relate back to an earlier filed complaint.
Lead Plaintiff alleges that
[p]laintiffs executed a ... tolling agreement with Dynegy. The agreement states any action against Dynegy is deemed to have been commenced no later than March 24, 2003. The tolling agreement was entered on behalf of Lead Plaintiff and the putative class and tolls the applicable statutes of limitations (and similar defenses) for any claim asserted in this litigation. The tolling agreement states in pertinent part that if Lead Plaintiff "files a complaint against Dynegy Incorporated arising out of or related to any offering of Dynegy, Inc. securities, or any claims asserted in [this] Action now or hereafter ... *863 any defense of ... statute of limitations or any other defense based on the passage of time, is hereby tolled, and will be applied as though the action against Dynegy Incorporated was commenced no later than March 24, 2003."
(SAC ¶ 155)[101]
DHI argues that the tolling agreement executed by DI does not apply to claims asserted against it because
[p]laintiff does not allege that it entered into a tolling agreement with Dynegy Holdings. Nor could any of the tolling agreements on which Plaintiff relies apply to claims against any defendant arising from Dynegy Holdings' debt offerings of March 2001 and February 2002. In fact, Dynegy Holdings, a separate incorporated entity and distinct registered issuer with the SEC, is not a signatory to, nor are its securities the subject of, the referenced tolling agreements, which narrowly address a possible future "complaint against Dynegy Incorporated arising out of or related to any offering of Dynegy, Inc. securities."[102]
Although Lead Plaintiff responds that the tolling agreement encompasses plaintiffs' § 11 claims arising from the sale of DHI's debt securities because it applies not only to claims filed against DI arising out of or related to any offering of DI securities, but also to "any claims asserted in [this] Action now or hereafter,"[103] Lead Plaintiff fails to offer any explanation of how or why the tolling agreement executed by DI binds DHI. Even assuming without deciding that claims arising from DHI's debt securities could fall under the rubric of "any claims asserted in [this] Action now or hereafter," Lead Plaintiff does not allege that DHI signed the agreement and does not contest DHI's assertion that because it is a "separate incorporated entity and distinct registered issuer with the SEC,"[104] the agreement cannot bind DHI. Accordingly, the court concludes that the § 11 claim asserted against DHI arising from the registration statement for debt securities issued on February 15, 2002, is barred by limitations.
2. The 1933 Act Individual Defendants
For the reasons explained above in § IV.C.3.(b).(3).(i).(B), the court has already concluded that the § 11 claims arising from DHI's debt security offerings asserted against individual defendants Watson, Bergstrom, Doty, and Mott, do not relate back to an earlier filed complaint.
Lead Plaintiff alleges that "Plaintiffs executed tolling agreements with the Individual Defendants" (SAC ¶ 154), and that these individual defendants are "[t]he defendants identified in ¶¶ 16-19," i.e., Watson, Doty, Bergstrom, and Mott. (SAC ¶ 20) Lead Plaintiff has also alleged a § 11 claim against Dynegy's former chief counsel and secretary, Randolph, and the table included in ¶ 154 of the SAC lists Randolph as having executed a tolling agreement. The court will consider Randolph's arguments together with those of the other individual defendants (Watson, Doty, Bergstrom, and Mott) who have adopted by reference the arguments asserted by *864 the Companies in their motions to dismiss. [105]
The 1933 Act Individual Defendants argue that the tolling agreements that they executed are inapplicable to claims arising from the registration statement for DHI's February 15, 2002, debt security offering because § 11 claims cannot be tolled by agreement, because plaintiffs were on inquiry notice of their § 11 claims before the tolling agreements' effective dates, and because purchasers of DHI's debt securities were not parties to the agreements and were not intended to be third-party beneficiaries of them. For the reasons explained in § IV.C.3.(c).(3).(ii).(B).(2), above, the court has already concluded that defendants' argument that § 11 claims cannot be tolled by agreement lacks merit, and for the reasons explained in §§ IV.C.3.(c).(2).(i) and IV.C.3.(c).(3).(i).(A), above, the court has already concluded that the plaintiffs were not placed on inquiry notice on March 13, 2002, before the tolling agreements are alleged to have taken effect.
The court is persuaded, however, that the tolling agreements executed by the 1933 Act Individual Defendants are inapplicable to § 11 claims arising from the registration statement for DHI's debt security offering of February 15, 2002, because the putative class on whose behalf the agreements were executed did not include purchasers of DHI's debt securities. Defendants argue that tolling agreements are not enforceable for claims arising from DHI's February 15, 2002, debt security offering because
the agreement was entered into by Lead Plaintiff "on behalf of itself and the putative class in In re Dynegy Inc. Sec. Litig., Master File No. H-02-1571," as of March 24, 2003[, and n]one of the putative classes alleged in any of the original complaints included Hawaii Ironworkers and WVIMB or any Dynegy Holdings debt security holder.[106]
Lead Plaintiff responds that because the "putative class" is identified without reference to time, and because the tolling agreement is necessarily forward looking, WVIMB is a third-party beneficiary of the tolling agreement because WVIMB is a member of the putative class alleged in the 1933 Act Complaint.[107]
When construing a contract under Texas law the court must strive to give effect to the written expression of the parties' intent. Forbau v. Aetna Life Ins. Co., 876 S.W.2d 132, 133 (Tex.1994); Sun Oil Co. (Del.) v. Madeley, 626 S.W.2d 726, 727-28 (Tex.1981) (goal of contract interpretation is to give effect to the parties' intentions as expressed in the contract). Texas courts read the contract as a whole and give each part of the contract meaning. Forbau, 876 S.W.2d at 133. If a written contract is worded in such a way that it can be given a definite or certain legal meaning then the contract is not ambiguous. National Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc., 907 S.W.2d 517, 520 (Tex.1995); Sun Oil, 626 S.W.2d at 732.
The parties agree that the tolling agreement purports to toll the statute of limitations for asserting claims against the defendants in this action. They disagree, however, about the scope and meaning of *865 that agreement. The agreement entered by Lead Plaintiff and the 1933 Act Individual Defendants provides as follows:
This Agreement, dated as of March 24, 2003, is made by and among (1) the Regents of the University of California, Lead Plaintiff, on behalf of itself and the putative class in In re Dynegy, Inc. Securities Litigation, Master File No. H-02-1571 (the "Action"), pending in the United States District Court for the Southern District of Texas; and (2) Charles L. Watson, Robert D. Doty, Stephen W. Bergstrom, Michael R. Mott, Kenneth E. Randolph ... (the "Dynegy Individuals").
The parties to this Agreement agree as follows:
1. In the event that, prior to the termination of this Agreement or any extension thereof, Lead Plaintiff (1) files a complaint against any of the Dynegy Individuals arising out of or related to any offering of Dynegy, Inc. Securities, or any claims asserted in the Action now or hereafter; ... any defense of laches, estoppel, statute of limitations or any other defense based on the passage of time, is hereby tolled, and will be applied as though the action against the Dynegy Individual(s) was commenced no later than March 24, 2003 ...[108]
Because the parties do not argue that this agreement is ambiguous, and because it is worded in such a way that it can be given a definite or certain legal meaning, the court concludes that this agreement is not ambiguous. See National Union Fire, 907 S.W.2d at 520. The interpretation of an unambiguous agreement is a question of law. DeWitt County Elec. Coop., Inc. v. Parks, 1 S.W.3d 96, 100 (Tex.1999).
Contrary to Lead Plaintiff's contention that the "putative class" named in the agreement is identified without reference to time and, therefore, broad enough to encompass WVIMB as a third-party beneficiary because WVIMB is a member of the putative class alleged in the Consolidated Complaint filed on June 6, 2003,[109] the court concludes that the "putative class" named in the agreement is necessarily identified by reference to the agreement, which expressly states
This Agreement, dated as of March 24, 2003, is made by and among (1) the Regents of the University of California, Lead Plaintiff, on behalf of itself and the putative class in In re Dynegy, Inc. Securities Litigation, Master File No. H-02-1571 (the "Action"), pending in the United States District Court for the Southern District of Texas.[110]
On March 24, 2003, the putative class included only purchasers of various interests in the common stock of DI. Lead Plaintiff's original complaint, which was filed on June 25, 2002, was brought on behalf of "all persons who purchased the common stock of Dynegy Inc .... between January 23, 2001 and May 15, 2002."[111] Although members of the class included purchasers of DI stock and stock options,[112] by March *866 24, 2003, no claims had been asserted on behalf of debt securities purchasers against DHI, and the putative class did not include purchasers of DHI's debt securities.
Citing Frazer v. United States, 49 Fed.Cl. 734, 736 (2001), aff'd 288 F.3d 1347 (Fed.Cir.2002), and Caguas Central Federal Savings Bank v. United States, 215 F.3d 1304, 1308-1309 (Fed.Cir.2000), cert. denied, 531 U.S. 1070, 121 S.Ct. 759, 148 L.Ed.2d 661 (2001), defendants assert that "[g]iven that the agreement expressly addresses only `Dynegy Inc.' and `any offering of Dynegy Inc. securities,' there is nothing in the text of the agreement to suggest that a Dynegy Holdings bondholder was intended to be a third-party beneficiary of the agreement." See Frazer, 49 Fed.Cl. at 736 (disallowing extension of tolling to bank where bank "was not a party to this agreement and there is nothing in the text of the agreement to suggest that the bank was intended to be a third-party beneficiary of the agreement"); Caguas Central Savings, 215 F.3d at 1309-1310 (person who was not a party to tolling agreement could not rely upon agreement where the person did not "fall within a class clearly intended to be benefitted thereby").
Lead Plaintiff attempts to distinguish these and other cases on which defendants rely as not involving a proposed class action and not involving tolling agreements that include express language covering absent class members, but Lead Plaintiff fails to cite any authority supporting its argument that the "putative class" named in a tolling agreement may include any party that the Lead Plaintiff subsequently attempts to add as a named plaintiff. Although Lead Plaintiff's position in this litigation allows it to add parties and claims intended to broaden the class, its position as Lead Plaintiff does not allow it to add parties whose claims have otherwise expired. In re Enron Corp. Sec., Derivative & "ERISA" Litig., 310 F.Supp.2d 819, 859 (S.D.Tex. March 29, 2004) (recognizing Lead Plaintiff's ability to add party plaintiffs so long as their claims are timely). See also In re Enron Corp. Sec., Derivative & "ERISA" Litig., 2004 WL 405886, *7-*20 (S.D.Tex. February 25, 2004)(addressing limitations in context of motion to intervene).
Because as of March 24, 2003, the putative class included only purchasers of DI stock and stock options, basic principles of contract construction prevent the court from concluding that the tolling agreements entered by the 1933 Act Individual Defendants with Lead Plaintiff acting on behalf of the putative class as of March 24, 2003, apply to § 11 claims asserted by Lead Plaintiff on behalf of WVIMB and a putative class of DHI bond holders, none of whom were proposed as plaintiffs until June 6, 2003, when the Consolidated Complaint was filed. Accordingly, the court concludes that § 11 claims asserted against the 1933 Act Individual Defendants arising from the registration statement for DHI's February 15, 2002, debt security offering are barred by limitations.
3. Andersen and Underwriters
The court has already concluded that Andersen executed a tolling agreement with Lead Plaintiff. See § IV.C.3.(c).(3).(ii).(B).(3), above. Paragraph 154 of the SAC alleges that "Plaintiffs executed tolling agreements with ... Dynegy's underwriters." In response to the motions to dismiss urged by each of these defendants, Lead Plaintiff has submitted to the court copies of the tolling agreements that it entered with each of *867 them.[113] Like DHI and the 1933 Act Individual Defendants, these defendants argue that the tolling agreements entered with Lead Plaintiff are unenforceable to toll the statute of limitations for § 11 claims arising from the registration statement for DHI's February 15, 2002, debt security offering because, inter alia, the putative class on whose behalf the tolling agreements were executed did not include DHI bondholders. The court agrees. For the reasons explained above in § IV.C.3.(c).(ii).(C).(2), above, the court concludes that the tolling agreements executed by Arthur Andersen and the underwriters are unenforceable for claims arising from DHI's February 15, 2002, debt offering.
4. Negative Causation Defense
Defendants argue that the § 11 claims that Lead Plaintiff asserts on behalf of Hawaii Ironworkers for damages arising from DHI's March 15, 2001, debt security offering and on its own behalf for damages arising from DI's December 20, 2001, stock offering should be dismissed in whole or in part because they are subject to the negative causation defense. Asserting that this is an affirmative defense on which defendants bear the burden of proof, Lead Plaintiff responds that this defense may not be considered on a motion to dismiss.
(a) Applicable Law
Section 11(a) of the 1933 Act imposes civil liability on issuers and other signatories of a registration statement if the registration statement contains material misrepresentations and the plaintiffs acquired the securities without knowledge of the misrepresentations. See 15 U.S.C. § 77k(a); Akerman v. Oryx Communications, Inc., 810 F.2d 336, 340 (2d Cir.1987). Section 11(e) provides the measure of damages in 1933 Act suits:
The suit ... may be to recover such damages as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages [as calculated under subsection (1), above] ...
15 U.S.C. § 77k(e). Because § 11(a) imposes strict liability for misrepresentations contained in a registration statement, any decline in value is presumed to be caused by the misrepresentation. See Akerman, 810 F.2d at 340. Section 11(e), however, provides the following affirmative defense:
[I]f the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, such portion of or all such damages shall not be recoverable.
15 U.S.C. § 77k(e). This defense is known as the "negative causation defense." See Akerman, 810 F.2d at 340. Where a defendant proves that the decline in the value of a security was not caused by the material omissions or misstatements in the registration statement, plaintiff is not entitled to recover any damages. Id. The *868 defendant bears the burden of proof on this defense. Id. Although the defendant's burden has been characterized by courts as "heavy," it is not insurmountable, id. at 341, and courts have awarded both summary judgment and Rule 12(b)(6) dismissal to defendants in appropriate cases. See In re Fortune Systems Sec. Litig., 680 F.Supp. 1360, 1369-1370 (N.D.Cal.1987)(granting summary judgment); In re McKesson HBOC, Inc. Sec. Litig., 126 F.Supp.2d 1248, 1262 (N.D.Cal.2000)(granting motion to dismiss).
(b) Hawaii Ironworkers
Defendants argue that the § 11 claims based on the March 2001 debt offering must be dismissed because Lead Plaintiff's pleadings establish that Hawaii Ironworkers, the only entity alleged to have purchased securities issued in the March 15, 2001, debt offering, sold all of its holdings on May 16, 2001, months before any of the so-called "truth" concerning alleged misstatements about Black Thunder or Dynegy's falsified financial statements was disclosed to the public.[114] Relying on Akerman, 810 F.2d at 342, defendants argue that although the 1933 Act Complaint alleges generally that Hawaii Ironworkers' loss was the direct and proximate result of defendants' alleged misrepresentations (sac ¶ 173), when read together with the § 27 certification executed by Hawaii Ironworkers, the 1933 Act Complaint shows on its face that Hawaii Ironworkers could not have suffered any losses caused by misrepresentations in the registration statement for the March 15, 2001, debt offering because none of the alleged misrepresentations about Black Thunder or Dynegy's falsified financial statements were disclosed before Hawaii Ironworkers sold their DHI notes on May 16, 2001. Lead Plaintiff responds that although the Akerman court did assert that "[in claims brought under § 11 t]he price decline before disclosure may not be charged to defendants," 810 F.2d at 342, Akerman was not decided on a Rule 12(b)(6) motion to dismiss but on a Rule 56 motion for summary judgment. Lead Plaintiff also argues that the cases in which Rule 12(b)(6) dismissals have been granted pursuant to the negative causation defense, and on which defendants rely, e.g., In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 272 F.Supp.2d 243, 253-255 (S.D.N.Y.2003), and McKesson, 126 F.Supp.2d at 1262, are distinguishable on their facts from this case. The court agrees.
The certification attached to Lead Plaintiff's original consolidated complaint (Docket Entry No. 112) alleges that Hawaii Ironworkers purchased their DHI debt securities on April 17, 2001, for $99.76 each and sold them a month later, on May 16, 2001, for $97.56 each, suffering a loss of $2.20 per note. This certification also shows that Hawaii Ironworkers sold their DHI securities ten months before Lead Plaintiff alleges that facts about the Black Thunder transaction began to be disclosed in March of 2002 (SAC ¶ 47; SEAC ¶ 51), a year before Lead Plaintiff alleges that analysts began to question the Black Thunder transaction in an article published in The New York Times on May 14, 2002 (SAC ¶ 150; SEAC ¶ 263), and more than a year before July 23, 2002, when Lead Plaintiff alleges that DHI investors became aware that DHI's financial condition and credit were seriously compromised. (SAC ¶¶ 3, 139, 142)
Because violation of § 11(a) is a strict liability offense, once plaintiff has alleged that he purchased a security traceable to a registration statement containing material *869 misrepresentations, any decline in value is presumed to have been caused by the misrepresentations in the registration statement. See Akerman, 810 F.2d at 340-341. Although § 11(e) provides an affirmative defense to defendants who can "prove[ ] that any portion or all of such damages represent[ ] other than the depreciation in value ... resulting from [the alleged misrepresentations]," 15 U.S.C. § 77k(e), the mere fact that plaintiff's losses were incurred before the alleged misrepresentations became public is not proof that the losses are attributable to something other than the misrepresentations in the registration statement. "[W]hether losses are attributable to other sources is necessarily a fact question." In re Initial Public Offering Sec. Litig., 241 F.Supp.2d 281, 351 n. 80 (S.D.N.Y.2003).
Courts have dismissed § 11 claims under Rule 12(b)(6) only when undisputed facts make "clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Swierkiewicz, 122 S.Ct. at 998. See, e.g., McKesson, 126 F.Supp.2d at 1248 (dismissing § 11 claims under Rule 12(b)(6) after finding that facts pleaded in complaint showed that plaintiff suffered no loss because plaintiff sold for a profit); Merrill Lynch, 272 F.Supp.2d at 253-255 (dismissing § 11 claim under Rule 12(b)(6) upon finding that undisputed facts showed plaintiff's alleged losses were not recoverable under § 11 because the price decline for which plaintiff sought recovery matched price decline in the market at large); Initial Public Offering, 241 F.Supp.2d at 281 (dismissing under Rule 12(b)(6) § 11 claims asserted by plaintiffs who pleaded facts establishing that they sold their shares above the offering price).
Defendants point to no allegations in the pleadings that explain what, other than the misrepresentations, could have caused the loss allegedly suffered by Hawaii Ironworkers. Because defendants bear the burden of proving that the cause of the alleged loss is attributable to something other than the alleged misrepresentations, and because defendants here have offered no explanation for Hawaii Ironworkers' alleged loss, the court is not persuaded that the § 11 claims asserted by Lead Plaintiff on their behalf should be dismissed at this stage of the lawsuit. Moreover, the cases on which defendants rely do not support an alternative outcome.
In Merrill Lynch, 272 F.Supp.2d at 254, the court dismissed plaintiff's § 11 claims on a Rule 12(b)(6) motion only after concluding that plaintiff's alleged losses could not be attributed to the non-disclosures underlying her claims. The court did not dismiss those claims merely because plaintiff's losses occurred before the alleged non-disclosures were revealed to the public. See id. at 272 F.Supp.2d at 254-255. The plaintiff alleged losses from the decline in value of fund shares that occurred before April 8, the day the plaintiff alleged that information concerning investment banking conflicts were first disclosed in an attorney general's report. Id. at 254. The court dismissed the plaintiff's § 11 claim only after determining that the fund's net asset value per share had declined approximately 76.5% over the alleged class period, that the technology sector in which the fund shares were invested had suffered a proportionate decline over the same period, and that the fund held no shares in the companies mentioned in the attorney general's report issued on April 8. Id. Although the court cited Akerman, 810 F.2d at 342, in support of its decision to dismiss the plaintiff's § 11 claims, the court did not dismiss those claims merely because plaintiff's losses had occurred before the alleged misrepresentations were disclosed. Instead, the court dismissed those claims upon determining that plaintiff's losses had *870 been caused by a factor other than the misrepresentations in the registration statement, i.e., market decline. McKesson, 126 F.Supp.2d. at 1262, is also factually distinguishable from this case. There the dismissal was granted only after the court determined that plaintiffs had sold their securities for a profit. Id.
Because Lead Plaintiff alleges that the registration statement for the DHI debt securities offered on March 15, 2001, contained misrepresentations, that Hawaii Ironworkers purchased securities traceable to that registration statement and sold those securities for a loss, a presumption arises that the loss suffered by Hawaii Ironworkers is attributable to the misrepresentations contained in the registration statement. Because defendants have pointed to no facts in the pleadings that would allow the court to conclude that Hawaii Ironworkers' losses were caused by some other factor, defendants' motions to dismiss claims arising from the registration statement for DHI's debt securities offered on March 15, 2001, as subject to the negative causation defense will be denied.
(c) The Regents
Citing Akerman, 810 F.2d at 342, for its assertion that "price decline before disclosure [of the truth] may not be charged to defendants," defendants argue that Lead Plaintiff's § 11 claims based on the December 20, 2001, stock offering should be dismissed to the extent that those claims seek damages for untruths revealed after May of 2002 because Lead Plaintiff, the only entity alleged to have purchased Dynegy stock, testified at the Olis trial that it sold its stock in May of 2002 before the alleged "truth" concerning many of the misrepresentations alleged in the 1933 Act Complaint were publicly revealed. [115] In support of this argument defendants cite Lead Plaintiff's allegations that the Companies' false statements about asset impairment, forward power curves, investment valuation, and accounting for acquisitions and taxes were all disclosed after May of 2002, the month in which, according to Lead Plaintiff's testimony at the Olis trial, Lead Plaintiff sold its Dynegy stock.[116] Defendants also cite Merrill Lynch, 272 F.Supp.2d at 253-255, and McKesson, 126 F.Supp.2d at 1262, as examples of cases in which plaintiffs' § 11 claims have been dismissed on Rule 12(b)(6) motions pursuant to assertions of the negative causation defense.
Citing Initial Public Offering, 241 F.Supp.2d at 351 n. 80, Lead Plaintiff responds that its § 11 claims should not be dismissed on these grounds because the timing of its stock sale, offered through testimony from the Olis trial, does not show that the depreciation in value of Dynegy stock was unrelated to misrepresentations in the registration statement, because the stock's price decline remains a subject of factual inquiry, and because the price decline is presumed to have been caused by misrepresentations in the registration statement.[117] The court agrees.
In Akerman plaintiffs sought damages for a depreciation in stock price that occurred prior to public disclosure of misleading information on the theory that insider trading had deflated the securities' true value. 810 F.2d at 341-343. After *871 defendants presented evidence that no depreciation in value had occurred between the time of disclosure and the time that suit was filed and that, in fact, the price at the time of suit was higher than at the time of the offering, the court granted defendants' summary judgment. Id.See also Akerman v. Oryx Communications. Inc., 609 F.Supp. 363, 370-371 (S.D.N.Y.1984), aff'd by 810 F.2d 336 (2d Cir.1987).
Although the Akerman court stated that price declines that occur before disclosure of misrepresentations are generally not attributable to defendants, the court allowed plaintiffs the opportunity to show that such a price decline was, in fact attributable to the undisclosed misrepresentations. Because the Akerman court did not dismiss the plaintiffs' claim merely because the plaintiffs sought recovery of damages for a price decline that occurred before disclosure of the alleged misrepresentations, and because defendants in the present case fail to show that the price decline is attributable to something other than the misrepresentations incorporated into the registration statement, the court is not persuaded that Akerman supports the defendants' argument that § 11 claims for misrepresentations that were not disclosed until after the stock declined in price should be dismissed. Accordingly, defendants' motions to dismiss claims arising from the registration statement for DI's stock offering of December 20, 2001, as subject to the negative causation defense, will be denied.
5. Non-Issuer Affirmative Defenses
In addition to the limitations and loss-based affirmative defenses available to all defendants, the non-issuer defendants may assert statutorily recognized affirmative defenses, i.e., (1) the defendant conducted a reasonable investigation, § 11(b)(3)(A)-(B) (the due diligence defense), 15 U.S.C. § 77k(b)(3)(A)-(B); and (2) the defendant reasonably relied on the opinion of an expert, § 11(b)(3)(C), 15 U.S.C. § 77k(b)(3)(C). The reasonableness of the defendants' investigation and/or reliance on an expert is judged by the objective standard of "a prudent man in the management of his own property." 15 U.S.C. § 77k(c). Defendants bear the burden of proof for these affirmative defenses. See Fed.R.Civ.P. 8(c), and 15 U.S.C. § 77k(b).
(a) Reasonable Investigation (Due Diligence)
Entitlement to the reasonable investigation defense requires defendants to establish that after reasonable investigation they had reasonable grounds to believe, and did believe, that the non-expertised parts of the registration statement were accurate. 15 U.S.C. § 77k(b)(3)(A). Lead Plaintiff has pleaded that "[n]one of [the 1933 Act Individual Defendants or the Director Defendants] made a reasonable investigation or possessed reasonable grounds for the belief that the alleged misleading statements in the registration statements ... were true and did not omit any material facts." (SAC ¶ 169) The Director Defendants argue that the § 11 claims asserted against them should be dismissed because they conducted a reasonable investigation of the non-expertised portions of the registration statements, and of Project Alpha.[118]
The only § 11 claim asserted against the Director Defendants is the claim arising *872 from the registration statement for DI's December 20, 2001, stock offering. In support of their argument that they are entitled to dismissal of this claim based on the due diligence defense, the Director Defendants cite Lead Plaintiff's allegations that Dynegy's management made a presentation to the board's finance committee about Project Alpha's tax and accounting treatment (SEAC ¶ 136), Foster's testimony at the Olis trial that management told the board the Company would receive accounting and tax opinions from Andersen for Project Alpha (SEAC ¶ 136), and Andersen's opinion letters regarding Project Alpha's tax and accounting treatment (SEAC ¶ 136). From these allegations the Director Defendants conclude that "[t]he Amended Complaints thus demonstrate that the Board not only was assured by Dynegy management of the propriety of Project Alpha, but also that Dynegy received expert opinions from Andersen regarding both the accounting and tax aspects of that transaction."[119] The Director Defendants also argue that the objective reasonableness of their investigation of Project Alpha is further demonstrated by plaintiffs' allegations that employees conspired with outside counsel and bankers to conceal from Andersen aspects of Project Alpha that would have revealed its "bogus nature."[120]
Lead Plaintiff responds that the Director Defendants fail to point to any allegations in the pleadings that establish as a matter of law that they "had, after reasonable investigation, reasonable ground to believe and did believe," that the challenged registration statement contained no material misstatements or omissions.[121] The court agrees.
Lead Plaintiff's pleadings do not allege that the Director Defendants conducted any investigation of the information contained in the registration statement for DI's stock offering, much less a reasonable investigation. Moreover, the Director Defendants do not argue that they conducted any investigation. Instead, they argue that they did not need to conduct an investigation because they reasonably relied on representations made by Dynegy's managers. Reliance on company managers does not entitle board members to dismissal based on due diligence. Moreover, the Director Defendants' reliance on testimony presented at the Olis trial and assertions that company employees conspired with outside counsel and bankers to conceal information from company auditors persuades the court that whether the Director Defendants' reasonably relied on managements' presentations is a question of fact that cannot be decided on the pleadings alone.
(b) Reasonable Reliance on an Expert
Entitlement to the reasonable-reliance-on-an-expert defense requires defendants to establish that they had no reason to believe, and did not believe, that the expertised parts of the registration statement were inaccurate. 15 U.S.C. § 77k(b)(3)(C).
(1) Individual and Director Defendants
Randolph and the Director Defendants argue that the § 11 claims asserted against them should be dismissed because they reasonably relied on Andersen's opinions that the expertised parts of the challenged registration *873 statements were accurate. Randolph also argues that he reasonably relied on the opinion of Dynegy's corporate counsel, Vinson & Elkins. In support of this argument defendants cite Lead Plaintiff's allegations that Andersen audited the Companies' financial statements during the Class Period, issued certified reports with unqualified opinions, and consented to incorporation of its certified reports containing its opinions into the challenged registration statements. Defendants argue that plaintiffs' allegation that Andersen certified the 2000 Form 10-K establishes that defendants reasonably relied on Andersen's opinion regarding the propriety of Black Thunder, and that plaintiff's allegation that Andersen certified the propriety of Project Alpha establishes that defendants reasonably relied on Andersen's opinion regarding Project Alpha's propriety. [122] Defendants also cite plaintiffs' allegations that Andersen supplied an opinion concerning the propriety of the tax component of Project Alpha, as well as an SAS-50 letter addressing the propriety of Project Alpha's accounting treatment, and Lead Plaintiff's failure to allege that defendants had any reasonable basis for doubting the integrity of Andersen's representations.[123]
Given the complexity of the Black Thunder and Project Alpha transactions, and plaintiffs' allegations that Andersen was, itself, deceived, defendants argue that imposition of liability on them would effectively require them to have discovered information that was used to deceive the auditors.[124] In support of these arguments defendants cite In re Software Toolworks Inc., 50 F.3d 615, 624 (9th Cir.1994), cert. denied sub nom. Montgomery Securities v. Dannenberg, 516 U.S. 907, 116 S.Ct. 274, 133 L.Ed.2d 195 (1995) (accounting decisions "represent precisely the type of `certified' information on which section 11 permits non-experts to rely"), and In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1421 (9th Cir.1994), cert. denied, 516 U.S. 868, 116 S.Ct. 185, 133 L.Ed.2d 123 (1995)(reliance on auditor immunized other defendants from liability for allegedly false or misleading statements).
Lead Plaintiff responds that the pleadings do not establish that Randolph and the Director Defendants reasonably relied on Andersen's opinions because the pleadings contain no facts showing that these defendants believed the registration statements were accurate, or that given the improprieties allegedly exemplified by Black Thunder, Project Alpha, and Dynegy's pervasive inflation of its natural gas and power trading results, these defendants had reason to believe that reliance on Andersen's opinions was reasonable under the circumstances.[125] Lead Plaintiff also argues that because the reasonable reliance defense applies only to expertised portions of the registration statements, and because its allegations are based not just on expertised 10-K forms, but also on non-expertised 10-Q forms, that the reliance-on-an-expert defense is unavailing to these defendants. [126] Lead Plaintiff also argues that Randolph's reliance on the opinion of Vinson & Elkins is unavailing *874 because that opinion stated only "that the Notes ... will constitute legal, valid and binding obligations of" DHI, something that plaintiffs have not challenged.[127] The court agrees.
Because plaintiffs have not challenged the validity of the notes, Randolph's reliance on Vinson & Elkins' opinion is unavailing. In Worlds of Wonder, 35 F.3d at 1421, on which defendants rely, the court concluded that reliance on the auditor immunized other defendants from liability for allegedly false or misleading statements because the plaintiffs admitted that the company's management made full disclosure of all material information to the auditor. In the present case, however, plaintiffs allege that Dynegy employees withheld material information from its auditor. Whether Randolph and the Director Defendants' reliance on the expertised parts of the registration statements certified by Andersen was reasonable under the circumstances is, therefore, a question of fact that cannot be resolved on the pleadings alone.
(2) Underwriter and Related Defendants
Lead Plaintiff has pleaded that
[t]he underwriting defendants named in this complaint underwrote the Dynegy and Dynegy Holdings securities sold in the offerings... these defendants were obligated to make reasonable and diligent investigations of the statements contained in the registration statements ... to ensure that they were not misleading... the underwriters did not make a reasonable and diligent investigation, nor did they possess reasonable grounds for the belief that the statements contained in the registration statements ... were true ...
(SAC ¶ 172)
The Underwriter Defendants argue that the § 11 claims asserted against them should be dismissed because § 11 provides a safe harbor for underwriters who rely in good faith on the expertised portions of a registration statement.[128] Citing In re Worlds of Wonder Sec. Litig., 814 F.Supp. 850, 867-868 (N.D.Cal.1993), aff'd in part, rev'd in part, 35 F.3d 1407 (9th Cir.1994), cert. denied, 516 U.S. 868, 116 S.Ct. 185, 133 L.Ed.2d 123 (1995), the Underwriter Defendants argue they are not required to investigate the expertised portions of a registration statement because they have no duty to repeat the auditors' investigation of the issuer's financial statements.[129] They also argue that they are not competent to second guess the auditors on complex issues such as accounting for minority interest transactions and proper use of mark-to-market accounting, especially where, as here, plaintiffs do not allege any facts suggesting that the underwriters had any reason to believe that DHI's financial statements contained material misstatements or omissions, and disclaim any allegations that the underwriters acted in bad faith.[130]See id. at 864-865 ("It is absurd in these circumstances for Plaintiffs to suggest that the other defendants, who are not accountants, possibly could have known of any mistakes by [the auditor].").[131]
Lead Plaintiff responds that the § 11 claims asserted against the underwriters *875 should not be dismissed because the pleadings do not contain facts establishing that the underwriters reasonably relied on experts, because the burden to plead and prove such facts lies with the underwriters and not with plaintiffs, and because despite the underwriters' assertions to the contrary, complex transactions such as Black Thunder and Project Alpha are "just as much, if not more so, the domain of the Underwriter Defendants  sophisticated, investment bankers  as they are in the realm of auditors." [132] Lead Plaintiff also argues that because the § 11 claims asserted against the underwriters are premised not only on the expertised portions of the registration statements, but also on the non-expertised portions represented by the Companies' admittedly false and misleading quarterly financial results reported on unaudited 10-Q forms, and because the underwriters are legally responsible for the accuracy of those interim, unaudited financial results, the reliance-on-an-expert affirmative defense does not provide sufficient grounds for dismissing the § 11 claims asserted against the underwriters. The court agrees.
Although the underwriters are entitled to rely on the expertised portions of the registration statements, they are only allowed to do so as long as that reliance is reasonable. Defendants bear the burden of pleading and proving that their reliance was reasonable. The underwriters' argument that the § 11 claims asserted against them should be dismissed because they reasonably relied on Andersen's opinions is based solely on assertions that the registration statements contained portions that were certified by Andersen and that plaintiffs' pleadings do not contain facts showing why the underwriters should not have relied on those expertised portions of the registration statements. Because the underwriters bear the burden of pleading and proving that their reliance on expertised portions of the registration statements was reasonable, and because they have failed to cite any allegations in the pleadings that establish their reliance was reasonable, the court is not persuaded that the § 11 claims asserted against them should be dismissed on this basis.
(c) Conclusions
As recognized by defendants, "it is typically premature to raise these affirmative defenses [based on due diligence and reliance on an expert] in a motion to dismiss."[133] Because the non-issuer defendants who have asserted entitlement to these affirmative defenses  the Director Defendants and the underwriters  have failed to show that facts included in the pleadings establish as a matter of law either that any of them conducted a reasonable investigation of any of the non-expertised parts of the challenged registration statements, or that their reliance on the expertised parts of the registration statements was reasonable under the circumstances, the court concludes that these defendants have failed to establish their entitlement to these affirmative defenses as a matter of law, and that their motions to dismiss on this basis should be denied. Significantly, the authorities on which these defendants rely in support of their arguments for dismissal had all reached summary judgment or trial before a determination regarding entitlement to these affirmative defenses was made. See, e.g., Software Toolworks, 50 F.3d at *876 624 (summary judgment); Worlds of Wonder, 35 F.3d at 1421 (summary judgment). Because Lead Plaintiff has otherwise satisfied the pleading requirements of § 11, it does not need to show that the non-issuer defendants failed in their due diligence obligations. Non-issuer defendants wanting to avail themselves of the safe harbor defenses provided by the 1933 Act must affirmatively demonstrate their entitlement to those defenses. As observed by the Enron court,
[t]here is good reason why such a decision should not be made on a motion to dismiss pursuant to Rule 12(b)(6). "Reasonableness" with respect to these defenses is not subject to a heightened pleading standard, and there are factual issues in determining what was reasonable under the circumstances alleged by Lead Plaintiff in this action.
In re Enron Corp. Sec., Derivative & "ERISA" Litig., 258 F.Supp.2d 576, 639 (S.D.Tex.2003).
D. Defendants' Motions to Dismiss § 15 Claims
Lead Plaintiff's 1933 Act claims for violations of § 15, 15 U.S.C. § 770, arise from the Companies' (DI and DHI) issuance of false financial statements and other untrue statements about their operating performance that were incorporated into the registration statements for DHI's March 15, 2001, and February 15, 2002, debt security offerings, and DI's December 20, 2001, stock offering. (SAC ¶ 1)
1. Dynegy Inc.
Lead Plaintiff alleges that "Dynegy controls Dynegy Holdings and is liable pursuant to § 15 of the Securities Act." (SAC ¶ 166) Lead Plaintiff argues that no grounds exist to dismiss its control-person allegations against DI.[134]
DI argues that Lead Plaintiff cannot claim that any agreement has tolled the statute of limitations as to § 15 claims against DI for control-person liability with respect to DHI's debt offerings because neither Hawaii Ironworkers, WVIMB, nor any other purchaser of DHI's securities contracted with DI to toll potential claims against DI arising from DHI's offering and because if the statute of limitations runs as to an alleged primary violator, it also runs as to the control person.[135]
For the reasons explained in §§ IV.C.3.(c).(3).(ii).(A) and (C)(1), above, the court concludes that the § 15 claim asserted against DI arising from the registration statement for DHI's offer of debt securities on March 15, 2001, is not barred by limitations because the primary claim against DHI is not barred by limitations, but that the § 15 claim arising from the registration statement for DHI's offer of debt securities on February 15, 2002, is barred by limitations.
2. Individual Defendants
Lead Plaintiff alleges that four of the five 1933 Act
Individual Defendants (Doty, Watson, Bergstrom and Mott) are liable for violating § 15 of the Securities Act. The[se] Individual Defendants did not act in good faith and directly or indirectly controlled persons who committed predicate, primary violations of § 11 of the Securities Act. Because of their status as high-ranking officers/directors of Dynegy, the Individual Defendants were authorized to initiate, ratify, implement and/or monitor the Company's organizational decision making processes, had *877 the actual power to directly or indirectly influence Dynegy's corporate policy and actions (including the Company's accounting policies and decisions, public statements, finance decisions and the contents of the false and misleading registration statements complained of herein) and therefore were control persons of Dynegy and its employees.
(SAC ¶ 170)
Citing Dennis, 918 F.2d at 509, individual defendants, Watson, Bergstrom, Doty, and Mott, argue that Lead Plaintiff's pleadings fail to state a claim for control-person liability under § 15 because the SAC does not plead sufficient facts showing that Dynegy violated § 11, a necessary predicate for derivative liability under § 15. Individual defendants Watson, Bergstrom, Doty, and Mott, also argue that Lead Plaintiff has failed to allege facts showing that they knowingly participated in or induced a violation of § 11 by Dynegy.
Because plaintiffs have pleaded that they purchased DI stock in the December 20, 2001, offering pursuant to a registration statement that contained materially false statements and omissions, the court concludes that a predicate violation of § 11 has been pleaded against DI. Because Lead Plaintiff has also pleaded that individual defendants Watson, Bergstrom, Doty, and Mott, were officers of the company who possessed the power to control and/or influence corporate policy, the court concludes that Lead Plaintiff has stated claims for control-person liability against them. In this circuit a plaintiff may assert control-person liability by alleging either that the control person had the power to control the controlled person or to influence corporate policy; actual exercise of control and/or participation in a violation of § 11 need not be alleged. See G.A. Thompson & Co. v. Partridge, 636 F.2d 945, 957-958 (5th Cir.1981); Abbott v. Equity Group, Inc., 2 F.3d 613, 619-620 (5th Cir.1993), cert. denied sub nom. Turnbull v. Home Insurance Co., 510 U.S. 1177, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994). Moreover, while status alone will not subject a defendant to liability under § 15, influence over the direction of the company will. Dennis v. General Imaging, Inc., 918 F.2d 496, 509-510 (5th Cir.1990).
3. Underwriters and Related Defendants
For the reasons explained in § IV.C.3.(c).(3).(ii).(B).(4), above, the court concludes that the § 11 claims asserted against underwriters Lehman Brothers, Inc., Merrill Lynch, ABN AMRO Inc., CSFB, and Commerzbank Capital Markets Corp. arising from the registration statement for DHI's debt security offering of March 15, 2001, and against Lehman Brothers Inc. arising from the registration statement for DI's stock offering of December 20, 2001, will not be dismissed. Because the court has concluded that the predicate claims against these underwriters will not be dismissed, the court also concludes that the claims for control-person liability under § 15 asserted against their corporate parents, Lehman Brothers Holding Inc. (Lehman Parent), Merrill Lynch & Co., Inc. (Merrill Parent), Commerzbank AG. (Commerzbank Parent), and ABN AMRO Holding N.V., and ABN AMRO Bank N.V., will not be dismissed. (See SAC ¶ 13.)
E. Conclusions as to Motions to Dismiss 1933 Act Claims (Summary Table)
In the 1933 Act Complaint Lead Plaintiff alleges violations of §§ 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o, against DI and DHI, and other defendants as set forth in a table at ¶ 164. The *878 following table summarizes the 1933 Act claims alleged in this action and indicates whether the court has concluded that they should be dismissed  indicated by a "D"  or remain live  indicated by an "L." "N/A" indicates that no claim was alleged.

--------------------------------------------------------------------------------------
 1933 Act Defendants § 11 § 15
 ---------------------------------------------------------
 Registration
 Registration Statement Registration
 Statement for DI Statement
 for DHI Class A for DHI
 6.875% Notes Common Stock 8.75% Notes
 Offered on Offered on Offered on
 3-15-2001 12-20-2001 2-15-2002
--------------------------------------------------------------------------------------
 Dynegy Inc. N/A L N/A L
--------------------------------------------------------------------------------------
 Dynegy Holdings Inc. L N/A D N/A
--------------------------------------------------------------------------------------
 Charles L. Watson L L D L
--------------------------------------------------------------------------------------
 Stephen W. Bergstrom L L D L
--------------------------------------------------------------------------------------
 Robert D. Doty L L D L
--------------------------------------------------------------------------------------
 Michael R. Mott N/A L D L
--------------------------------------------------------------------------------------
 Kenneth E. Randolph L N/A D N/A
--------------------------------------------------------------------------------------
 Charles E. Bayless N/A L N/A N/A
--------------------------------------------------------------------------------------
 Darald W. Callahan N/A L N/A N/A
--------------------------------------------------------------------------------------
 Michael D. Capellas N/A D N/A N/A
--------------------------------------------------------------------------------------
 Daniel L. Dienstbier N/A L N/A N/A
--------------------------------------------------------------------------------------
 Jerry L. Johnson N/A D N/A N/A
--------------------------------------------------------------------------------------
 George L. Kirkland N/A L N/A N/A
--------------------------------------------------------------------------------------
 Richard H. Matzke N/A L N/A N/A
--------------------------------------------------------------------------------------
 H. John Riley, Jr. N/A D N/A N/A
--------------------------------------------------------------------------------------
 Sheli Z. Rosenberg N/A L N/A N/A
--------------------------------------------------------------------------------------
 Joe J. Stewart N/A L N/A N/A
--------------------------------------------------------------------------------------
 J. Otis Winters N/A L N/A N/A
--------------------------------------------------------------------------------------
 Lehman Brothers Inc. L L N/A N/A
--------------------------------------------------------------------------------------
 Lehman Brothers N/A N/A N/A L
 Holding Inc.
--------------------------------------------------------------------------------------
 Merrill, Lynch, Pierce, L N/A N/A N/A
 Fenner & Smith Inc.
--------------------------------------------------------------------------------------
 Merrill Lynch & Co., Inc. N/A N/A N/A L
--------------------------------------------------------------------------------------
 ABN AMRO Inc. L N/A D N/A
--------------------------------------------------------------------------------------
 ABN AMRO Holding N/A N/A N/A L
 N.V.
--------------------------------------------------------------------------------------
 ABN AMRO Bank N.V. N/A N/A N/A L
--------------------------------------------------------------------------------------
 Banc One Capital N/A N/A D N/A
 Markets, Inc.
--------------------------------------------------------------------------------------
 Bank One Corp. N/A N/A N/A D
--------------------------------------------------------------------------------------
 Banc of America N/A N/A D N/A
 Securities LLC
--------------------------------------------------------------------------------------
 Bank of America Corp. N/A N/A N/A D
--------------------------------------------------------------------------------------
 Commerzbank Capital L N/A D N/A
 Markets Corp.
--------------------------------------------------------------------------------------
 Commerzbank AG N/A N/A N/A L
--------------------------------------------------------------------------------------

*879

--------------------------------------------------------------------------------------
 Credit Lyonnais N/A N/A D N/A
 Securities (USA) Inc.
--------------------------------------------------------------------------------------
 Credit Lyonnais N/A N/A N/A D
--------------------------------------------------------------------------------------
 Credit Suisse First L N/A D N/A
 Boston (CSFB)
--------------------------------------------------------------------------------------
 The Royal Bank of N/A N/A D N/A
 Scotland plc
--------------------------------------------------------------------------------------
 The Royal Bank of N/A N/A N/A D
 Scotland Group plc
--------------------------------------------------------------------------------------
 SG Cowen Securities N/A N/A D N/A
 Corp.
--------------------------------------------------------------------------------------
 Société Générale Group N/A N/A N/A D
--------------------------------------------------------------------------------------
 TD Securities (USA) Inc. N/A N/A D N/A
--------------------------------------------------------------------------------------
 WestLB AG N/A N/A D N/A
--------------------------------------------------------------------------------------
 Arthur Andersen L L D N/A
--------------------------------------------------------------------------------------

V. Claims Asserted Under the 1934 Securities and Exchange Act

Plaintiffs' claims for violation of the 1934 Act arise from alleged misrepresentations about DI's and DHI's finances arising from the Black Thunder and Project Alpha transactions and from the Companies' allegedly improper accounting practices. The 1934 Act claims are brought as a class action on behalf of persons who between January 27, 2000, and July 22, 2002 (the Class Period), purchased the publicly traded securities of DI and DHI. (SEAC ¶ 1) The 1934 Act claims are asserted against DI, DHI, Watson, Bergstrom, Doty, Mott, Matthew K. Schatzman, and Louis J. Dorey (together "the 1934 Act Individual Defendants"), Citigroup, Inc., and certain of Citigroup, Inc.'s wholly-owned subsidiaries, i.e., Citibank, N.A. and Salomon Smith Barney, Inc. (SEAC ¶¶ 1, 27-37)
A. Applicable Law
1. Section 10(b) and Rule 10b-5
Section 10(b) of the Exchange Act makes it unlawful for any person:
To use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.
15 U.S.C. § 78j(b). Rule 10b-5 makes it unlawful for any person, directly or indirectly,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
*880 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
17 C.F.R. § 240.10b-5(b).
2. Rule 9(b) and Private Securities Litigation Reform Act
Actions for securities fraud filed pursuant to § 10(b) and Rule 10b-5 are subject to the pleading requirements of Fed.R.Civ.P. 9(b) and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4, et seq. (PSL RA).
(a) Rule 9(b)
"In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). Plaintiffs must also plead the elements of their Rule 10b-5 claims with particularity. See Goldstein v. MCI WorldCom, 340 F.3d 238, 245 (5th Cir.2003) (citing Williams v. WMX Technologies, Inc., 112 F.3d 175, 177 (5th Cir.), cert. denied, 522 U.S. 966, 118 S.Ct. 412, 139 L.Ed.2d 315 (1997)). See also Shushany v. Allwaste, Inc., 992 F.2d 517, 520-521 (5th Cir.1993). Particularity is required so that the complaint provides defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims and then attempting to discover unknown wrongs. See Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1067 (5th Cir.1994).
Pleading fraud with particularity in this circuit requires "the particulars of `time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby.'" Id. at 1068 (quoting Tel-Phonic Services, Inc. v. TBS International, Inc., 975 F.2d 1134, 1139 (5th Cir.1992)). "A dismissal for failure to plead fraud with particularity as required by Rule 9(b) is a dismissal on the pleadings for failure to state a claim." Southland Securities Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 361 (5th Cir.2004).
(b) PSLRA
In 1995 Congress amended the 1934 Act through the passage of the PSLRA. In relevant part, the PSLRA, 15 U.S.C. § 78u-4(b)(1), provides that
In any private action arising under this chapter in which the plaintiff alleges that the defendant 
(A) made an untrue statement of a material fact; or
(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.
In ABC Arbitrage Plaintiffs Group v. Tchuruk, 291 F.3d 336, 350 (5th Cir.2002), the Fifth Circuit coalesced the pleading requirements in the PSLRA and Rule 9(b) into a succinct directive for litigants:
[A] plaintiff pleading a false or misleading statement or omission as the basis for a section 10(b) and Rule 10b-5 securities fraud claim must, to avoid dismissal pursuant to Rule 9(b) and 15 U.S.C. §§ 78u-4(b)(1) & 78u-4(b)(3)(A):
(1) specify the [sic] each statement alleged to have been misleading, i.e., contended to be fraudulent;
*881 (2) identify the speaker;
(3) state when and where the statement was made;
(4) plead with particularity the contents of the false representations;
(5) plead with particularity what the person making the misrepresentation obtained thereby; and
(6) explain the reason or reasons why the statement is misleading, i.e., why the statement is fraudulent.
This is the "who, what, when, where, and how" required under Rule 9(b) in our securities fraud jurisprudence and under the PSLRA.
Where misrepresentations appear in certain types of documents that plaintiffs believe were written by groups, some courts have allowed plaintiffs to link certain defendants to alleged misrepresentations simply by pleading that the defendants were part of the group that likely put the challenged documents together. In re Solv-Ex Corp. Sec. Litig., 210 F.Supp.2d 276, 283 (S.D.N.Y.2000); In re Worlds of Wonder Sec. Litig., 721 F.Supp. 1140, 1143 (N.D.Cal.1989). Under this group-pleading-doctrine, the plaintiff need not allege any facts demonstrating an individual defendant's participation in the particular communication containing the misstatement or omission where the defendants are insiders or affiliates of the company. Solv-Ex, 210 F.Supp.2d at 283. The group-pleading-doctrine allows plaintiffs to plead the first element of a section 10(b) case against an individual defendant without citing particular facts connecting the defendant to the alleged fraud.
In Southland, the Fifth Circuit held that group pleading
cannot withstand the PSLRA's specific requirement that the untrue statements or omissions be set forth with particularity as to "the defendant" and that scienter be pleaded with regard to "each act or omission" sufficient to give "rise to a strong inference that the defendant acted with the required state of mind."
365 F.3d at 364. Given the PSLRA's directive that each defendant must be enlightened as to his or her part in the alleged fraud, corporate officers may not be held responsible for unattributed corporate statements solely on the basis of their titles, even if their general level of day-to-day involvement in the corporation's affairs is pleaded. However, corporate documents that have no stated author, or statements within documents not attributed to any individual, may be charged to one or more corporate officers provided specific factual allegations link the individual to the statement at issue. Specific facts tying a corporate officer to a statement would include a signature on the document or particular factual allegations explaining the individual's involvement in the formulation of either the entire document, or that specific portion of the document, containing the statement. Id. at 365. "The corporation itself may be treated as making press releases and public statements issued by authorized officers on its behalf, and statements made by its authorized officers to further the interests of the corporation." Id.
3. Pleading Standards
Violations of § 10(b) and Rule 10b-5 may be achieved by using devices, schemes, or artifices, making misstatements or omissions of material fact, or engaging in any act, practice, or course of business that would operate as a fraud in connection with the purchase or sale of any security. To state a claim under section 10(b) of the 1934 Act and Rule 10b-5 the plaintiffs must allege (1) that the defendant made a material misstatement or an omission, or committed a manipulative or deceptive act in furtherance of an alleged *882 scheme to defraud, (2) with scienter, (3) on which plaintiff relied, (4) that proximately caused the plaintiff's injury. See Nathenson v. Zonagen Inc., 267 F.3d 400, 406-407 (5th Cir.2001) (quoting Tuchman, 14 F.3d at 1067).
(a) Misrepresentations and Manipulations
A misrepresentation is not actionable unless it is material. Tuchman, 14 F.3d at 1067. To meet the materiality requirement "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the `total mix' of information made available." Basic Inc. v. Levinson, 485 U.S. 224, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988). "[M]ateriality is not judged in the abstract, but in light of the surrounding circumstances." Rubinstein v. Collins, 20 F.3d 160, 168 (5th Cir.1994) (quoting Krim v. BancTexas Group Inc., 989 F.2d 1435, 1448 (5th Cir.1993)). The appropriate inquiry is whether, under all the circumstances, the statement or omitted fact "is one [that] a reasonable investor would consider significant in [making] the decision to invest, such that it alters the total mix of information available about the proposed investment." Id. (quoting Krim, 989 F.2d at 1445).
(b) Scienter
The term "scienter" as applied to conduct giving rise to an action under the 1934 Act and Rule 10b-5 is defined as "a mental state embracing intent to deceive, manipulate or defraud." Lovelace v. Software Spectrum Inc., 78 F.3d 1015, 1018 (5th Cir.1996) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976)). "In order to survive a motion to dismiss, a plaintiff alleging a section 10(b)/Rule 10b-5 claim must ... plead specific facts giving rise to a `strong inference' of scienter." Abrams v. Baker Hughes, Inc., 292 F.3d 424, 430 (5th Cir.2002) (quoting Nathenson, 267 F.3d at 407).
[S]evere recklessness can supply the scienter required to prove securities fraud. Severe recklessness is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."
Id. (quoting Nathenson, 267 F.3d at 408-409). Plaintiffs cannot simply allege that defendants had fraudulent intent; the PSLRA requires plaintiffs to set forth specific facts that support a strong inference of fraudulent intent:
In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.
15 U.S.C. § 78u-4(b)(2). Moreover, "the PSLRA requires the plaintiffs to distinguish among those they sue and enlighten each defendant as to his or her particular part in the alleged fraud." Southland, 365 F.3d at 365. See also Goldstein, 340 F.3d at 245 (citing Nathenson, 267 F.3d at 407).
(1) Circumstantial Evidence
The Fifth Circuit has "never required a plaintiff to present direct evidence of scienter in order to withstand dismissal of his securities claims." Goldstein, 340 F.3d *883 at 246. "[U]nder the PSLRA circumstantial evidence can support a strong inference of scienter." Nathenson, 267 F.3d at 410. Nevertheless, conclusory allegations will not suffice to plead scienter, and the court may not conduct a piecemeal analysis of the alleged facts and circumstances but must, instead, view the totality of the alleged facts and circumstances as a whole to determine whether they raise the requisite strong inference of scienter. See Abrams, 292 F.3d at 430-431 (citing Nathenson, 267 F.3d at 424-425).
(2) Motive and Opportunity
Before enactment of the PSLRA the Fifth Circuit followed the Second Circuit's approach that allowed plaintiffs to raise an inference of scienter either by pleading facts that identify circumstances indicating defendants' conscious or severely reckless behavior, or by pleading facts that demonstrate defendants' motive and opportunity to commit securities fraud. Lovelace, 78 F.3d at 1018-1019. See also Melder v. Morris, 27 F.3d 1097, 1102 (5th Cir.1994), and Tuchman, 14 F.3d at 1068. Following the PSLRA, however, the Fifth Circuit has "concluded that `[a]ppropriate allegations of motive and opportunity may meaningfully enhance the strength of the inference of scienter,' but that allegations of motive and opportunity, without more, will not fulfill the pleading requirements of the PSLRA." Goldstein, 340 F.3d at 246 (quoting Nathenson, 267 F.3d at 412).
Insider trading can be alleged as a form of motive and opportunity. See Southland, 365 F.3d at 368 (citing In re Comshare Inc. Sec. Litig., 183 F.3d 542, 553 (6th Cir.1999) (allegations "that the individual [d]efendants did profit by selling many of their shares at artificially inflated prices during the class period ... largely tend to illustrate that [d]efendants had the motive and opportunity to commit securities fraud")). However, insider trading will raise a strong inference of scienter only when "in suspicious amounts or at suspicious times." Id. (quoting Abrams, 292 F.3d at 435). See also In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 987 (9th Cir.1999) ("insider trading is suspicious only when dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information"). Courts consider the amount and percentage of shares sold, trading history, and timing, including whether other defendants sold shares at the same time, when assessing whether a stock sale qualifies as extraordinary or unusual. See id. (citing In Re Silicon Graphics, 183 F.3d at 986).
(3) Totality of the Circumstances
All the facts and circumstances alleged must be considered to determine whether they, in toto, raise a requisite strong inference of scienter. Abrams, 292 F.3d at 430; Nathenson, 267 F.3d at 410. Conclusory assertions that the defendant should have known about internal corporate problems based merely on his position or status within the corporation will not suffice to establish scienter. Abrams, 292 F.3d at 432. The mere publication of inaccurate accounting figures or failure to follow GAAP, without more, does not establish scienter. Melder, 27 F.3d at 1103. Allegations that the defendant was motivated to commit fraud to enhance his incentive compensation or to raise capital are also inadequate to establish scienter because "the executives of virtually every corporation in the United States would be subject to fraud allegations." Abrams, 292 at 434.
(c) Reliance
Plaintiffs must also allege reliance on defendants' material misrepresentations or omissions. In class actions plaintiffs usually *884 premise the reliance element of their claims on the fraud-on-the-market doctrine, which allows plaintiffs who may not have read the alleged misrepresentations to rely upon market conditions reflecting the fraud. The theory is that an established market assimilates all of the available information regarding a particular stock, sets the stock price accordingly, and that investors make their decisions in reliance on the integrity of an informed market. See Basic, 108 S.Ct. at 983. Where material misrepresentations have been placed into the mix of information or where omissions render the market information misleading, the stock price is skewed and investors may be defrauded. Id. Under this theory plaintiffs are entitled to a rebuttable presumption of reliance when they show that materially misleading statements were, in fact, disseminated into "an impersonal, well-developed market for securities." Id. at 991. Defendants can rebut the presumption by showing that the market price was not affected by their misrepresentations, that the plaintiffs did not trade in reliance on the integrity of the market, or that plaintiffs would have traded despite knowing the statement was false. Id. at 992.
(d) Proximate Cause of Injury
Under the PSLRA plaintiffs "have the burden of proving that the act or omission of the defendant alleged to violate [the 1934 Act] caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). In this circuit it is not sufficient for plaintiffs to allege that they would not have invested had they known the truth; plaintiffs must also allege that "the untruth was in some reasonably direct, or proximate, way responsible for [their] loss. The causation requirement is satisfied in a Rule 10b-5 case only if the misrepresentation touches upon the reasons for the investment's decline in value." Huddleston v. Herman & MacLean, 640 F.2d 534, 549 (5th Cir.1981), rev'd in part on other grounds, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).[136]
*885 4. Section 20(a)
Section 20(a) of the 1934 Act defines controlling person liability. It provides, in pertinent part, that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter ... shall also be liable jointly and severally with and to the same extent as such controlled person." 15 U.S.C. § 78t(a). To establish controlling person liability plaintiffs must show that a primary violation was committed and that the defendants directly or indirectly controlled the violator. See ABC Arbitrage, 291 F.3d at 348 n. 57, 362 n. 123. See G.A. Thompson & Co., Inc. v. Partridge, 636 F.2d 945, 958 (5th Cir.1981)(rejecting need to allege that the controlling person actually participated in the underlying primary violation). Nevertheless, the plaintiff needs to allege some facts beyond a defendant's position or title to show that the defendant had actual power or control over the controlled person. See Dennis v. General Imaging, Inc., 918 F.2d 496, 509-510 (5th Cir.1990).
B. Companies and Individual Defendants
The Companies and the Individual Defendants argue that the 1934 Act claims asserted against them should be dismissed because plaintiffs have failed to satisfy the pleading requirements for stating either a primary claim under § 10(b) or Rule 10b-5, or a claim for control person liability under § 20(a). These defendants also argue that the claims asserted against DI arising from Black Thunder, and the claims asserted against DHI arising from Black Thunder, Project Alpha, and the CMS trades are barred by limitations.
1. Limitations
(a) Claims Asserted Against DI
The Companies argue that the 1934 Act claims asserted against DI arising from Black Thunder are barred by limitations because plaintiffs were place on inquiry notice of those claims on March 13, 2002, by DI's filing of its 2001 Form 10-K, which disclosed the transaction's credit rating triggers. For the reasons explained in §§ IV.C.3.(c).(2).(i), and IV.C.3.(c).(3).(i).(A), above, the court has already concluded that plaintiffs were not placed on inquiry notice of claims arising from Black Thunder on March 13, 2001, and that the date on which plaintiffs were placed on inquiry notice of those claims is a question of fact that cannot be resolved on a motion to dismiss. Accordingly, DI's motion to dismiss claims asserted against it arising from Black Thunder will be denied.
(b) Claims Asserted Against DHI
The Companies argue that the 1934 Act claims asserted against DHI arising from Black Thunder, Project Alpha, and the CMS trades are barred by limitations because those claims were alleged for the first time in the First Amended Consolidated Complaint for Violation of the Securities Exchange Act (Docket Entry No. 316), which for limitations purposes was filed on January 16, 2004, the date that plaintiffs sought leave to amend.[137] Defendants argue that this date was more than *886 one year after plaintiffs were placed on inquiry notice of those claims. Plaintiffs argue that since DHI was timely named in the Consolidated Complaint filed on June 6, 2003, as a 1933 Act defendant, the 1934 Act claims asserted against it in the First Amended Consolidated Complaint are timely because they relate back to the Consolidated Complaint. [138] Plaintiffs also argue that because the 1934 Act Complaint was filed 18 months after passage of the Sarbanes-Oxley Act, the expanded limitations period contained in that Act for claims sounding in fraud applies to the 1934 Act claims asserted against DHI.[139] Although DHI argues that the extended limitations period created by the Sarbanes-Oxley Act does not apply to the 1934 Act claims asserted against it, DHI does not dispute Lead Plaintiff's argument that these claims relate back to the Consolidated Complaint filed on June 6, 2003.
(1) Relation Back
The new claims at issue are 1934 Act claims asserted on behalf of named plaintiffs and putative class representatives Hawaii Ironworkers and WVIMB against DHI arising from misrepresentations about Black Thunder, Project Alpha, and Dynegy's allegedly improper accounting practices including, inter alia, the round-trip trades with CMS. Lead Plaintiff argues that the new 1934 Act claims asserted against DHI are not barred by limitations because they relate back to the Consolidated Complaint filed on June 6, 2003, in which Hawaii Ironworkers, WVIMB, and DHI were first named as parties in this action. Under Rule 15(c)(2) new claims asserted against existing parties relate back to the original complaint if the "claim ... asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Fed.R.Civ.P. 15(c)(2).
The claims that Lead Plaintiff asserted against DHI in the June 6, 2003, Consolidated Complaint were claims for violation of the 1933 Act arising from misrepresentations allegedly contained in registration statements for debt securities offered on March 15, 2001, and February 15, 2002. The court has already concluded that the 1933 Act claims asserted against DHI arise from alleged misrepresentations about Black Thunder and Project Alpha but do not arise from alleged misrepresentations about the CMS trades.[140]
*887 Because the 1933 Act claims asserted against DHI in the Consolidated Complaint are based on alleged misrepresentations about Black Thunder and Project Alpha, and because the 1934 Act claims asserted against DHI are also based, in part, on alleged misrepresentations about Black Thunder and Project Alpha, the court concludes that the 1934 Act claims asserted against DHI that arise from Black Thunder and Project Alpha share the same factual basis as the 1933 Act claims asserted against DHI in the Consolidated Complaint, but that the 1934 Act claims asserted against DHI that arise from the CMS trades do not share the same factual basis as the claims asserted against DHI in the Consolidated Complaint. The court also concludes that the allegations contained in the Consolidated Complaint brought the factual basis of Lead Plaintiff's 1934 Act claims arising from Black Thunder and Project Alpha to DHI's attention, and that DHI's failure to dispute Lead Plaintiff's relation-back argument[141] demonstrates that DHI is neither surprised nor prejudiced by the addition of these new claims against it. See Federal Deposit Ins. Corp. v. Bennett, 898 F.2d 477, 480 (5th Cir.1990)(a complaint properly relates back to the filing of the original complaint even where the theory of recovery is wholly different "if the factual situation upon which the action depends remains the same and has been brought to defendant's attention by the original pleading"). Accordingly, the court concludes that the 1934 Act claims arising from misrepresentations about Black Thunder and Project Alpha asserted against DHI relate back to the filing date of Lead Plaintiff's Consolidated Complaint on June 6, 2003. The court must now determine whether on June 6, 2003, these claims were timely.
Because the court has already concluded that the date on which plaintiffs were placed on inquiry notice of facts underlying their claims arising from Black Thunder poses a question of fact that cannot be resolved on a motion to dismiss, the court also concludes that the 1934 Act claims asserted against DHI arising from misrepresentations about Black Thunder cannot be dismissed as barred by limitations. See §§ IV.C.3.(c).(2) and IV.C.3.(c).(3). (i). Because the court has already concluded that plaintiffs were placed on inquiry notice of facts underlying their claims arising from Project Alpha by May 15, 2002, a date that is more than one year before the June 6, 2003, filing date of the Consolidated Complaint, the court concludes that the 1934 Act claims asserted against DHI arising from Project Alpha are barred by limitations unless subject to the extended statute of limitations included in the Sarbanes-Oxley Act.
(2) Sarbanes-Oxley Act
On July 30, 2002, in response to a wave of corporate accounting scandals that undermined the integrity of the financial markets, Congress passed the Sarbanes-Oxley Act. Public Company Accounting and Investor Protection Act of 2002, Pub.L. 107-204, Title VIII, § 804, 116 Stat. 745, 801, codified in part at 28 U.S.C. § 1658(b). The Sarbanes-Oxley Act extended the statute of limitations for private securities fraud claims from one to two years after discovery of the facts constituting the violation, and from three to five years after the violation occurred:
[A] private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory *888 requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. § 78c(a)(47)), may be brought not later than the earlier of  (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation.
28 U.S.C. § 1658(b). The Sarbanes-Oxley Act applies to "all proceedings addressed by this section that are commenced on or after the date of enactment of this Act [July 30, 2002]," and expressly states that "[n]othing in this section shall create a new, private right of action." Public L. 107-204, Title VIII, § 804(b)-(c). See also Practice Commentary following 28 U.S.C. § 1658. Thus, if this consolidated class action was commenced prior to July 30, 2002, § 804's expanded limitations period does not apply to it.
DHI argues that because the twenty-eight class action lawsuits that are now consolidated into this action were all filed between April 26, 2002, and June 26, 2002, before enactment of the Sarbanes-Oxley Act on July 30, 2002, the Sarbanes-Oxley Act's extended statute of limitations does not apply to this action. Citing Lampf, Pleva, Lipkind, Prupis and Petigrow v. Gilbertson, 501 U.S. 350, 111 S.Ct. 2773, 2782, 115 L.Ed.2d 321 (1991), DHI argues that this action is governed, instead, by the pre-Sarbanes-Oxley Act statute of limitations that requires a plaintiff to sue within one year after it discovers, or should have discovered, facts constituting the violation, or within three years of the violation, whichever is earlier.[142] The court agrees.
Plaintiffs argue that because "the 1934 Act claims asserted against DHI commenced on January 16, 2004, roughly eighteen months after Sarbanes-Oxley's enactment ... [that t]he new, longer two/five year statute of limitations applies to the claims asserted against [DHI]."[143] Citing Friedman v. Rayovac Corp., 295 F.Supp.2d 957, 975 (W.D.Wis.2003), plaintiffs argue that Sarbanes-Oxley's limitation period applies to all proceedings commenced after July 30, 2002.[144] Like this case, Friedman was a consolidated action. All the underlying cases in Friedman were filed before July 30, 2002, but in January of 2003 plaintiffs amended the complaint to add an additional defendant. Faced with having to decide when the proceeding commenced for purposes of the Sarbanes-Oxley Act's limitations period, the court concluded that the extended limitations period applied to the proceedings against the newly added defendant that had "commenced after the effective date of the [Sarbanes-Oxley A]ct." Id. The court reasoned that
[plaintiffs] could have filed a separate action against [the newly added defendant] in January 2003, in which case there could be no dispute over the application of the new statute of limitations. It would make little sense to create a rule encouraging judicial inefficiency by requiring separate lawsuits for claims against different defendants arising out of the same conduct.
Id. at 976.[145]
Citing In re Enron Corp. Sec., Derivative & "ERISA" Litig., 2004 WL 405886, *889 *16 & n. 42 (S.D.Tex. February 25, 2004), the Companies urge the court to reject the Friedman court's reasoning as unpersuasive. Relying on the Second Circuit's decision in Gerber v. MTC Electronic Technologies. Co., Ltd., 329 F.3d 297, 309-310 (2d Cir.), cert. denied, 540 U.S. 966, 124 S.Ct. 432, 157 L.Ed.2d 311 (2003), which involved a similar issue regarding the PSLRA, the Enron court declined to follow Friedman. In Gerber the Second Circuit affirmed the district court's refusal to apply the PSLRA to parties and claims that were added after the PSLRA's enactment to a lawsuit that had been filed before the PSLRA's enactment because by its express terms the PSLRA applies to "actions" and not to "parties" or "claims." Enron, 2004 WL 405886 at *17. The Gerber court reasoned that "[i]n the absence of any indication to the contrary, we doubt that Congress intended that courts would apply different sets of substantive and procedural rules to groups of plaintiffs asserting identical claims in a single action, depending on when those plaintiffs were added to the complaint." 329 F.3d at 310.
The court concludes that the reasoning of Gerber is both persuasive and relevant to the issue now before the court. Because the lawsuits that are now consolidated into this action were all commenced before July 30, 2002, the court concludes the extended limitations period provided by the Sarbanes-Oxley Act does not apply to this case. See Gerber, 329 F.3d at 309-310 (declining to apply different sets of procedural rules to groups of plaintiffs asserting identical claims in a single action based on when those plaintiffs were added to the complaint). Accordingly, the court concludes that the claims asserted against DHI that arise from Project Alpha are barred by limitations because plaintiffs were on inquiry notice of those claims no later than May 15, 2002, a date that is more than one year before Lead Plaintiff filed either the Consolidated Complaint (Docket Entry No. 112) on June 6, 2003, or the January 16, 2004, motion to amend (Docket Entry No. 306) pursuant to which the 1934 Act claims against DHI were added to the First Amended Consolidated Complaint for Violation of the 1934 Act (Docket Entry No. 316).
(c) Conclusions
For the reasons explained at §§ IV.C.3.(c).(2).(i) and IV.C.3.(c) .(3), above, the court has already concluded that plaintiffs were not placed on inquiry notice of claims arising from misrepresentations about Black Thunder on March 13, 2002, and that the date on which the plaintiffs were placed on inquiry notice of those claims is a question of fact that cannot be resolved on a motion to dismiss. Accordingly, the motion of DI to dismiss the 1934 Act claims asserted against it arising from misrepresentations about Black Thunder as barred by limitations will be denied.
Because DHI and purchasers of its debt securities were added to this action by the Consolidated Complaint (Docket Entry No. 112) filed on June 6, 2003, and because the 1933 Act claims asserted against DHI in the Consolidated Complaint arise from alleged misrepresentations about Black Thunder and Project Alpha, but do not arise from alleged misrepresentations about the CMS trades, the court concludes that the 1934 Act claims that Lead Plaintiff asserts against DHI arising from Black Thunder and Project Alpha relate back to the Consolidated Complaint, but that the 1934 Act claims that Lead Plaintiff asserts *890 against DHI arising from the CMS trades do not relate back to the Consolidated Complaint. Because Lead Plaintiff alleges that plaintiffs were on notice of their claims against DHI by July 22, 2002, (SEAC ¶¶ 5-6), a date that is more than one year before the 1934 Act claims arising from the CMS trades were asserted against DHI, these claims will be dismissed as barred by limitations.
For the reasons stated in § IV.C.3.(c).(2).(iii), the court has already concluded that the date on which plaintiffs were placed on inquiry notice of claims arising from Black Thunder presents a question of fact that cannot be resolved on a motion to dismiss. Accordingly, the 1934 Act claims asserted against DHI arising from Black Thunder will not be dismissed as barred by limitations.
For the reasons stated in § IV.C.3.(c).(2).(iii).(B), and § IV.C.3.(c).(3). (i).(C), the court has already concluded that plaintiffs were placed on inquiry notice of claims arising from Project Alpha by May 15, 2002. Because that date was more than one year before June 6, 2003, the date Lead Plaintiff filed its first Consolidated Complaint, and because the court has concluded that the extended limitations period established by the Sarbanes-Oxley Act does not apply to this case, the 1934 Act claims asserted against DHI arising from Project Alpha will be dismissed as barred by limitations.
2. Failure to State a Claim for Primary Liability under § 10(b) and Rule 10b-5
The Companies argue that the 1934 Act claims asserted against them should be dismissed because plaintiffs have failed to plead with particularity facts showing that Black Thunder, Project Alpha, or their accounting practices were fraudulent, or that any of the alleged misrepresentations were made with scienter, that plaintiffs relied on any misrepresentations about Black Thunder, Project Alpha, or the Companies' allegedly improper accounting practices, or that plaintiffs' reliance on misrepresentations about Black Thunder, Project Alpha, or their accounting practices proximately caused plaintiffs' alleged losses.
(a) Misrepresentations
The Companies argue that the 1934 Act claims should be dismissed because "[t]he new pleading continues a sweeping, indiscriminate approach of labeling everything Dynegy did a `fraud,' but fails to provide sufficient factual support, particularly as to the elements of falsity and scienter."[146] The Companies challenge plaintiffs' allegations regarding misrepresentations about Black Thunder, Project Alpha, and Dynegy's allegedly improper accounting for natural gas contracts, forward power contracts, gas trading volume, and trading losses. For the reasons explained below the court concludes that plaintiffs' allegations are sufficiently particularized to satisfy the pleading requirements of Rule 9(b) and the PSLRA with respect to the Companies' misrepresentations about Black Thunder, Project Alpha, and their allegedly improper accounting for the two round-trip trades with CMS on November 15, 2001, but are not sufficiently particularized to satisfy the pleading requirements for stating § 10(b) or Rule 10b-5 claims arising from Dynegy's other allegedly improper accounting practices, i.e., improper accounting for natural gas contracts, forward power contracts, and trading losses. [147]
*891 (1) Black Thunder
The Companies argue that plaintiffs' allegations regarding Black Thunder fail to satisfy the pleading requirements of Rule 9(b) and the PSLRA because Black Thunder had no effect on Dynegy's reported cash flows from operations, because the accounting treatment was audited without qualification by Dynegy's auditor in June of 2000, Arthur Andersen, and was subsequently audited and approved by Dynegy's current auditor, PricewaterhouseCoopers, and because Dynegy has never restated its financial statements with respect to Black Thunder.[148] The court disagrees.
Plaintiffs allege that Black Thunder was an off balance sheet transaction promoted and structured by Citigroup to disguise an $850 million loan to Dynegy as an equity interest investment that closed in June of 2000. (SAC ¶¶ 40-41; SEAC ¶¶ 41, 44) Lead Plaintiff alleges that DI's and DHI's 2000 second fourth-quarter Forms 10-Q, and DI's and DHI's 2000 and 2001 Forms 10-K misrepresented the Black Thunder transaction by falsely classifying the proceeds on their balance sheets as equity instead of debt (SAC ¶ 45; SEAC ¶ 49), and failing to reveal "the repayment obligation, ratings triggers and other key terms" that would have identified Black Thunder as a financing. (SAC ¶ 46; SEAC ¶ 50) Plaintiffs allege that the misrepresentations about Black Thunder contained in these filings violated GAAP and FASB Concepts 1 and 2 by presenting a financing as an equity transaction.[149] (SAC ¶¶ 73-78) Plaintiffs allege that although the Companies initially presented Black Thunder as an equity transaction, in June of 2002 they "amended" Black Thunder to include mortgages on Dynegy's Illinova power plants and to reclassify the equity investment as debt. Plaintiffs allege that the so-called amendment shows that the transaction's original presentation was false. (SEAC ¶¶ 48, 56) In further support of their belief that Black Thunder's original presentation was false, plaintiffs allege that the SEC required both DI and DHI to amend their 2001 Forms 10-K to include full disclosure of the features that caused Black Thunder to be debt not equity. (SEAC ¶ 52)
Plaintiffs' allegations contain the date of the Black Thunder transaction (June of 2000), the amount of the transaction ($850 million), details of the accounting treatment it received, the Companies' financial statements that were allegedly falsified by its accounting treatment (SEAC ¶¶ 41-55), and the bases for their belief that the transaction and its accounting treatment fraudulently understated the Companies' debt (i.e., amendment of its terms to include mortgages and restatements of the Companies' initial disclosures). (SEAC ¶¶ 290-295) The court concludes that these allegations are sufficient to satisfy the particularity requirements of Rule 9(b) and the PSLRA for pleading that the Companies' presentations of Black Thunder on their financial statements were false and misleading.
(2) Project Alpha
Plaintiffs' Project Alpha allegations contain specific information regarding *892 the date of the transaction (April of 2001), its amount ($300 million), details of its accounting treatment and the reasons for its falsity (i.e., it overstated cash flow from operations and understated tax liability), the Companies' financial statements that were allegedly falsified by that accounting treatment (SEAC ¶¶ 59-88), and the bases for plaintiffs' belief that the transaction and its accounting treatment were fraudulent (i.e., the criminal convictions of key members of Dynegy's Project Alpha "deal team" and the Companies' restatement of the $300 million as cash flow from financing instead of cash flow from operations). (SEAC ¶¶ 281-289) The court concludes that these allegations are sufficient to satisfy the particularity requirements of Rule 9(b) and the PSLRA for pleading that the Companies' presentations of Project Alpha on their financial statements were false and misleading.
(3) Accounting Practices
The Companies argue that plaintiffs' various allegations of accounting improprieties should be dismissed because plaintiffs make "the unwarranted inference that all of Dynegy's financial statements during the putative class period were misleading... without demonstrating how they were false."[150]
(i) Natural Gas Contracts
Plaintiffs allege that the Companies overestimated earnings by $125 million from 1998-2002 by improperly estimating the value of natural gas contracts. (SEAC ¶¶ 90-92) Plaintiffs allege that these overestimates were not disclosed until November 14, 2002, when the Companies filed their third-quarter 2002 Forms 10-Q, which included an after-tax charge of approximately $80 million ($124 million pre-tax) related to their natural gas marketing business. (SEAC ¶¶ 296-298) Plaintiffs' allegations of improper accounting for natural gas contracts do not contain information about any gas contract(s) for which the accounting was allegedly improper. Because plaintiffs have failed to allege for any natural gas contract(s) entered by DI or DHI during the putative class period facts showing the date, amount, accounting treatment, reasons why the accounting was improper, or the Companies' financial statements that were allegedly falsified by the accounting treatment for such contracts, the court concludes that plaintiffs' allegations of improper accounting for natural gas contracts are not sufficiently particularized to satisfy the pleading requirements of Rule 9(b) or the PSLRA. See In re Metawave Communications Corp. Sec. Litig., 298 F.Supp.2d 1056, 1080 (W.D.Wash.2003)(plaintiffs' failure to specify any actual transactions that led to overstatement of revenue undermined scienter allegations); Greebel v. FTP Software, Inc., 194 F.3d 185, 204 (1st Cir.1999)(absence of specific identifying information as to amount and nature of contingent sales transactions indicated allegations were insufficient to raise inference of scienter).
(ii) Forward Power Contracts
Plaintiffs allege that DI and DHI overestimated earnings by $94 million in 2001 and $74 million in the first-quarter of 2002 by using its own proprietary models to account for forward power contracts. (SEAC ¶ 100) Plaintiffs allege that DI and DHI used proprietary models "to predict forward-price curves, based on economic inputs that considered power-plant constraints, as well as volatility or mergers and acquisitions data." (SEAC ¶ 105) *893 Plaintiffs allege that Dynegy's "use of forward-price curve models, in conjunction with mark-to-market accounting, was a recipe to manufacture earnings" (SEAC ¶ 103), and that the economic factors in Dynegy's forward-price curve were "knobs and dials" created to meet "whatever predetermined deal outcome was required." (SEAC ¶¶ 106, 299-301) Plaintiffs' allegations of improper accounting for forward power contracts do not contain information about any forward power contract(s) for which the Companies allegedly manipulated forward price curves. Because plaintiffs have failed to allege for any forward power contract(s) entered by DI or DHI during the putative class period facts showing the date, amount, accounting treatment, reasons why the accounting was improper, or the financial statements that were allegedly falsified by that accounting treatment, the court concludes that plaintiffs' allegations of improper accounting for forward power contracts are not sufficiently particularized to satisfy the pleading requirements of Rule 9(b) or the PSLRA. See Metawave, 298 F.Supp.2d at 1080; Greebel, 194 F.3d at 204.
(iii) Trading Volume
Plaintiffs allege that DI falsely inflated its gas trading volume and revenues by engaging in round-trip trades and manipulating its electronic trading systems to double and triple count gas and power trades. (SEAC ¶¶ 94, 109) Plaintiffs allege that during 2000 the creator of a management reporting system called the "Executive Dashboard," which was designed, inter alia, to incorporate all reported trades between DI's business units, discovered that DI was double and triple counting gas and energy trades, trade volumes, and values, and that DI's Abacus program duplicated intra-company trades, and triple counted trades involving its Canadian operations. (SEAC ¶ 109) Plaintiffs allege that the double- and triple-counted trades materially inflated the value of transactions reported for Dynegydirect, an internet-based, commission-free business-to-business trading site for energy and communications commodities, and that DI's 2001 Form 10-K falsely stated that it included "immaterial amounts of inter-affiliate gas sales." (SEAC ¶ 111) Plaintiffs allege that on November 15, 2001, DI entered into two round-trip trades of electricity on Dynegydirect with CMS, another energy trading company. (SEAC ¶ 94) Plaintiffs allege that the round-trip trades in which each company simultaneously bought and sold 5,000 megawatts of on-peak electricity at $34 per megawatt hour (MWH) for calendar year 2002, and 15,000 megawatts of on-peak electricity at $25.50 for December of 2001, resulted in neither profit nor loss for either party. (SEAC ¶ 94) Plaintiffs allege that in its fourth-quarter 2001 earnings release DI reported $13 billion in trading value of which $1.7 billion was attributable to the two November 15, 2001, round-trip trades. (SEAC ¶ 95) Plaintiffs allege that in its first-quarter 2002 earnings release DI reported 89.7 million MWH of electricity traded, approximately 5 million MWH of which were the product of round-trip trades. (SEAC ¶ 95) Plaintiffs allege that in that same press release DI improperly reported $236 million in revenue and $236 million in offsetting costs from the round-trip trades. (SEAC ¶ 95) Plaintiffs allege that when, in April of 2002, the market questioned DI and its officers about the round-trip trades, Bergstrom falsely attributed the trades to stress testing. (SEAC ¶¶ 96-98, 261-262)
Plaintiffs' allegations of improper accounting for gas trading volume do not contain any information about specific trades that are alleged to have been double or triple counted, but do contain specific *894 information about the two round-trip trades with CMS that occurred on November 15, 2001. Plaintiffs' lack of specificity regarding the allegedly double- and triple-counted trades leads the court to conclude that they have failed to satisfy the pleading requirements of Rule 9(b) and the PSLRA with respect to their allegations that Dynegy's accounting for those trades resulted in statements about them that were false and misleading. Because plaintiffs' allegations regarding the round-trip trades with CMS contain the date on which the trades occurred (November 15, 2001), specific details about the trades, including the amounts of energy involved, the prices at which the energy was traded, and the expected delivery dates, the false statements that those trades allegedly caused to be included in DI's fourth-quarter 2001 and first-quarter 2002 earnings releases, and the reasons for their belief that those statements were false and misleading (SEAC ¶¶ 94-95), the court concludes that plaintiffs' allegations are sufficient to satisfy the particularity requirements of Rule 9(b) and the PSLRA for pleading that false and misleading statements about the two round-trip gas trades with CMS were included in these two DI earnings releases (i.e., the fourth-quarter 2001 and first-quarter 2002 earnings releases).
(iv) Trade Losses
Plaintiffs allege that the Companies improperly accounted for trade losses by declaring trades "hedges" after  instead of before  the losses occurred. (SEAC ¶¶ 107-108) Plaintiffs allege that this "book doctoring" occurred in February of 2001 when Dynegy executives became aware that 10 trades had resulted in a loss of $2 million that was reduced to $500,000 by reclassifying the trades as hedges after-the-fact. (SEAC ¶ 108) Plaintiffs' allegations of improper accounting for trade losses do not contain information about any specific trades that resulted in losses for which the accounting was allegedly improper. Nor do they include allegations of any public statements that were falsified as a result of this alleged "book doctoring." Because plaintiffs have failed to allege for any trade loss suffered by DI or DHI during the putative class period facts showing the dates the trades occurred, the commodity traded, the dollar amount of the trade and the resulting loss, or reasons why the accounting was improper, or the public financial statements that were allegedly falsified by improper accounting for trade losses, the court concludes that plaintiffs' allegations of improper accounting for trade losses are not sufficiently particularized to satisfy the pleading requirements of Rule 9(b) or the PSLRA.
(4) Conclusions
Because the allegations contained in the 1934 Act Complaint do not contain specific information about the natural gas contracts, forward power contracts, or trade losses that plaintiffs allege were improperly accounted for, the court concludes that plaintiffs' allegations that the Companies improperly accounted for these transactions are not sufficiently particularized to satisfy the pleading requirements of Rule 9(b) and the PSLRA to support the 1934 Act claims that allegedly arise from them. Accordingly, the 1934 Act claims arising from DI's and DHI's allegedly improper accounting for natural gas contracts, forward power contracts, and trade losses will be dismissed.
Because the allegations contained in the 1934 Act Complaint regarding the Companies' alleged misrepresentations about Black Thunder, Project Alpha, and round-trip trades with CMS include facts showing the dates, the amounts, the accounting *895 treatments, the reasons why plaintiffs believe the accounting treatments were improper, and the financial statements that were allegedly falsified by misrepresentations about those transactions, the court concludes that plaintiffs' allegations about these transactions are sufficiently particularized to satisfy the pleading requirements of Rule 9(b) and the PSLRA.
(b) Scienter
The Individual Defendants argue that they are entitled to dismissal of the § 10(b) and Rule 10b-5 claims asserted against them because plaintiffs have failed to allege with particularity facts showing that they made any misrepresentations about the Companies' finances or that any misrepresentations they may have made were made with the required state of mind. [151] The critical issue in a motion to dismiss based on insufficient allegations of scienter "is whether the allegations of fraud contained in the plaintiffs' complaint are sufficiently connected to [each of the defendants] such that [a] strong inference of scienter on their part is appropriate." Goldstein, 340 F.3d at 249. In determining whether a plaintiff's allegations support a strong inference of scienter, the court must consider all facts, circumstances, and allegations in toto. Goldstein, 340 F.3d at 246; Abrams, 292 F.3d at 431 ("the allegations should not be read in isolation, but taken together as a whole to see if they raise the necessary strong inference of scienter"). See also Nathenson, 267 F.3d at 425. The court must weigh the plaintiff's allegations in order to "determine whether or not the facts support a `strong inference' of scienter... [t]hat is ... whether the inferences toward scienter are strong or weak." Rosenzweig v. Azurix Corp., 332 F.3d 854, 867 (5th Cir.2003)(stating that "the PSLRA's pleading standards explicitly contemplate such weighing").
(1) Charles L. Watson
Watson argues that the 1934 Act claims asserted against him should be dismissed because plaintiffs have failed to allege with particularity facts showing that he made any misrepresentations about Dynegy's finances or that he made any misrepresentations with scienter. Plaintiffs respond that Watson was at all relevant times the Chairman and Chief Executive Officer (CEO) of Dynegy (SEAC ¶ 28) and argue that the 1934 Act claims asserted against him should not be dismissed because their allegations show that he acted with scienter when he signed SEC filings that incorporated DI's and DHI's admittedly false financial statements and he publicly defended Dynegy's accounting practices when they were questioned by the media. Plaintiffs allege that Watson knew or was severely reckless in not knowing that the SEC filings he signed and the public statements he made were false because he knew that Black Thunder and Project Alpha were fraudulent schemes and that Dynegy's accounting practices were improper.[152]
*896 (i) Black Thunder
Citing SEAC ¶ 43, plaintiffs argue that Watson's scienter is evidenced by his intent to use off balance sheet vehicles to fund growth. Citing SEAC ¶ 50 plaintiffs argue that Watson, along with other defendants, participated in a formal presentation of Black Thunder to Dynegy's Board. Plaintiffs argue that it is reasonable to infer from Watson's participation in the presentation to the Board that Watson was familiar with Black Thunder's terms. Plaintiffs also argue that "[c]oncomitant with the creation of the [Black Thunder] transaction, Watson pledged some 4.4 million shares of his Dynegy stock as collateral for a loan, and thus had a significant personal financial interest in keeping Dynegy's stock price high to avoid margin calls."[153]
In SEAC ¶ 43 plaintiffs allege that
[t]he individual [d]efendants repeatedly held discussions amongst themselves about the importance of the credit-rating agencies' view of Dynegy's balance sheet. Citigroup understood this, and promoted the structure of the Black Thunder loan to look like equity. Citigroup was able to sell Black Thunder to Dynegy because the deal was consistent with Watson's stated preference for using off-balance sheet vehicles to fund growth.
In SEAC ¶ 50 plaintiffs allege "[t]he [i]ndividual [d]efendants were each familiar with the terms of Black Thunder and Watson, Doty and Bergstrom prepared the presentation to the Board on this transaction." In SEAC ¶ 420 plaintiffs allege that
in May 2000, Watson pledged some 4.4 million shares of his Dynegy stock as collateral for a loan. The stock was trading at $35 per share during this time. Watson benefitted from the inflated price of Dynegy stock by securing a larger loan and was motivated to maintain the stock at inflated levels to prevent a margin call.
Plaintiffs argue that it is reasonable to infer from these allegations that Watson knew or was severely reckless in not knowing that Black Thunder was intended to falsify Dynegy's financial statements. Plaintiffs' argument is unpersuasive and insufficient to raise a strong inference of scienter because plaintiffs provide no facts supporting their conclusory assertions that Watson had a stated preference for using off balance sheet transactions to fund growth, or that because Watson participated with others in a presentation to the Board about Black Thunder he knew or was severely reckless in not knowing that Black Thunder served no legitimate business purpose and was purposefully designed to falsify Dynegy's financial statements by understating debt. Plaintiffs admit that they do not know the date(s) on which Black Thunder was presented to the Board, and they allege no facts showing what about Black Thunder was presented to the Board, what about Black Thunder Watson presented to the Board, or how they know that Watson had a stated preference to fund growth with off balance sheet transactions.
(ii) Project Alpha
Citing SEAC ¶ 62 and ¶ 134 plaintiffs argue that Watson's scienter is evidenced by his involvement with Citigroup in structuring Project Alpha, and by his participation with others in a presentation to Dynegy's Board that described Project Alpha as a way to address the disconnect between Dynegy's cash flow and earnings.
In SEAC ¶ 62 Lead Plaintiff alleges that
*897 Watson, Doty and Bergstrom were involved with Citigroup in structuring Project Alpha and presented the transaction to the Board of Directors as a way to address the disconnect between Dynegy's reported cash flow and its true earnings. As the SEC found in its order against Dynegy, and as stated in its complaint, the allegations to which Dynegy consented, "[i]nternal Dynegy documents make clear that one of Alpha's principal purposes was to address the "disconnect ... between book and cash earnings" and to improve the "quality of earnings"  i.e., to create the appearance that Dynegy's operations were generating far more cash than they actually were.
(SEAC ¶ 62)
Plaintiffs argue that Watson's scienter can reasonably be inferred from these allegations because they show that Watson was involved with Citigroup and other defendants in structuring Project Alpha and because the SEC found that Project Alpha was fraudulently used to inflate the Company's cash flow by $300 million, understate reported debt by approximately the same amount, and increase profits by $79 million. These conclusory allegations of Watson's involvement with Citigroup in structuring Project Alpha are not supported by corroborating facts that describe how Watson was involved in structuring Project Alpha, or what, if any, of the internal documents referenced by the SEC were documents that Watson prepared, approved, or even received.
In SEAC ¶ 134 plaintiffs cite testimony presented at the Olis trial as additional evidence of both Watson's scienter and Project Alpha's fraudulent purpose:
Foster met with senior management, including Treasury VP Jeff McParland (Gould's boss), CFO Doty, COO Bergstrom, and CEO Watson, and explained to them the purpose and effect of Project Alpha. Power Point slides were used by senior management to show the Company's Board why Project Alpha was necessary: (a) risk-management activities had grown dramatically; (b) risk-management assets and liabilities had grown on Dynegy's balance sheet; (c) net risk-management assets had been over $250 million in the last 18 months; (d) the increase was from unrealized gains, which were reflected as income, but did not generate cash, leading to the disconnect; and (e) Project Alpha was meant to address the disconnect through a five-year gas-supply contract with cash flow from operations of $300 million and significant earnings and cash-tax benefits, plus help meeting the goal of reducing Dynegy's [effective tax rate] ETR (thus increasing income), which was linked to performance bonuses in Dynegy's tax department.
(SEAC ¶ 134) Plaintiffs infer from these allegations that Watson participated in a presentation to the Board about Project Alpha, and that because Watson participated in such a presentation he knew or was severely reckless in not knowing that Project Alpha was intended to falsify Dynegy's financial statements. The court is not persuaded that these allegations are sufficiently particularized to give rise to a strong inference of scienter.
Plaintiffs' description of the Power Point presentation fails to allege what, if any, part of it Watson prepared or presented to the Board. Moreover, the 1934 Act Complaint contains no allegations of fact showing what Watson knew about Project Alpha, when he knew it, or that Watson had any knowledge about the features that plaintiffs claim caused Project Alpha to be fraudulent, i.e., plaintiffs do not allege that Watson knew about the hedging and tear-up agreements or about the agreement to *898 hide their existence from Andersen. Nor do plaintiffs allege facts showing that Watson knew Project Alpha was not a gas supply contract and was, instead, a disguised loan.
Testimony presented at the Olis trial, and cited by plaintiffs in the 1934 Complaint, indicates that the people who knew all the details about Project Alpha, including those that caused it to be fraudulent, i.e., people who knew about the existence of the hedging and tear-up agreements and the concealment of their existence from Andersen, were members of Dynegy's Alpha "deal team" and the executive to whom they reported. (SEAC ¶ 138) Gene Foster testified that the members of Dynegy's Alpha "deal team" were Foster, Olis, Sharkey, Norman, Gould, Ho, and Roth (SEAC ¶ 138), [154] that the deal team members who knew about the impermissible hedging and tear-up agreements and their concealment from Andersen were Foster, Olis, Sharkey, and Gould (SEAC ¶ 144), and that the executive to whom they reported was Doty. (SEAC ¶ 130)
Because plaintiffs' allegations about Watson's knowledge and participation in Project Alpha lack factual particularity, the court concludes that they are not sufficient to give rise to a strong inference that Watson acted with scienter or severe recklessness when he signed SEC filings that allegedly contained financial statements falsified by misrepresentations about Project Alpha and made public statements defending Project Alpha as a gas supply transaction. See Southland, 365 F.3d at 363-365 and 373 (rejecting group-pleading-doctrine and requiring plaintiffs to plead facts demonstrating that each individual defendant actually knew or was severely reckless in not knowing about alleged falsehoods).
(iii) Motive and Opportunity
Plaintiffs allege that
[d]uring the Class Period, while in possession of adverse, material, undisclosed information about the Company, Watson sold 5,061,549 shares of his Dynegy stock for $56.4 million in illegal insider-trading proceeds. Watson, in May 2000, pledged some 4.4 million shares of his Dynegy stock as collateral for a loan, thus benefitting from the inflation in Dynegy stock and motivating him to keep Dynegy stock trading at inflated levels. For his participation in defendants' wrongful scheme, Watson was paid a bonus of $5 million in 2001 together with more than one million stock options.
(SEAC ¶ 28) Plaintiffs also allege that Watson sold 287,000 shares of stock in April of 2000 for $32 per share for proceeds of $9,406,313; sold 358,198 shares in May of 2000 for between $32.44 and $34.91 per share for proceeds of $12,108,037; and sold 4,956,351 shares in May of 2002 for between $7.60 and $8.99 per share for proceeds of $34,920,210. (SEAC ¶ 419) Because the sales in April and May of 2000 are alleged to have occurred before Black Thunder closed in June of 2000, and long before Project Alpha closed in April of 2001, the court concludes that these sales are not sufficient to raise any inference of scienter much less a strong inference of scienter on Watson's part.
*899 Although plaintiffs argue that the sales Watson made in the spring of 2000 were suspicious because they were made days after Dynegy announced positive first quarter 2000 results in a press release,[155] the timing of his sales is not alleged in the 1934 Act Complaint. Moreover, the 1934 Act Complaint does not contain facts showing that Watson's sales were connected to any of the alleged fraud, that Watson's sales were dramatically out of line with his prior trading practices, or that Watson's sales were calculated to maximize his personal benefit from undisclosed inside information. Absent such allegations, the sales are not sufficient to raise an inference of scienter. See Abrams, 292 F.3d at 435 (only insider trading in suspicious amounts or at suspicious times is probative of scienter); Silicon Graphics, 183 F.3d at 986 (plaintiffs must allege the amount and percentage of shares sold, the timing, and whether sales were consistent with the insider's trading history).
Although plaintiffs allege that Watson pledged some 4.4 million shares of stock as collateral for a loan in May of 2000 concurrently with the Black Thunder transaction, and that he thereby benefitted from the inflated value of the stock, they fail to explain how the stock price in May of 2000 could have been inflated by Black Thunder, a transaction that was not consummated until June of 2000. Plaintiffs' allegations that Watson's pledge of stock motivated him to undertake fraudulent acts intended to keep Dynegy's share price high to avoid a margin call are too general to raise a strong inference of scienter. Corporate executives commonly secure personal loans with shares of stock, and absent allegations of a particularized motive to keep stock values high the court is not persuaded that merely pledging stock as collateral for a loan is sufficient to create a strong inference of scienter. See, e.g., Goldstein, 340 F.3d at 250 (finding sufficiently particularized allegations that if company's stock price dropped significantly, defendant stood to lose millions in compensation and, that if his compensation underwent a materially adverse change, personal loans of named amounts from named banks that were secured by shares of company stock would become due).
Nor is the court persuaded that Watson's sale of stock in May of 2002 raises a strong inference of scienter because by the time that sale occurred the price of Dynegy's stock had already fallen from its alleged Class Period high of $55 per share (SEAC ¶ 6) to under $10 per share. See Coates v. Heartland Wireless Communications, Inc., 26 F.Supp.2d 910, 919-920 (N.D.Tex.1998) (stating that the "notion that [the defendant] would engage in fraud and then wait for the stock price to plummet before selling his securities without benefitting from the fraud is a non-sensical premise"); Thornton v. Micrografx, Inc., 878 F.Supp. 931, 938 (N.D.Tex.1995) (concluding that no showing of scienter had been made where defendants allegedly committed fraud to inflate stock price yet waited for weeks while the stock price slid downward before selling their stock).
Only insider trading in suspicious amounts or at suspicious times is probative of scienter. Abrams, 292 F.3d at 435. Although plaintiffs argue that Watson's sale was suspicious because it was conducted just a week before he was forced to resign and only two months before Dynegy announced its dramatic restatement of earnings,[156] plaintiffs have not alleged these facts in the 1934 Act Complaint and *900 have not alleged that when Watson sold stock in May of 2002 he knew either that he would be forced to resign or that Dynegy would subsequently announce a significant restatement in earnings. Nor do plaintiffs allege facts showing that this sale was out of line with Watson's prior trading practice or at a time calculated to maximize personal profit from undisclosed inside information. This failure is fatal to plaintiffs' argument that Watson's stock sales either a strong inference of scienter or any inference of scienter capable of enhancing inferences raised by the circumstantial evidence.
(iv) Conclusions
Considering the totality of the circumstances, the court concludes that the plaintiffs' allegations against Watson are not sufficiently particularized either to state a claim for a primary violation of the 1934 Act or to raise a strong inference that Watson knew, or was severely reckless in not knowing, that SEC filings he signed and statements he made to the media were falsified by misrepresentations about Black Thunder, Project Alpha, or Dynegy's round-trip trades with CMS. See Goldstein, 340 F.3d at 251 ("[p]laintiff's general allegation that [defendant] was a `hands on' CEO and therefore must have been aware of the accounts receivable situation simply lacks the requisite specificity"). Because plaintiffs' allegations fail to connect Watson's allegedly fraudulent conduct either to his pledge of stock as security for a loan, or to any of his stock sales, and because plaintiffs fail to allege any facts showing his trading history, the court concludes that plaintiffs' motive and opportunity allegations regarding Watson fail to enhance any inference of scienter arising from their allegations of circumstantial evidence. See Abrams, 292 F.3d at 434 (motives alleged in the complaint were not the types of motive that support a strong inference of scienter). Accordingly, Watson's motion to dismiss will be granted.
(2) Stephen W. Bergstrom
Bergstrom argues that the 1934 Act claims asserted against him should be dismissed because plaintiffs have failed to allege with particularity facts showing that he made any misrepresentations about Dynegy's finances or that he made any misrepresentations with scienter. Plaintiffs respond that Bergstrom was at all relevant times the Chief Operating Officer (COO) of Dynegy (SEAC ¶ 30), and argue that the 1934 Act claims asserted against him should not be dismissed because their allegations show that he acted with scienter when he signed SEC filings that incorporated DI's and DHI's admittedly false financial statements, and he publicly defended Dynegy's accounting practices when they were questioned by the media. Plaintiffs allege that Bergstrom knew or was severely reckless in not knowing that the SEC filings he signed and the public statements he made were false because he knew that Black Thunder and Project Alpha were fraudulent schemes and that Dynegy's accounting practices were improper.
(i) Black Thunder and Project Alpha
Citing the same paragraphs of the 1934 Act Complaint that they argue raise a strong inference of Watson's scienter, plaintiffs argue that they have alleged facts that raise a strong inference of Bergstrom's scienter, i.e., SEAC ¶¶ 50, 62, and 134. For the reasons set forth above with respect to Watson, the court concludes that plaintiffs' allegations that Bergstrom was involved in structuring the Black Thunder and Project Alpha transactions, and that he participated together with others in presentations to the Board about those transactions, fail to state with particularity facts that, assumed to be true, raise *901 a strong inference that he knew that Black Thunder and Project Alpha were transactions intended to deceive, manipulate, or defraud the public.
(ii) Improper Accounting Practices
Plaintiffs argue that their allegations that Dynegy engaged in improper accounting practices demonstrate that Bergstrom knew, or was severely reckless in not knowing, that the Companies improperly accounted for gas trading volume by engaging in round-trip trades.
Citing SEAC ¶¶ 97-98 plaintiffs argue that their allegations contain particularized facts showing that Bergstrom knew, or was severely reckless in not knowing, that his statement in the May 9, 2002, Wall Street Journal that the round-trip trades made with CMS on November 15, 2001, were made "to fulfill a customer requirement" and to "stress test" Dynegydirect because the platform had been having problems with large transactions was false. Plaintiffs allege that Bergstrom knew, or was severely reckless in not knowing, that this statement was false when he made it because he knew that stress testing involved running multiple trades through Dynegydirect simultaneously and did not involve running two trades two minutes apart, knew that the size of a trade had no effect on Dynegydirect's ability to function, and knew that Dynegydirect had already been stress tested. (SEAC ¶¶ 97-98, 261) As evidence that on May 9, 2002, Bergstrom knew, or was severely reckless in not knowing, that the trades were not made to stress test Dynegydirect, plaintiffs allege that following disclosure of the round-trip trades in April of 2002 Bergstrom held an all-hands meeting to devise a response. (SEAC ¶ 98) Plaintiffs allege that at that meeting Bergstrom told employees that the trades were made to stress test the system and that one of the employees asked Bergstrom if he really believed that explanation would fly outside the company. (SEAC ¶ 98)
The court concludes that these allegations are sufficient, although only barely so, to raise a strong inference that Bergstrom knew, or was severely reckless in not knowing, that his statement in the May 9, 2002, Wall Street Journal that the round-trip trades with CMS had been made at a customer request to stress test the system was false. However, because plaintiffs fail to allege facts showing either when Bergstrom learned that the round-trip trades had occurred, or when he learned that the Dynegydirect system had been stress tested, the court is not persuaded that plaintiffs have alleged facts that raise a strong inference that statements Bergstrom may have made about the round-trip trades before he was confronted by an employee about them at the all hands meeting that plaintiffs allege occurred following their disclosure in April of 2002 were made with scienter.
(iii) Motive and Opportunity
Plaintiffs allege that
[d]uring the Class Period, while in possession of adverse, material, undisclosed information about the Company, Bergstrom sold 500,000 shares of his Dynegy stock for almost $17 million in illegal insider-trading proceeds. For his participation in defendants' wrongful scheme, Bergstrom was paid a bonus of $5 million in 2001 together with 450,000 stock options.
(SEAC ¶ 30) Plaintiffs also allege that Bergstrom's sale of 500,000 shares occurred in May of 2000 for between $32.48 and $34.80 per share for proceeds of $16,945,850. (SEAC ¶ 419) Because the sale in May of 2000 occurred before Black Thunder, Project Alpha, or the round-trip trades with CMS, the court concludes that *902 this sale is not sufficient to raise any inference of scienter much less a strong inference of scienter. Although plaintiffs argue that Bergstrom's stock sale was suspicious because it occurred over a three-day period less than two weeks after Dynegy reported robust earnings, none of these facts about the timing of Bergstrom's stock sale are alleged in the 1934 Act Complaint. Moreover, even if these facts were alleged in the 1934 Act Complaint, the court concludes that they are not sufficient to raise a strong inference of scienter because they are uncorroborated by facts that either connect Bergstrom's sale to any of the alleged fraud, or show that the sale was extraordinary or otherwise suspicious. Accordingly, the court is not persuaded that plaintiffs' pleadings about Bergstrom's stock sale are sufficiently particularized either to raise a strong inference of scienter or to enhance any inference of scienter raised by the circumstantial evidence. See Abrams, 292 F.3d at 435 (only insider trading in suspicious amounts or at suspicious times is probative of scienter); Silicon Graphics Inc. Sec. Litig., 183 F.3d at 986 (defendant's trading history is a critical element in analyzing whether a sale is unusual or suspicious).
(iv) Conclusions
Considering the totality of the circumstances, the court concludes that the plaintiffs' allegations about Bergstrom are sufficient to raise a strong inference that he knew, or was severely reckless in not knowing, that his statements in the May 9, 2002, Wall Street Journal describing the November 15, 2001, round-trip trades with CMS as trades made pursuant to a customer request and trades made to stress test the Dynegydirect system, were false when made, but that plaintiffs' allegations are not sufficient to raise a strong inference of scienter with respect to Bergstrom's allegedly false statements about Black Thunder or Project Alpha. Because plaintiffs' allegations fail to connect Bergstrom's allegedly fraudulent statements about the round-trip trades with CMS to the single sale of stock alleged to have occurred in May of 2000, over a year before the round-trip sales occurred, and because plaintiffs fail to allege any facts showing Bergstrom's trading history, the court concludes that plaintiffs' motive and opportunity allegations regarding Bergstrom fail to enhance the inference of scienter arising from their allegations of circumstantial evidence. See Abrams, 292 F.3d at 434. For these reasons Bergstrom's motion to dismiss will be granted as to Black Thunder and Project Alpha, but denied as to his statement about the round-trip trades with CMS.
(3) Robert D. Doty
Doty argues that the 1934 Act claims asserted against him should be dismissed because plaintiffs have failed to allege with particularity facts showing that he made any misrepresentations about Dynegy's finances or that he made any misrepresentations with scienter. Plaintiffs respond that Doty was at all relevant times the Chief Financial Officer (CFO) of Dynegy (SEAC ¶ 29), and argue that the 1934 Act claims asserted against him should not be dismissed because their allegations show that he acted with scienter when he signed SEC filings that incorporated DI's and DHI's admittedly false financial statements, and he publicly defended Dynegy's accounting practices when they were questioned by the media. Plaintiffs allege that Doty knew, or was severely reckless in not knowing, that the SEC filings he signed and the public statements he made were false because he knew that Black Thunder and Project Alpha were fraudulent transactions.
*903 (i) Black Thunder
Citing the same paragraphs of the 1934 Act Complaint that they argue raise a strong inference of Watson's and Bergstrom's scienter, plaintiffs argue that they have alleged facts that raise a strong inference of Doty's scienter, i.e., SEAC ¶¶ 50, 62, and 134. For the reasons set forth above with respect to Watson and Bergstrom, the court concludes that plaintiffs' allegations that Doty was involved in structuring the Black Thunder and Project Alpha transactions, and that he participated together with others in presentations to the Board about those transactions, fail to state with particularity facts that, assumed to be true, raise a strong inference that he knew Black Thunder was a transaction intended to deceive, manipulate, or defraud the public.
(ii) Project Alpha
In addition to plaintiffs' allegations that Doty was involved together with Watson, Bergstrom, and Citigroup in structuring Project Alpha (SEAC ¶ 62), and that together with Watson and Bergstrom he presented Project Alpha to the Board (SEAC ¶¶ 62, 134), plaintiffs cite testimony from the Olis trial that the court concludes is sufficiently particularized to raise a strong inference of Doty's scienter with respect to Project Alpha.
At the Olis trial Foster testified that the Dynegy employees who knew all the features of Project Alpha, including those features that caused Project Alpha to be fraudulent, were members of Dynegy's "deal team" and the executive to whom they reported. (SEAC ¶¶ 130, 138) Foster identified the members of Dynegy's deal team as himself, Olis, Sharkey, Norman, Gould, Ho, and Roth (SEAC ¶ 138), identified the deal team members who knew about the impermissible hedges and tear-up agreements and their concealment from Andersen as himself, Olis, Sharkey, and Gould (SEAC ¶ 144), and identified the executive to whom they reported as Doty. (SEAC ¶ 130) Foster also testified that Project Alpha was Doty's project (SEAC ¶ 130), that Alpha's principal objective was to "increase operating cash flow" (SEAC ¶ 132), that Doty wanted Alpha done as soon as possible in case there were objections from the Board (SEAC ¶ 135), and that in a presentation to the Board's finance committee Doty gave a summary presentation and Foster told members that a tax opinion from Andersen would be needed to report the benefits of the transaction in Dynegy's financial statements. (SEAC ¶ 136) Foster testified that during the closing session in New York a problem arose over how the equity investors' (Deutsche Bank and CSFB) interest would be guaranteed. (SEAC ¶ 139) Foster testified that the use of hedging and tear-up provisions intended to provide the equity investors complete protection for their investment was proposed as a solution to the problem. (SEAC ¶ 141) Use of this "solution" meant that the equity investors' investment was never at risk. (SEAC ¶ 140)
Foster testified that he and Olis decided to tell Doty that the transaction would include documents that would need to be hidden from Andersen, that they placed a call to Doty "to talk about the tear-up situation," that Foster explained to Doty "that if we wanted to get this deal done, we're not going to be able to give all the documents to Arthur Andersen," and that Doty's response was that he understood. (SEAC ¶ 142) Foster testified that lawyers for DI and Citigroup drafted the tear-up provisions as a Citibank amendment to the Citibank original swap confirmation documents, that he (Foster) knew that Andersen did not want the provisions, and that as a result the members of Dynegy's "deal team" who knew about them "actively *904 worked to make sure that [Andersen] did not receive [them]." (SEAC ¶ 142)
Plaintiffs also allege that Foster testified that
[o]n March 26, 2002, in response to The Wall Street Journal article about Project Alpha, which followed former Dynegy manager Ted Beatty's discussions with The Wall Street Journal and the SEC, Foster, Olis, Meg Nolan, a high-level executive in investor relations, Mott and CFO Doty were involved in preparing talking points to refute the article. The group had discussed whether to disclose, in discussing Project Alpha, the operating-cash-flow benefit from the transaction. [Foster testified that]
[g]oing through what we were going to say to The Wall Street Journal, the issue was what was the purpose and the intent of Alpha. I believed that the intent was operating cash flow and tax benefits, and Jamie Olis was under the impression that we had to push the tax benefits much more significantly than cash flow benefits.
(SEAC ¶ 148) Plaintiffs allege that "the first talking point for CFO Doty was `Business purpose: Multi-year gas supply arrangement with tax benefits/mitigation'" (SEAC ¶ 148), and that when Doty used this talking point in his rebuttal to The Wall Street Journal he knew that it was false from the stated opinions of Foster and Olis. (SEAC ¶ 246)
(iii) Conclusions
The court concludes that plaintiffs' allegations are sufficient to raise a strong inference that Doty knew, or was severely reckless in not knowing, that the SEC filings he signed were falsified by misrepresentations about Project Alpha. The court concludes that these allegations are also sufficient to raise a strong inference that Doty knew, or was extremely reckless in not knowing, that his public statements about Project Alpha were false for similar reasons.[157] For these reasons Doty's motion to dismiss will be granted as to Black Thunder and the round-trip trades with CMS, but will be denied as to Project Alpha.
(4) Michael R. Mott
Mott argues that the 1934 Act claims asserted against him should be dismissed because plaintiffs have failed to allege with particularity facts showing that he made any misrepresentations about Dynegy's finances or that he made any misrepresentations with scienter. Plaintiffs respond that Mott was Senior Vice-President and Controller of Dynegy from March of 2001 to January 17, 2003, when he resigned, and that from January of 2000 to March of 2001 he was Vice-President and Assistant Corporate Controller of Dynegy. (SEAC ¶ 31) Plaintiffs argue that the 1934 Act claims asserted against Mott should not be dismissed because their allegations show that he acted with scienter when he signed SEC filings that incorporated DI's and DHI's admittedly false financial statements, and he publicly defended Dynegy's accounting practices when they were questioned by the media. Plaintiffs allege that Mott knew or was severely reckless in not knowing that the SEC filings he signed and the public statements he made were false because he knew that Black Thunder and Project Alpha were fraudulent transactions.
*905 (i) Black Thunder
Citing the paragraphs of the 1934 Act Complaint in which they allege that Black Thunder was a fraudulent transaction, plaintiffs argue that Mott knew Black Thunder was a fraudulent transaction and, therefore, that when, in May of 2002, Mott defended Black Thunder to The New York Times by asserting that "Black Thunder has an equity interest and an equity like participation" he acted with scienter. (SEAC ¶¶ 55, 263-264) Plaintiffs argue that the close proximity of Mott's May 2002 statement to The New York Times and Dynegy's amendment of Black Thunder in June of 2002 to include mortgages on its Illinova power plants provide additional evidence of Mott's scienter. Mott argues that these allegations are insufficient to raise a strong inference of scienter because they include no facts showing that he knew the statement was false when made. The court agrees.
The "mere publication of inaccurate [information] does not establish scienter... [t]he party must know that it is publishing materially false information, or must be severely reckless in publishing such false information." See Abrams, 292 F.3d at 432. Plaintiffs' conclusory allegations regarding Mott's knowledge of the Black Thunder transaction are not sufficient to raise a strong inference that he knew, or was severely reckless in not knowing, at the time he defended Black Thunder to The New York Times that the transaction was in substance a loan. Plaintiffs fail to allege any facts showing that Mott had any connection to or involvement with the Black Thunder transaction before he made the challenged statement to The New York Times, or how or when he knew that Black Thunder was a loan and not an equity transaction. The court concludes that plaintiffs' conclusory allegations that Mott falsely described Black Thunder as an equity like transaction to The New York Times with scienter because Black Thunder was in substance a loan are not sufficient to satisfy the particularity requirements of Rule 9(b) or the PSLRA. See Southland, 365 F.3d at 382 (allegation that defendant knew company could not perform was insufficient to raise strong inference of scienter absent facts showing how defendant knew company could not perform).
(ii) Project Alpha
Citing Foster's testimony from the Olis trial, plaintiffs argue that their allegations against Mott are sufficient to raise a strong inference of scienter regarding Mott's involvement with the Project Alpha transaction. The court disagrees.
Testimony presented at the Olis trial, and cited by plaintiffs in the 1934 Complaint, is that the Dynegy employees who knew all the features of Project Alpha, including those that caused it to be fraudulent, were Foster, Olis, Sharkey, Gould, and Doty. (SEAC ¶¶ 130, 138) Although Foster testified that on September 27, 2000, Olis reported to him and to Mott that Andersen's engagement partner, Jim Hecker, agreed that prepaid forward swap cash receipts could be reported as cash flow from operations as long as the prepaid forward was to a non-affiliated party outside of the Project Alpha transaction (SEAC ¶ 133), and that Foster asked Mott whether he agreed with Andersen's assessment (SEAC ¶ 133), Foster did not testify that Mott knew that Dynegy's Project Alpha "deal team" failed to heed Hecker's advice and, in fact, disregarded it and actively concealed evidence of that disregard from Hecker and others at Andersen.
Although plaintiffs allege at ¶ 124 that Foster identified Mott as a member of the Project Alpha conspiracy to commit securities fraud, the trial transcript shows that *906 Foster actually testified that he had "no direct knowledge of Michael Mott as part of this conspiracy."[158] Moreover, at ¶ 130 in which plaintiffs list the members of the Alpha conspiracy, Mott's name does not appear. While Foster testified that he and Olis informed Doty that in order to close, Project Alpha documents would have to be withheld from Andersen, plaintiffs fail to cite any testimony showing that Mott was informed of the tear-ups or their concealment from Andersen.
The only other testimony from the Olis trial cited by the plaintiffs about Mott is Foster's testimony that
[o]n March 26, 2002, in response to The Wall Street Journal article about Project Alpha, which followed former Dynegy manager Ted Beatty's discussions with The Wall Street Journal and the SEC, Foster, Olis, Meg Nolan, a high-level executive in investor relations, Mott and CFO Doty were involved in preparing talking points to refute the article. The group had discussed whether to disclose, in discussing Project Alpha, the operating-cash-flow benefit from the transaction.
(SEAC ¶ 148) These allegations are far too general to raise a strong inference of scienter as to Mott.
Plaintiffs' allegations about Mott's personal involvement with and knowledge of Project Alpha consists solely of an allegation that in September of 2000, at a very early stage of planning for Project Alpha, Olis informed Mott that Andersen had explained how the deal had to be structured so that the cash flow could be booked as cash flow from operations, and that in March of 2002 Mott participated in an all hands meeting to decide how best to respond to questions about Project Alpha raised by The Wall Street Journal. Because these allegations do not contain facts that show when, where, or how Mott learned that Project Alpha was a fraudulent transaction, the court concludes that they fail to raise a strong inference that Mott knew the transaction was fraudulent.
(iii) Motive and Opportunity
Plaintiffs allege that
[d]uring the Class Period, while in possession of adverse, material, undisclosed information about the Company, Mott sold 28,074 shares of his Dynegy stock for $763,000 in illegal insider-trading proceeds.
(SEAC ¶ 31) The court concludes that this single sale is not sufficient to enhance any inference of scienter raised by the circumstantial evidence alleged because plaintiffs fail to corroborate these allegations with facts that connect Mott's sale to any of the alleged fraud or that show the sale was unusual or otherwise suspicious. See Abrams, 292 F.3d at 435 (only insider trading in suspicious amounts or at suspicious times is probative of scienter). Although plaintiffs argue that Mott's sale was suspicious because it was "late in the Class Period after the completion of Project Alpha yet before the existence of Project Alpha was revealed," [159] the court is not persuaded that the timing of the sale in relation to Project Alpha is probative of scienter because plaintiffs have not alleged in the 1934 Act Complaint any facts showing that Mott knew that Project Alpha was fraudulent.
(iv) Conclusions
Considering the totality of the circumstances, the court concludes that the plaintiffs' *907 allegations against Mott are not sufficiently particularized either to state a claim for a primary violation of the 1934 Act or to raise a strong inference that Mott knew, or was severely reckless in not knowing, that SEC filings he signed and statements he made to the media were falsified by misrepresentations about Black Thunder or Project Alpha. Because plaintiffs' allegations fail to connect Mott's allegedly fraudulent conduct to his February 2002 stock sale, and because plaintiffs fail to allege any facts showing Mott's trading history, the court concludes that plaintiffs' motive and opportunity allegations regarding Mott fail either to raise a strong inference of scienter or to enhance any inference of scienter arising from their allegations of circumstantial evidence. See Abrams, 292 F.3d at 434 (motives alleged in the complaint were not the types of motive that support a strong inference of scienter). For these reasons Mott's motion to dismiss will be granted.
(5) Matthew K. Schatzman
Schatzman argues that the 1934 Act claims asserted against him should be dismissed because plaintiffs have failed to allege with particularity facts that either state a claim or give rise to a strong inference of scienter. The court agrees.
Plaintiffs allege that Schatzman was at all relevant times President of Dynegy's energy trading division and its chief trader. (SEAC ¶ 32) Plaintiffs have not alleged that Schatzman signed any SEC filings that contained material misrepresentations about Dynegy's finances or made any public misrepresentations. Plaintiffs' claims against Schatzman appear to be premised on his participation in Dynegy's allegedly fraudulent accounting for gas trading volume.[160] Although participation in fraudulent activities can support claims for the violation of Rule 10b-5(c), which prohibits any person, directly or indirectly, from engaging "in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security," 17 C.F.R. § 240.10b-5(c), the court is not persuaded that plaintiffs' allegations are sufficient either to state a claim against Schatzman or to raise a strong inference of scienter with respect to him.
(i) Gas Trading Volume
Plaintiffs allege that
[d]uring 2000, a management reporting system for Dynegy's senior executives and officers was created to allow the review of real-time and historical trading results. The system was called the "Executive Dashboard," which was designed to incorporate all reported trades between Dynegy's business units. In programming this aspect of the Executive Dashboard, its creator discovered Dynegy was double and triple-counting gas and energy deal counts, trade values and notational values and that Dynegy's Abacus program was duplicating intra-Company trades, and such trades involving the Canadian operations were triple-counted. When the Executive Dashboard's creator questioned the propriety of this, he was informed that the inflation was directed by Schatzman, Dynegy's trading President, who reported directly *908 to Bergstrom. The purported reason was that Enron was probably doing it too.
Schatzman received these numbers, but never subtracted the intra-Company amounts from the figures reported to the public, for the double-triple-counted trades remained in the system and were reported through to the public, as determined by the Executive Dashboard's creator. The inclusion of intra-Company trades materially inflated the notational value of transactions reported for Dynegydirect:

--------------------------------------------------------------
 Q1 01 Q2 01 Q3 01 Q4 01
--------------------------------------------------------------
Dynegy direct $9B $11B $10B $13B
Notional transactions
reported
in Dynegy earnings
releases
--------------------------------------------------------------
Amount of $2.5B $4.2B $3.9B $3.6B
undisclosed
intra-Company
trades included
in notional
transactions
--------------------------------------------------------------
Percentage of 28% 38% 39% 28%
total reported
notional transactions
from intra-Company
trades
--------------------------------------------------------------

In the 2001 Form 10-K, a footnote to the trading volumes section falsely stated: "Includes immaterial amounts of inter-affiliate sales." Dynegy Holdings' February 19, 2002 Prospectus Supplement, filed in connection with the registration statement for the 8.75% Notes, also reported that Dynegy already had $43 billion in notional value of contracts.
(SEAC ¶¶ 109-111)
Plaintiffs argue that these allegations that Dynegy's electronic trading system inflated the volume figures reported to the public are sufficient both to state a claim against Schatzman and to raise a strong inference of scienter. The court disagrees because these allegations are not corroborated with facts describing either the role that Schatzman played in trade volume counting and/or reporting, or the reliability of the source(s) on which these allegations are based, i.e., facts showing that the source(s) are both reliable and positioned to know this information. Assuming without deciding that the Executive Dashboard's creator is a reliable source for the allegations that the system double- and triple-counted, intra-company trades, plaintiffs nevertheless fail to allege facts that either identify the source or describe the circumstances under which the Executive Dashboard's creator was informed that Schatzman directed the inflation and received the numbers but failed to subtract them from the amounts reported to the public. Nor do plaintiffs allege facts that show how or why these trade counts falsified the Company's financial statements, deviated from accepted accounting standards or reporting requirements, or manipulated the market for Dynegy's securities.
(ii) Motive and Opportunity
Plaintiffs allege that in May of 2000 while in possession of adverse, material, undisclosed information about the Company, Schatzman sold 156,654 shares of his Dynegy stock for over $5 million in illegal insider-trading proceeds. (SEAC ¶¶ 32, 419) Plaintiffs argue that the sheer size of Schatzman's sale is probative of scienter. The court disagrees.
Plaintiffs allege that Schatzman made a single sale in May of 2000, long before most, if not all, of the alleged fraud occurred, at a price ($32.32) that was far below the alleged class period high of $55. (SEAC ¶ 6) Far from being suspiciously timed or calculated to maximize personal benefit from allegedly undisclosed information, the timing of Schatzman's sale is not consistent with fraudulent intent. See Nathenson, 267 F.3d at 420-421 (sales well *909 below the class period high were "so inauspiciously timed" that they "do not meet this test"); In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1093-1096 (9th Cir.2002) (sales made at $20 to $25 were not suspicious  even if in substantial quantities  where stock price peak was several months later at $40). Moreover, although plaintiffs allege that the sale was made while Schatzman possessed "adverse, material, undisclosed information about the Company" (SEAC ¶ 27), plaintiffs fail to plead any facts showing what "adverse, material, undisclosed information about the Company" Schatzman possessed.
The court concludes that Schatzman's single sale is not sufficient either to state a claim or to raise any inference of scienter because plaintiffs fail to allege facts that connect the sale to any alleged fraud or that show the sale was extraordinary or otherwise suspicious. See Abrams, 292 F.3d at 435 (insider selling must be unusual to have meaningful probative value); Nathenson, 267 F.3d at 420-421 (same). Failure to plead those factors negates any inference of scienter. See Silicon Graphics, 183 F.3d at 986 (defendant's trading history is a critical element in analyzing whether a sale is unusual or suspicious).
(iii) Conclusions
The Fifth Circuit has stated that the critical issue in a motion to dismiss based on insufficient allegations of scienter "is whether the allegations of fraud contained in the plaintiffs' complaint are sufficiently connected to [each of the defendants] such that [a] strong inference of scienter on their part is appropriate." Goldstein, 340 F.3d at 249. When considered in toto, the allegations asserted against Schatzman fail either to state a claim or to raise a strong inference of scienter because they are no more than conclusory assertions of wrongdoing unsupported by particularized facts that connect him to any alleged fraud. For these reasons Schatzman's motion to dismiss will be granted.
(6) Louis J. Dorey
Dorey argues that plaintiffs have failed to allege with particularity facts that either state a claim against him or give rise to a strong inference that he acted with scienter. The court agrees. Plaintiffs allege that Dorey was President of Energy Marketing until June 2002 and then was Executive Vice-President of Finance. (SEAC ¶ 33) Plaintiffs have not alleged that Dorey signed any SEC filings that contained material misrepresentations or made any public misrepresentations. Plaintiffs' claims against Dorey are premised on his participation in Dynegy's allegedly fraudulent accounting for forward power contracts. [161]
Because the court has already concluded that plaintiffs' allegations that Dynegy improperly accounted for forward power contracts are not sufficiently particularized to support claims for violation of § 10(b) and Rule 10b-5, and because plaintiffs do not allege that Dorey was connected to Black Thunder, Project Alpha, or the round-trip trades with CMS, i.e., transactions that the court has concluded plaintiffs have pleaded with sufficient particularity to support claims for violation of § 10b and Rule 10b-5, the court concludes that plaintiffs have failed to state a claim for violation of § 10(b) against Dorey. Accordingly, Dorey's motion to dismiss will be granted.
(7) The Companies
The court has already concluded that plaintiffs' allegations regarding the falsity *910 of the Companies' statements about and accounting for Black Thunder, Project Alpha, and two round-trip trades with CMS are sufficiently particularized to satisfy the pleading requirements of Rule 9(b) and the PSLRA. The Companies argue that the 1934 Act claims arising from alleged misrepresentations about these transactions should be dismissed because plaintiffs have failed to plead facts that raise a strong inference of scienter.
In Southland the Fifth Circuit addressed the manner in which allegations of corporate scienter are to be analyzed:
For purposes of determining whether a statement made by the corporation was made by it with the requisite Rule 10(b) scienter we believe it appropriate to look to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment.
Southland, 365 F.3d at 366 (citing Nordstrom, Inc. v. Chubb & Son, Inc., 54 F.3d 1424, 1435 (9th Cir.1995) ("there is no case law supporting an independent `collective scienter' theory"), and Apple Computer, Inc. Sec. Litig., 243 F.Supp.2d 1012, 1023 (N.D.Cal.2002) ("It is not enough to establish fraud on the part of a corporation that one corporate officer makes a false statement that another knows to be false. A defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter, i.e., knows that the statement is false, or is at least deliberately reckless as to its falsity, at the time he or she makes the statement."). The Southland court explains that
[t]his is consistent with the general common law rule that where, as in fraud, an essentially subjective state of mind is an element of a cause of action also involving some sort of conduct, such as a misrepresentation, the required state of mind must actually exist in the individual making (or being a cause of the making of) the misrepresentation, and may not simply be imputed to that individual on general principles of agency.
Southland, 365 F.3d at 366.
(i) Black Thunder
Because plaintiffs have failed to allege facts showings that any individual officer, director, or employee of DI or DHI knew, or was severely reckless in not knowing, that Black Thunder was not as DI and DHI disclosed, an equity transaction, but instead a disguised loan intended to understate the Companies' debt, the court concludes that plaintiffs have failed to raise a strong inference that any misrepresentations about Black Thunder made by DI or DHI were made with scienter. For these reasons the Companies' motion to dismiss plaintiffs' 1934 Act claims arising from misrepresentations about Black Thunder will be granted.
(ii) Project Alpha
Because plaintiffs have alleged that Doty, with scienter, made false statements about Project Alpha, and because from the face of the complaint all the statements attributed to him appear to have been made pursuant to his position of authority as Dynegy's CFO, on Dynegy's behalf, and in the course of his employment, the court concludes that plaintiffs have alleged facts sufficient to impute Doty's scienter to DI regarding DI's allegedly false and misleading statements about *911 Project Alpha. See Southland, 365 F.3d at 380 (citing Paul F. Newton & Co. v. Texas Commerce Bank, 630 F.2d 1111, 1118 (5th Cir.1980)).[162]
(iii) Round-trip Trades with CMS
Because plaintiffs have alleged that Bergstrom, with the requisite scienter, made at least one false statement about two round-trip trades that DI executed with CMS on November 15, 2001, and because from the face of the complaint the statement attributed to him appears to have been made pursuant to his position of authority as Dynegy's COO, on Dynegy's behalf, in the course of his employment, the court concludes that plaintiffs have alleged facts sufficient to impute Bergstrom's scienter regarding DI's allegedly false and misleading statements about the two round-trip trades with CMS to DI.[163]See Southland, 365 F.3d at 380 (citing Paul F. Newton, 630 F.2d at 1118 (holding that "common law agency principles, including the doctrine of respondeat superior, remain viable in actions brought under the [1934 Act] and provide a means of imposing secondary liability for violations of the Act independent of § 20(a)").
(c) Reliance
Plaintiffs allege that
Lead Plaintiff, WVIMB and Hawaii Ironworkers and the other Class members have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices in connection with their purchase of Dynegy securities. Lead Plaintiff, WVIMB and Hawaii Ironworkers and other Class members would not have purchased Dynegy securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' acts.
(SEAC ¶ 439)
The Dynegy Defendants argue that the 1934 Act claims should be dismissed because plaintiffs have failed to plead facts sufficient to invoke the fraud-on-the-market presumption of reliance.[164] Defendants argue that plaintiffs' pleadings are insufficient to invoke this presumption because they have failed to allege that Dynegy's stock and debt securities traded on an open and efficient market. Defendants' argument is directed almost exclusively to the market for DHI's bonds. Since the court has already concluded that the 1934 Act claims asserted against DHI arising from Project Alpha and the CMS trades are barred by limitations, and that the claims asserted against DHI arising from Black Thunder are subject to dismissal because plaintiffs have failed to plead facts that give rise to a strong inference of either DI's or DHI's scienter with respect to Black Thunder, the court concludes that defendants' argument regarding the openness and efficiency of the market for DHI's bonds is moot because all the 1934 Act claims asserted against DHI are subject to dismissal. Because defendants do not challenge either the openness or the efficiency of the market for DI's stock, which trades on the New York Stock Exchange, and because in SEAC ¶ 439 Lead Plaintiff alleges that it purchased *912 DI's common stock in reliance on the integrity of the market, the court concludes that Lead Plaintiff has satisfied the requirements for pleading reliance.
(d) Proximate Cause
The Dynegy Defendants argue that the 1934 Act claims asserted by The Regents against DI for stock purchases, and asserted by Hawaii Ironworkers against DHI for bond purchases, fail for lack of loss causation where the so-called "truth" was not revealed until after they sold their securities.[165] Because the court has already concluded that the 1934 Act claims asserted against DHI are subject to dismissal, DHI's argument that the claims asserted by Hawaii Ironworkers should be dismissed for failure to allege loss causation is moot.
Asserting that The Regents sold their DI stock in May of 2002, defendants also argue that plaintiffs' claims for various accounting improprieties that were not revealed until after May of 2002 should be dismissed for lack of loss causation. Because the only claims arising from accounting improprieties that are alleged to have been disclosed after Lead Plaintiff sold its Dynegy stock are claims arising from Dynegy's allegedly improper accounting for natural gas contracts, forward power contracts, and trading losses, which the court has already concluded are subject to dismissal because Lead Plaintiff failed to plead them with factual particularity, DI's argument that these claims should be dismissed because Lead Plaintiff failed to allege loss causation is moot.
3. Failure to State a Claim for Secondary "Control-Person" Liability under § 20(a)
Plaintiffs allege claims for control-person liability under § 20(a) against DI, DHI, Watson, Doty, Bergstrom, and Mott. (SEAC ¶ 437(b))
(a) The Companies
Lead Plaintiff alleges that DI and DHI
directly or indirectly controlled employees of the Company who committed deceptive acts in violation of § 10(b), including the Individual Defendants and Dynegy employees Olis, Foster and Sharkey. Dynegy, besides being liable for the securities fraud of Foster, Olis and Sharkey under theories of respondeat superior, is liable as a control person of these former, and convicted, Dynegy employees.
(SEAC ¶ 440(b))
"Control person liability is secondary only and cannot exist in the absence of a primary violation." Southland, 365 F.3d at 383 (citing Lovelace, 78 F.3d at 1021 & n. 8). The court has already concluded that the 1934 Act Complaint alleges primary violations by Bergstrom for misrepresentations made with scienter about the two round-trip trades with CMS, and by Doty for misrepresentations made with scienter arising from Project Alpha. These allegations of primary violations by Bergstrom and Doty, each of whom served at the time of the alleged misrepresentations as an executive officer of the Companies, are sufficient to support plaintiffs' allegations of control person liability against DI. See id. at 383-384 (recognizing that a corporation can have either respondeat superior or § 20(a) liability for the primary violations of its employees).
(b) Individuals
Plaintiffs allege that
*913 defendants Doty, Watson, Bergstrom, and Mott because of their status as high-ranking officers/directors of Dynegy, were authorized to initiate, ratify, implement and/or monitor the Company's organizational decision making processes, had the actual power to directly or indirectly influence Dynegy's corporate policy and actions (including the Company's accounting policies and decisions, public statements and finance decisions) and therefore were control persons of Dynegy and its employees, including Dynegy employees Olis, Foster, and Sharkey.
(SEAC ¶ 440(a))
While the individual defendants cannot have § 20(a) liability for their own statements, see Southland, 365 F.3d at 384, they can have § 20(a) liability for statements attributed to DI, e.g., for statements contained in press releases and SEC filings that are not attributable to any single individual but were clearly made on behalf of the Companies. See id. at 365 ("[r]especting the potential section 10(b) liability of [the company] itself... as all of the individual defendants were executive officers... whose actions were intended to benefit [the company] ... [the court] will treat as having been made by [the company] the particular complained of statements in the SEC filings, reports and releases issued in its name."). Nevertheless, an officer's status alone will not subject him to liability under § 20(a); plaintiffs must allege some facts beyond a defendant's position or title that show that the defendant had actual power or control over the controlled person. See Dennis, 918 F.2d at 509-510.
The only officer against whom plaintiffs have alleged facts beyond his position or title from which it can reasonably be inferred that he had actual power or control over the Companies' allegedly fraudulent actions is Doty. Plaintiffs allege that
Foster reported directly to Doty, and Olis reported to Foster. Examples that Doty controlled Sharkey, Foster and Olis include the following: Doty headed Project Alpha and ordered Project Alpha to be completed as soon as possible in case there were objections from the Board. Doty received a call from Foster and Olis to discuss the "tear up" provision regarding Project Alpha, and Foster told Doty "that if we wanted to get this deal done, we're not going to be able to give all the documents to Arthur Andersen." Doty responded he understood. Thereafter, the "tear up" provisions were drafted as an amendment to the original swap confirmation documents regarding Project Alpha and concealed from Andersen.
(SEAC ¶ 440(a)) Because from these allegations it can reasonably be inferred that Doty had actual power or control over Dynegy's "deal team" that caused the Companies' statements about Project Alpha to be false, the court concludes that these allegations are sufficient to state a § 20(a) claim against Doty. Because plaintiffs fail to allege facts from which it can reasonably be inferred that Watson, Bergstrom, or Mott had actual power or control over the actions that allegedly caused the misrepresentations underlying this action, the court concludes that plaintiffs have failed to allege § 20(a) claims against these three defendants.
C. Citigroup
In a 55-page section of the 1934 Act Complaint titled "Involvement of Citigroup," plaintiffs allege two general categories of claims against Citigroup. Plaintiffs allege that "Citigroup structured, funded and executed two major series of transactions to hide off Dynegy's balance sheet hundreds of millions of dollars in *914 debt, and artificially inflate Dynegy's reported net income and cash flows,"[166] and that "Citigroup issued analyst reports that misleadingly gave Dynegy Citigroup's highest [buy] rating and falsely reported Dynegy's net income, cash flow and debt ratios."[167] (See SEAC ¶¶ 324-418.)
1. Claim for Primary Liability Against Citigroup and Citibank for Structuring, Funding, and Executing Black Thunder and Project Alpha
Citing Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), Citigroup argues that plaintiffs' 1934 Act claims against it should be dismissed because they are claims for aiding and abetting securities fraud that are not actionable under § 10(b). Plaintiffs respond that their allegations against Citigroup allege primary violations under Rule 10b-5(a) and (c) for engaging in manipulative acts. Subsections (a) and (c) of Rule 10b-5 proscribe the "employ[ment of] any device, scheme, or artifice to defraud," and "engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."
(a) Central Bank
In Central Bank, 114 S.Ct. at 1439, the plaintiffs were holders of bonds issued by a public building authority to finance public improvements at a planned residential and commercial development. When suspicion emerged that the official appraisal had inflated the value of the land securing the bonds, Central Bank allegedly agreed  at the urging of the land developer  to delay an independent review of the dubious appraisal until six months after the closing of a second bond issue. The building authority subsequently defaulted on the bonds. The bond holders sued not only the building authority, the bond underwriters, and the land developer, but also Central Bank on the theory that it should be held "secondarily liable under § 10(b) for its conduct in aiding and abetting the fraud." Id. at 1443. The Supreme Court rejected this aiding and abetting theory of secondary liability.
Central Bank announces two holdings. First, the Court held that § 10(b)
prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act... The proscription does not include giving aid to a person who commits a manipulative or deceptive act. We cannot amend the statute to create liability for acts that are not themselves manipulative or deceptive within the meaning of the statute.
Id. at 1448. Second, the Court held that the district court's grant of summary judgment to Central Bank was appropriate because merely aiding and abetting a manipulative or deceptive act committed by someone else does not trigger liability under § 10(b). Id. at 1455. Defendants, the Court said, can only be held liable under Rule 10b-5 if they themselves "employ[ ] a manipulative device or make[ ] a material misstatement (or omission) on which a purchaser or seller of securities relies ..." Id. Pointing out that a plaintiff must show reliance on the defendant's misstatement or omission to recover under Rule 10b-5, the Court stated that, "[w]ere we to allow *915 the aiding and abetting action proposed in this case, the defendant could be liable without any showing that the plaintiff relied upon the aider and abettor's statements or actions." Id. at 1449-1450.
Central Bank precludes liability based on allegations that a group of defendants acted together to violate the securities laws unless each defendant committed a manipulative or deceptive act in furtherance of the scheme. See Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin, 135 F.3d 837, 842 (2d Cir.1998) (extending Central Bank's reasoning to claims that group of defendants conspired to violate securities laws). But see also Wenneman v. Brown, 49 F.Supp.2d 1283, 1290 & n. 3 (D.Utah 1999) (finding no specific reference to conspiracy in Central Bank). A secondary actor may not be liable for primary violations under an alleged scheme to defraud unless all of the requirements for liability under Rule 10b-5 have been satisfied as to the secondary actor and any additional heightened pleading requirements have been met. Id. at 843 ("We simply hold that where the requirements for primary liability are not independently met, they may not be satisfied based solely on one's participation in a conspiracy in which other parties have committed a primary violation."). Secondary actions actors who conspire to commit violations will still be subject to liability if they independently satisfy requirements for primary liability. Id. at 844 (but declining to address the issue for lack of jurisdiction in that case). See also Central Bank, 114 S.Ct. at 1448 ("As in earlier cases considering conduct prohibited by § 10(b), we again conclude that the statute prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act... [§ 10(b)'s] proscription does not include giving aid to a person who commits a manipulative or deceptive act.").
(b) Citibank's Allegedly Manipulative Acts
Plaintiffs premise Citigroup's liability with regard to Black Thunder on Citibank's promotional statements to Dynegy employees that "Black Thunder's $850 million loan would be presented on Dynegy's balance sheet as an equity investment," on its preparation of sample balance sheets for the company and for the special purpose entities, and on allegations that it provided Dynegy disclosure language, including the "we have an option" language that Dynegy used in its initial disclosures about Black Thunder but ultimately restated. (SEAC ¶ 329) Plaintiffs premise Citigroup's liability with regard to Project Alpha on its promotional statements to Dynegy employees that "[r]atings agencies will not view the proceeds raised from the offering of the credit linked notes as "Company" debt" (SEAC ¶ 336), its requirement that all credit risk be eliminated through the use of tear-ups agreements and hedges (SEAC ¶ 372), and its execution of hedging and tear-up agreements with Dynegy in side agreements that were concealed from Andersen. (SEAC ¶¶ 374, 388, 396) The court is not persuaded that these allegations are sufficient to state a claim against Citigroup under § 10(b) and Rule 10b-5 for either transaction because they allege only that Citigroup aided and abetted Dynegy's alleged fraud.
In Central Bank the Court was not called upon to determine what constituted a manipulative act for purposes of § 10(b) and Rule 10b-5 because the plaintiffs alleged only that Central Bank was "secondarily liable under § 10(b) for its conduct in aiding and abetting the fraud." 114 S.Ct. at 1455. In S.E.C. v. Zandford, 535 U.S. 813, 122 S.Ct. 1899, 1903-1904, 153 L.Ed.2d 1 (2002), however, the Court held that a broker's alleged conduct of selling a *916 customer's securities with the undisclosed intent to misappropriate the proceeds constituted a deceptive device or contrivance in the purchase or sale of securities that was actionable under Rule 10b-5. See also Wharf (Holdings) Ltd. v. United International Holdings, Inc., 532 U.S. 588, 121 S.Ct. 1776, 149 L.Ed.2d 845 (2001) (selling securities while secretly never intending to honor them constitutes a § 10(b) violation); United States v. O'Hagan, 521 U.S. 642, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997) (secretly using misappropriated confidential information for trading purposes constitutes a § 10(b) violation); Superintendent of Ins. of State of N.Y. v. Bankers Life & Cas. Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971) (misleading investor into selling treasury bonds, on erroneous belief that it would receive proceeds of sale constitutes a § 10(b) violation). As explained by the Court in Zandford, the fraud in each of these cases was actionable under § 10(b) because it "coincided with the sale[ ] [of securities] themselves." 122 S.Ct. at 1904.
Because plaintiffs in this case do not allege any facts showing that Citigroup's allegedly manipulative and deceptive acts coincided with sales of Dynegy securities, the court concludes that the facts of this case are distinguishable from those in which courts have found defendants' acts to constitute a manipulative or deceptive device or fraud that is actionable under § 10(b). Plaintiffs' allegations regarding Citigroup's participation in the structuring of Black Thunder and Project Alpha do not identify Citigroup's actions as manipulative; plaintiffs' claims are that Dynegy improperly reported Black Thunder and Project Alpha on its financial statements and that Citigroup helped Dynegy do so by structuring, funding, and executing Black Thunder and Project Alpha. Under Central Bank the aid that Citigroup provided Dynegy is not actionable under § 10(b), and plaintiffs cannot invoke subsections (a) and (c) of Rule 10b-5 to circumvent Central Bank' s limitations on liability for a secondary actor's involvement in the preparation of false and misleading statements. See In re Lernout & Hauspie Securities Litigation, 230 F.Supp.2d 152, 174-175 (D.Mass.2002). As the Court explained in Central Bank, its holding does not mean that
aiding and abetting a wrongdoer ought [not] be actionable in certain instances. Cf. Restatements (Second) of Torts § 876(b) (1977). The issue, however, is not whether imposing private civil liability on aiders and abettors is good policy but whether aiding and abetting is covered by the statute.
114 S.Ct. at 1448. Nor does its holding mean that the SEC cannot maintain an aiding and abetting suit against Citigroup under § 10(b). Id. at 1445 (emphasizing that the issue before the court concerned only private rights of action). Because plaintiffs only allege that Citigroup engaged in acts that aided and abetted Dynegy's alleged fraud, the 1934 Act claims asserted against Citigroup for engaging in allegedly manipulative acts will be dismissed.
2. Claim for Primary Liability Against Citigroup and Salomon for Issuing False Research Reports
Citigroup argues that claims arising from "the handful of analyst statements plaintiffs do allege to be false" should be dismissed because "they are either subjective statements of opinion, and therefore inactionable under the securities laws, or statements by Dynegy that SSB's [Salomon Smith Barney] analyst merely reiterated in his reports and expressly attributed to Dynegy, and thus were not *917 statements of Citigroup at all."[168] Citigroup also argues that plaintiffs have failed to allege particularized facts raising a strong inference that Salomon's Dynegy analyst acted with scienter, as required by Rule 9(b) and the PSLRA.
Plaintiffs allege that
[i]n addition to structuring and executing Project Alpha and Black Thunder, Citigroup also made false statements concerning Dynegy by means of so-called research reports. The statements in the Citigroup research reports at ¶¶ 168, 178, 182, 184, 189, 191, 196, 204, 213, 226, 233, 239-240, [and] 250, concerning: (a) positive ratings/recommendations on Dynegy (b) Dynegy's financial statements  in particular cash flows and profits in 2001; (c) Dynegy's balance sheet, and (d) Dynegy's finances, financial ratios and financial discipline, were false and misleading and omitted material facts when made, based on what Citigroup knew in connection with Black Thunder and Project Alpha.
(SEAC ¶ 413) Plaintiffs allege that each of these research reports was issued by Salomon, that most, if not all of them, were prepared by Salomon's Dynegy analyst, Niles, and that each research report restated financial information that had appeared in either a press release or an SEC filing issued by Dynegy immediately prior to each research report's publication. Plaintiffs allege that Citigroup knew the financial information contained in these research reports was false because it had structured, funded, and executed Black Thunder and Project Alpha for the fraudulent purposes of allowing Dynegy to understate its debt and tax liabilities and overstate its revenues and cash flows.
Assuming without deciding that all the statements referenced were false and misleading, the court nevertheless concludes that plaintiffs' allegations fail to state a § 10(b) claim because they do not raise a strong inference of scienter. In Southland, 365 F.3d 353, the Fifth Circuit rejected the concept of collective corporate scienter, stating that
[f]or purposes of determining whether a statement made by the corporation was made by it with the requisite Rule 10(b) scienter we believe it appropriate to look to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment.
Southland, 365 F.3d at 366 (citing Nordstrom, 54 F.3d at 1435 ("there is no case law supporting an independent `collective scienter' theory"). See also Apple Computer, 243 F.Supp.2d at 1023 ("It is not enough to establish fraud on the part of a corporation that one corporate officer makes a false statement that another knows to be false. A defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter, i.e., knows that the statement is false, or is at least deliberately reckless as to its falsity, at the time he or she makes the statement.").
Plaintiffs allege that "Citigroup is an integrated financial-services institution ... [and] that Citigroup and its controlled subsidiaries, particularly Citibank, N.A. and *918 Salomon Smith Barney, Inc., are collectively referred to herein as `Citigroup.'" (SEAC ¶ 35) Plaintiffs allege that "Citibank, N.A. ("Citibank") is a wholly owned and controlled subsidiary of Citigroup. Citibank is liable under § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder for its participation in the fraudulent scheme to defraud, acts and course of business that operated as a fraud or deceit upon purchasers of Dynegy securities." (SEAC ¶ 36) Plaintiffs allege that "Salomon Smith Barney, Inc. ("Salomon") is a wholly owned and controlled subsidiary of Citigroup. Salomon is liable under § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder for issuing false and misleading statements concerning Dynegy and for its participation in the fraudulent scheme to defraud, acts and course of business that operated as a fraud or deceit upon purchasers of Dynegy securities." (SEAC ¶ 37)
These allegations make clear that Citigroup's alleged liability for structuring, funding, and executing the Black Thunder and Project Alpha transactions is premised on the acts of Citibank, while Citigroup's alleged liability for issuing analyst's reports containing false statements about Dynegy's finances is premised on the acts of Salomon. These conclusions are corroborated by the 1934 Act Complaint's descriptions of Black Thunder and Project Alpha that are rife with allegations of Citigroup and Citibank's involvement but wholly lacking allegations of Salomon's involvement (see SEAC ¶¶ 41-58, 326-338 (Black Thunder), 59-88, 339-405 (Project Alpha)), and by the 1934 Act Complaint's descriptions of false research reports, each of which is attributed to Salomon. (See paragraphs referenced in SEAC ¶ 413, i.e., ¶¶ 168, 178, 183, 184, 189, 191, 196, 204, 213, 226, 233, 239-240).
Assuming without deciding that Citibank knew that the Black Thunder and Project Alpha transactions were designed to falsify Dynegy's financial statements because it structured, funded, and executed each of these transactions, plaintiffs have failed to allege any facts showing how, when, where, or by whom Citibank's knowledge about Black Thunder and Project Alpha was communicated to Salomon or to its Dynegy analyst. Because the 1934 Act Complaint contains no allegations that Salomon or its Dynegy analyst knew, or was severely reckless in not knowing, that Dynegy's financial statements were falsified by misrepresentations about Black Thunder and/or Project Alpha, the court concludes that plaintiffs have failed to allege facts capable of raising any inference, much less a strong inference, that the Salomon research reports at issue were issued with scienter. See Southland, 365 F.3d at 366 (rejecting concept of collective corporate scienter in favor of requirement that courts look to the state of mind of the individual corporate officer who issued the statement(s) alleged to be fraudulent). Accordingly, the 1934 Act claims asserted against Citigroup for issuing allegedly false and misleading research reports will be dismissed.
3. Claim for Secondary "Control-Person" Liability Against Citigroup for Acts of Citibank and Salomon
Section 20(a) of the 1934 Act imposes liability on anyone "who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder." 15 U.S.C. § 78t(a). Plaintiffs allege that
Citigroup had the actual power to influence the policy and actions of its wholly owned subsidiaries Citibank and Salomon and their employees, and is liable under § 20(a) for their conduct as alleged herein. Citigroup controlled the *919 actions of its wholly owned subsidiaries by, among other things, reviewing and approving the structure, terms, and amount of all significant loans (including the hidden loans in Project Alpha and Black Thunder) made by Citigroup and its wholly owned subsidiaries.
(SEAC ¶ 440(c) Because the court has concluded that plaintiffs have failed to state a claim against Citibank or Salomon under § 10(b) or Rule 10b-5, there can be no liability against Citigroup under § 20(a). Accordingly, the § 20(a) claims alleged against Citigroup will be dismissed.
D. Conclusions
1. Conclusions as to Companies and Individuals
(a) Claims Asserted Under § 10(b) and Rule 10b-5
In the 1934 Act Complaint Lead Plaintiff alleges violations of § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5(b), against DI, DHI, Watson, Bergstrom, Doty, Mott, Schatzman, and Dorey. For the reasons explained above, the court concludes that (1) the § 10(b) and Rule 10b-5 claims asserted against DHI, Watson, Mott, Schatzman, and Dorey should be dismissed in entirety, (2) that the claims asserted against DI arising from Black Thunder should be dismissed but that the claims asserted against DI arising from Project Alpha and the round-trip trades with CMS should not be dismissed, (3) that the claims asserted against Bergstrom arising from Black Thunder and Project Alpha should be dismissed but that the claims arising from the round-trip trades with CMS should not be dismissed, and (4) that the claims asserted against Doty arising from Black Thunder and the round-trip trades with CMS should be dismissed but that the claims arising from Project Alpha should not be dismissed.
(b) Claims Asserted Under § 20(a)
In the 1934 Act Complaint Lead Plaintiff alleges violations of § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a), against DI, DHI, Watson, Bergstrom, Doty, and Mott. For the reasons set forth above the court concludes that the § 20(a) claims asserted against DHI, Watson, Bergstrom, and Mott should be dismissed, but that the § 20(a) claims asserted against DI and Doty should not be dismissed.
2. Conclusions as to Citigroup Defendants
(a) Claims Asserted Under § 10(b) and Rule 10b-5
In the 1934 Act Complaint Lead Plaintiff alleges violations of § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5(b), against Citigroup, Citibank, and Salomon. For the reasons explained above, the court concludes that (1) the § 10(b) and Rule 10b-5 claims asserted against Citigroup and Citibank for structuring, funding, and executing the Black Thunder and Project Alpha transactions will be dismissed, and (2) the § 10(b) and Rule 10b-5 claims asserted against Citigroup and Salomon for issuing false research reports will be dismissed.
(b) Claims Asserted Under § 20(a)
In the 1934 Act Complaint Lead Plaintiff alleges violations of § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a), against Citigroup. Because the court has concluded that plaintiffs have failed to state a claim against Citibank or Salomon under § 10(b) or Rule 10b-5, there can be no liability against Citigroup under § 20(a).
*920 3. Summary Table
The following table lists in chart form the court's disposition of the 1934 Act claims.

------------------------------------------------------------------------------------------
1934 Act Defendants § 10(b) & Rule 10b-5 § 20(a)
 -------------------------------------------
 Black Project Improper Accounting
 Thunder Alpha (Round-trip Trades)
------------------------------------------------------------------------------------------
Dynegy Inc. D L L L
------------------------------------------------------------------------------------------
Dynegy Holdings Inc. D D D D
------------------------------------------------------------------------------------------
Charles L. Watson D D D D
------------------------------------------------------------------------------------------
Stephen W. Bergstrom D D L D
------------------------------------------------------------------------------------------
Robert D. Doty D L D L
------------------------------------------------------------------------------------------
Michael R. Mott D D D N/A
------------------------------------------------------------------------------------------
Matthew K. Schatzman N/A N/A D N/A
------------------------------------------------------------------------------------------
Louis J. Dorey N/A N/A D N/A
------------------------------------------------------------------------------------------
Citigroup D D N/A D
------------------------------------------------------------------------------------------
Citibank, N.A. D D N/A N/A
------------------------------------------------------------------------------------------
Salomon Smith Barney, Inc. D D N/A N/A
------------------------------------------------------------------------------------------

Key: D: Dismissed claim; L: Live claim; N/A No claim Asserted.

VI. Plaintiffs' Requests to Amend

At the end of their responses to the defendants' motions to dismiss plaintiffs request leave to amend their complaint. Although plaintiffs have filed multiple responses to defendants' motions to dismiss, each with its own request for leave to amend, the following request is typical:
Defendants request dismissal with prejudice but cannot give any reasonable justification for why plaintiffs should not be afforded leave to replead claims against them in the event the Complaints are found to have a pleading deficiency. The case pleaded is based on what plaintiffs believe is sufficient under the law. If the Court disagrees the case is sufficiently pleaded, plaintiffs should be allowed to amend their allegations, to respond to the court's application of pleading standards.
Leave to amend should be "freely given when justice so requires." Fed.R.Civ.P. 15(a). See also Foman v. Davis, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (Rule 15(a)'s mandate that leave to amend "shall be freely given when justice so requires" "is to be heeded."). As the Fifth Circuit stated in Schlotzsky's, Rule 15(a) "favors leave as a necessary companion to notice pleading and discovery." 238 F.3d at 367 (holding that the district court erred in denying plaintiffs leave to file their amended securities complaint).[169]
*921 The Fifth Circuit recognizes that leave to amend shall be freely granted when justice so requires, Goldstein, 340 F.3d at 254, and that the Rule 15 evinces a bias in favor of granting leave to amend. Id. (citing Southern Constructors Group, Inc. v. Dynalectric Co., 2 F.3d 606, 611 (5th Cir.1993)). However, the Fifth Circuit has also stated that leave to amend under Rule 15 is by no means automatic, Southern Constructors, 2 F.3d at 612, and has upheld the denial of leave to amend when the moving party engaged in undue delay, Little, 952 F.2d at 846, or attempted to present theories of recovery serially to the district court. Southern Constructors, 2 F.3d at 612. The Supreme Court has sanctioned bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of the amendment as plausible reasons for a district court to deny a party's request for leave to amend. See Foman v. Davis, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).
The record before the court demonstrates that Lead Plaintiff has filed four complaints in this action: an Original Complaint for Violation of the Federal Securities Laws filed on June 25, 2002, (Docket Entry No. 1 in Civil Action No. H-02-2374); the Consolidated Complaint filed in this action on June 6, 2003, (Docket Entry No. 112); and two first amended consolidated complaints, one for violation of the 1933 Act (Docket Entry No. 315) and one for violation of the 1934 Act (Docket Entry No. 316). The last two complaints filed are 69-pages and 204-pages long, respectively. In addition to being poorly drafted and repetitive, Lead Plaintiff's 1933 and 1934 Act Complaints are legally deficient in many respects. Yet, almost as an afterthought, Lead Plaintiff has tacked a general curative amendment request to the end of each of the responses in opposition that it has filed to the defendants' motions to dismiss. Lead Plaintiff was certainly aware of the defendants' objections to its complaints as written because they appeared in the defendants' principal motions to dismiss. Despite this awareness, Lead Plaintiff has not demonstrated how it would replead its claims with greater specificity if given the opportunity, has not proffered proposed second amended consolidated complaints, and has not suggested in its responsive pleadings any additional facts not initially pleaded that could, if necessary, cure the pleading defects raised by the defendants. See Goldstein 340 F.3d at 254-255. Under these circumstances the court is not persuaded that Lead Plaintiff should receive yet another opportunity to amend its complaint(s). See McKinney v. Irving Independent School Dist., 309 F.3d 308, 315 (5th Cir.2002), cert. denied, 537 U.S. 1194, 123 S.Ct. 1332, 154 L.Ed.2d 1030 (2003) (finding no abuse of discretion in the district court's denial of leave to amend where the plaintiffs failed to submit a proposed amended complaint in a request for leave to amend and failed to alert the court to the substance of any proposed amendment). Accordingly, Lead Plaintiff's request for leave to amend will be denied. [170]

*922 VII. Order

For the reasons explained above (1) the Motion to Dismiss filed by Charles L. Watson (Docket Entry No. 323) is GRANTED in part and DENIED in part; (2) the Motion to Dismiss Claims Alleged Under the 1933 Act filed by Dynegy and Dynegy Holdings Inc. (Docket Entry No. 324) is GRANTED in part and DENIED in part; (3) the Motion to Dismiss Claims Alleged Under the 1934 Act filed by Dynegy and Dynegy Holdings Inc. (Docket Entry No. 325) is GRANTED in part and DENIED in part; (4) the Motion to Dismiss filed by Michael R. Mott (Docket Entry No. 327) is GRANTED in part and DENIED in part; (5) the Motion to Dismiss filed by Matthew K. Schatzman, and Louis J. Dorey (Docket Entry No. 328) is GRANTED; (6) the Motion to Dismiss filed by Kenneth E. Randolph (Docket Entry No. 329) is GRANTED in part and DENIED in part; (7) the Motion to Dismiss filed by Arthur Andersen LLP (Docket Entry No. 332) is GRANTED in part and DENIED in part; (8) the Motion to Dismiss filed by Robert D. Doty (Docket Entry No. 333) is GRANTED in part and DENIED in part; (9) the Motion to Dismiss filed by Dynegy's Outside Directors, Charles E. Bayless, Darald W. Callahan, Michael D. Capellas, Daniel L. Dienstbier, Jerry L. Johnson, George L. Kirkland, Richard H. Matzke, H. John Riley, Jr., Sheli Z. Rosenberg, Joe J. Stewart, and J. Otis Winters, (Docket Entry No. 335) is GRANTED as to Capellas, Johnson, and Riley, and DENIED as to all other Outside Director Defendants; (10) the Motion to Dismiss filed by Stephen W. Bergstrom (Docket Entry No. 338) is GRANTED in part and DENIED in part; (11) the Motion to Dismiss filed by Lehman Brothers Inc., Lehman Brothers Holding Inc., Merrill, Lynch, Pierce, Fenner & Smith, Inc., and Merrill Lynch & Co., Inc. (Docket Entry No. 339) is DENIED; (12) the Motion to Dismiss filed by Certain Underwriter and Related Defendants (Docket Entry No. 342) is GRANTED as to Banc One Capital Markets, Inc., Bank One Corp., Bank of America Securities LLC, Bank of America Corp., Crédit Lyonnais Securities (USA), Inc., Crédit Lyonnais, The Royal Bank of Scotland plc, The Royal Bank of Scotland Group, SG Cowen Securities Corp., Société Générale Group, TD Securities (USA) Inc., TD Bank Financial Group, WestLB AG (formerly known as Westdeutsche Landesbank Girozentrale), and DENIED as to ABN AMRO Inc., ABN AMRO Holding N.V., ABN AMRO Bank N.V., Commerzbank Capital Markets Corp., Commerzbank AG, Credit Suisse First Boston LLC (formerly known as Credit Suisse First Boston Corp.); and (13) the Motion to Dismiss filed by Citigroup Inc., Salomon Smith Barney Inc., and Citibank, N.A. (Docket Entry No. 347) is GRANTED. The Motion to Exceed Page Limits filed by Lead Plaintiff (Docket Entry No. 379) is GRANTED.[171]

*923 VIII. Order for Scheduling Conference

Counsel shall appear for a scheduling conference on Thursday, October 21, 2004, at 3:00 p.m. at the United States Courthouse, Court Room 9-B, 9th Floor, 515 Rusk Avenue, Houston, Texas 77002.
NOTES
[1] Subsequent orders of consolidation were issued on August 20, 2002 (Docket Entry No. 74), October 23, 2002 (Docket Entry No. 87), and November 22, 2002 (Docket Entry No. 90).
[2] When sections from either complaint are quoted, the quoted material is from the first cited complaint. While in some cases identical language is used in both complaints, in other cases the language differs slightly.
[3] GAAP are those principles recognized by the accounting profession as the conventional rules and procedures necessary to define accepted accounting practice at a particular time. (SAC ¶ 64)
[4] Section 11(a)(1-5) states in relevant part,

(a) Persons possessing cause of action; persons liable
In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue 
(1) every person who signed the registration statement;
(2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;
(3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner;
(4) every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him; [and]
(5) every underwriter with respect to such security.
15 U.S.C. § 77k(a).
[5] An exception to the no-scienter-requirement is that under § 27A(c) of the Private Securities Litigation Reform Act (PSLRA), to impose liability on a defendant for "forward-looking" statements, a plaintiff must demonstrate that the speaker or approving officer had actual knowledge of the false and misleading statement made on behalf of the corporation. 15 U.S.C. § 77z-2(c)(1)(B)(i).
[6] In Melder the Fifth Circuit concluded that Rule 9(b) applied to the plaintiffs' 1933 Act claims because the 1933 Act complaint adopted wholesale all the allegations asserted in support of the plaintiffs' claims for securities fraud under the 1934 Act. In Lone Star Ladies the Fifth Circuit limited Melder's reach by explaining that when a plaintiff alleges 1933 Act claims based on strict liability and expressly disavows and disclaims any allegations of fraud, the plaintiff's claims do not "sound in fraud" and cannot be dismissed for failure to satisfy Rule 9(b)'s pleading requirements as long as they state a negligence claim under § 11. Lone Star Ladies, 238 F.3d at 369.
[7] This Registration Statement is Exhibit B attached to Randolph's Motion to Dismiss, Docket Entry No. 329.
[8] "[T]he Certification previously filed in this action" was attached to the Consolidated Complaint filed in this action on June 6,
[9] See id.
[10] See also Signature Page of Registration Statement, Exhibit B attached to Randolph's Motion to Dismiss, Docket Entry No. 329.
[11] Lead Plaintiff alleges that DHI's 2000 Form 10-K represented that DHI had net income of more than $446 million in 2000, and that this was false because DHI's earnings for 2000 were only $398 million; the difference between $446 million and $398 million is $48 million.
[12] Lead Plaintiff alleges DHI's 2000 Form 10-K represented that DHI had net income of more than $152 million in 1999, and that this was false because DHI's earnings for 1999 were only $137 million; the difference between $152 million and $137 million is $15 million.
[13] See Amended Certification of Named Plaintiff Pursuant to Federal Securities Laws, Exhibit A attached to Notice of Filing of Amended Certifications by Lead Plaintiff, Docket Entry No. 393.
[14] See id.
[15] DI's 2000 10-K, filed on March 13, 2001, is Exhibit 3, DI's second-quarter 2001 Form 10-Q is Exhibit 4, and DI's third-quarter 2001 Form 10-Q is Exhibit 5 in the Appendix in Support of Defendants' Motions to Dismiss, Docket Entry No. 330.
[16] Lead Plaintiff alleges that DHI's third quarter 2001 Form 10-Q reported cash flow from operations as $642 million when they were actually $460 million, representing on overstatement of $182 million.
[17] This Registration Statement is Exhibit C attached to Randolph's Motion to Dismiss, Docket Entry No. 329.
[18] "[T]he Certification previously filed in this action" was attached to the Consolidated Complaint filed in this action on June 6, 2003 (Docket Entry No. 112).
[19] See id.
[20] See signature page of Registration Statement, Exhibit C attached to Randolph's Motion to Dismiss, Docket Entry No. 329.
[21] Although Lead Plaintiff also alleges that DHI's "February 19, 2002, Prospectus Supplement, filed in connection with the registration statement for the 8.75% notes ... reported that Dynegydirect had $43 billion in notational value of contracts" (SAC ¶ 58), "$13 billion of which was recorded in the fourth quarter" (SAC ¶ 138), but that this statement was false because "[a]pproximately 15% of the total fourth quarter value traded on Dynegydirect and more than half the increase in trading volumes between the third and fourth quarters was the result of round-trip or wash trades" (SAC ¶ 138), Lead Plaintiff has not asserted any claims under § 12, which governs false statements in a prospectus. See 15 U.S.C. § 771.
[22] See Andersen's Motion to Dismiss, Docket Entry No. 332, pp. 9-11; Memorandum of Law in Support of the Motion to Dismiss by Defendants Lehman Brothers Inc., et al., Docket Entry No. 340, pp. 12-14.
[23] Andersen's Motion to Dismiss, Docket Entry No. 332, p. 10. See also Docket Entry No. 340 at p. 13, where the Lehman and Merrill Lynch entities assert that Lead Plaintiff's "Original Complaint did not even name Lehman, Merrill or their Parents as defendants."
[24] See Exhibits A and B attached to Notice of Filing of Amended Certifications by Lead Plaintiff, Docket Entry No. 393.
[25] See Exhibit A attached to Docket Entry No. 393.
[26] DI and DHI's Motion to Dismiss, Docket Entry No. 324, p. 8. The 1933 Act Individual Defendants adopt and incorporate the arguments asserted by DI and DHI for dismissal of the 1933 Act claims asserted against them. See Watson (Motion to Dismiss, Docket Entry No. 323, p. 20), Doty (Motion to Dismiss, Docket Entry No. 333, p. 17), Bergstrom (Motion to Dismiss, Docket Entry No. 338, p. 14), Mott (Motion to Dismiss, Docket Entry No. 237, p. 18; Reply, Docket Entry No. 372, p. 13), and Randolph (Motion to Dismiss, Docket Entry No. 329, p. 6).
[27] DI and DHI's Motion to Dismiss, Docket Entry No. 324, p. 8.
[28] Id. 8-9. See also Memorandum and Points of Authorities in Support of the Dynegy Outside Directors' Motion to Dismiss, Docket Entry No. 336, p. 8.
[29] DI and DHI's Motion to Dismiss, Docket Entry No. 324, p. 7.
[30] Id. at n. 5.
[31] Lead Plaintiff's Opposition, Docket Entry No. 357, p. 5.
[32] Because Lead Plaintiff filed its original Complaint for Violation of the Federal Securities Laws against DI on June 25, 2002, it is unable to state otherwise. See Docket Entry No. 1 in Civil Action H-02-2374, The Regents of the University of California, On Behalf of Itself and All Others Similarly Situated v. Dynegy, Inc., Charles L. Watson, Robert D. Doty, and Stephen W. Bergstrom.
[33] The 1934 Act Complaint explains that these disclosures were made in a press release issued on July 23, 2002, in which Dynegy announced a "financial update." (SEAC ¶ 3)
[34] DI's and DHI's Motion to Dismiss, Docket Entry No. 324, p. 13.
[35] Lead Plaintiff alleges that only beginning with the announcement of earnings for the second-quarter of 2001 were the Companies' financial statements and other representations false and misleading because they omitted material facts about Project Alpha. (SAC ¶ 56; SEAC ¶ 87) See Motion of Defendants DI and DHI to Dismiss, Docket Entry No. 324, p. 1, n.3, asserting that although the suit filed by Stoneridge Investment Partners LLC asserted a claim under § 11 based on misrepresentations and omissions concerning Project Alpha in a Dynegy registration statement and a supplement issued on September 29, 2000, and October 2, 2000, respectively, the § 11 claim asserted by Stoneridge was temporally impossible because "Dynegy could not have made misrepresentations in September and October [2000] about a transaction that did not occur until April 2001." See also Reply of Defendants Dynegy Inc. and Dynegy Holdings Inc., Docket Entry No. 374, p. 15, stating ("the Project Alpha-related misrepresentation in Regents' original complaint could not have been asserted with respect to the March 2001 offering because Project Alpha post-dated that offering"). Like the registration statement challenged in the Stoneridge action, which allegedly bears a date in September of 2000, the registration statement for DHI's offer of debt securities on March 15, 2001, is alleged to bear a date in September of 2000.
[36] DI and DHI's Motion to Dismiss, Docket Entry No. 324, p. 7.
[37] See Watson Motion to Dismiss, Docket Entry No. 323, p. 20; Mott Motion to Dismiss, Docket Entry No. 327, pp. 17-18; Randolph Motion to Dismiss, Docket Entry No. 329, p. 6; Doty Motion to Dismiss, Docket Entry No. 333, p. 17; and Bergstrom Motion to Dismiss, Docket Entry No. 338, p. 14.
[38] Memorandum and Points of Authorities in Support of the Dynegy Outside Directors' Motion to Dismiss, Docket Entry No. 336, pp. 8-15, arguing that plaintiffs were on inquiry notice by Spring of 2002.
[39] Arthur Andersen's Motion to Dismiss, Docket Entry No. 332, pp. 3-9, arguing that plaintiffs were on inquiry notice by April of 2002.
[40] See Memorandum of Law in Support of the Motion to Dismiss by Defendants Lehman Brothers Inc., Lehman Brothers Holdings, Inc., Merrill Lynch, Pierce, Fenner & Smith Inc., and Merrill Lynch & Co., Inc., Docket Entry No. 340, p. 3 n.3, stating that these defendants "expressly adopt and incorporate by reference the argument in Part II of the Motion of Defendants Dynegy Inc. and Dynegy Holdings Inc. to Dismiss First Amended Consolidated Complaint for Violations of the Securities Act Of 1933, that Plaintiffs' claims are barred by the statute of limitations and are unaffected by any tolling agreements." See also Memorandum of Law in Support of Certain Underwriter Defendants and Related Defendants' Motion to Dismiss Plaintiffs' First Amended Consolidated Class Action Complaint for Violations of the Securities Act of 1933, Docket Entry No. 343, p. 13, arguing that plaintiffs were on inquiry notice of their § 11 claims "by May 2002 at the latest."
[41] DI and DHI's Motion to Dismiss, Docket Entry No. 324, p. 7.
[42] DI and DHI's Motion to Dismiss, Docket Entry No. 324, p. 3. See also Memorandum and Points of Authorities in Support of Dynegy Outside Directors' Motion to Dismiss, Docket Entry No. 336, pp. 15-18, asserting that three of the outside directors  Capellas, Johnson, and Riley  were not parties to any tolling agreement, and arguing that the tolling agreements are ineffective against those outside directors who did execute them; and Memorandum of Law in Support of Certain Underwriter and Related Defendants' Motion to Dismiss, Docket Entry No. 443, pp. 14-16, asserting that seven of these did not enter tolling agreements and adopting the arguments asserted by DI and DHI for those that did enter tolling agreements. The tolling agreements and the dates on which they were executed are set forth in the SAC at ¶ 154.
[43] Opposition of Lead Plaintiff to Motion to Dismiss 1933 Act Complaint, Docket Entry No. 357, p. 2.
[44] Id. at pp. 14-20.
[45] See Complaint for Violation of the Federal Securities Laws, Docket Entry No. 1, in Civil Action H-02-2374.
[46] Complaints that named Mott as a party defendant during this time period were filed in Civil Action Nos. H-02-1604, H-02-1657, H-02-1695, H-02-1800, H-02-1816, H-02-1932, H-02-1970, H-02-2058, H-02-2146, H-02-2174, H-02-2198, H-02-2199, H-02-2322, H-02-2367, and H-02-2723.
[47] See, e.g., H-02-1604, Docket Entry No. 4; H-02-1695, Docket Entry No. 3; H-02-1816, Docket Entry No. 6; H-02-1970, Docket Entry No. 8; and H-02-2174, Docket Entry No. 5.
[48] See Stoneridge Investment Partners LLC v. Dynegy Inc., No. H-02-2198, Amended Class Action Complaint for Violation of the Federal Securities Laws filed June 26, 2002, Docket Entry No. 5, ¶ 45.
[49] See Opposition of Lead Plaintiff to Motion to Dismiss, Docket Entry No. 357, pp. 17-18.
[50] Memorandum and Order of October 28, 2002, Docket Entry No. 88, p. 14.
[51] Opposition of Lead Plaintiff, Docket Entry No. 357, p. 19 n.11.
[52] Id. at pp. 15-16.
[53] Reply of Defendants Dynegy Inc. and Dynegy Holdings Inc., Docket Entry No. 374, pp. 13-16.
[54] Opposition of Lead Plaintiff, Docket Entry No. 88, p. 17. See also Complaint for Violation of the Federal Securities Laws, Docket Entry No. 1, in Civil Action H-02-2374, at p. 6 ¶ 18, stating that "[o]n March 15, 2001, Dynegy completed a $500 million offering of 10-year notes."
[55] See, e.g., In re USEC Sec. Litig., 190 F.Supp.2d 808, 820-21 (D.Md.2002); In re Merrill Lynch & Co. Inc. Research Reports Sec. Litig., 289 F.Supp.2d 416 (S.D.N.Y.2003)(finding that extensive media coverage of alleged conflicts of interest of research analysts and brokers at Merrill Lynch put plaintiffs on inquiry notice more than two years before they filed suit); but see In re WorldCom, Inc. Securities Litigation, 294 F.Supp.2d 431, 447 (S.D.N.Y.2003) (press reports did not constitute storm warnings sufficient to put plaintiffs on inquiry notice where reports failed to identify particular statements by WorldCom itself that would sufficiently alert an investor to her potential claims).
[56] Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co., 129 F.3d 222, 224 (1st Cir.1997).
[57] See, e.g., Theoharous v. Fong, 256 F.3d 1219, 1228 (11th Cir.2001).
[58] See In re Ultrafem Inc. Securities Litigation, 91 F.Supp.2d 678, 692 (S.D.N.Y.2000) (notice of informal investigation by SEC).
[59] See, e.g., Harner v. Prudential-Bache Sec. Inc., 35 F.3d 565 (Table), Nos. 92-1353, 92-1910, 1994 WL 494871, *5-6 (6th Cir.1994) (warning of risks in prospectus coupled with letters from partnership reporting substantially lower returns than expected should have put plaintiffs on notice of potential fraud).
[60] Lead Plaintiff's Opposition, Docket Entry No. 357, pp. 6-7.
[61] See DI's and DHI's Motion to Dismiss, Docket Entry No. 324, pp. 9-11. The Director Defendants argue that plaintiffs were on inquiry notice of their claims by either March, April, or May of 2002. See Memorandum and Points of Authorities in Support of the Dynegy Outside Directors' Motion to Dismiss, Docket Entry No. 336, pp. 10-15. Andersen argues that plaintiffs were placed on inquiry notice in April of 2002, and that even more information became available in May of 2002. See Andersen's Motion to Dismiss, Docket Entry No. 332, pp. 3-7. Certain Underwriters argue that plaintiffs were on inquiry notice of their 1933 Act claims as early as March of 2002 and at the latest by May of 2002. See Memorandum of Law in Support of Certain Underwriter Defendants' Motion to Dismiss, Docket Entry No. 343, pp. 10-13. Like the Individual Defendants, the Lehman and Merrill Lynch entities adopt the Companies' limitations arguments. See Memorandum of Law in Support of Motion to Dismiss by Lehman and Merrill Lynch entities, Docket Entry No. 340, p. 3 n.3. DI's 2001 10-K, filed on March 13, 2002, is Exhibit 7, in the Appendix in Support of Defendants' Motions to Dismiss, Docket Entry No. 330.
[62] DI and DHI's Motion to Dismiss, Docket Entry No. 324, pp. 10-11.
[63] Lead Plaintiff's Opposition, Docket Entry No. 357, pp. 8-9. See also allegations asserted in SAC ¶ 47:

Dynegy and Dynegy Holdings mentioned that they had an obligation to create a $270 million sinking fund and there was a cash flow trigger for an additional $60 million. In addition, there was a ratings trigger that required posting $270 million in cash. What was initially "separate assets and liabilities" became distinctly Dynegy and Dynegy Holdings liabilities. This filing still neglected to portray Dynegy and Dynegy Holdings as obligated to repay the $850 million borrowed, only that they have an "option" to acquire the investor's interests.
[64] See DI's and DHI's Motion to Dismiss, Docket Entry No. 324, pp. 11-12. See also Memorandum and Points of Authorities in Support of Dynegy Outside Directors' Motion to Dismiss, Docket Entry No. 336, pp. 11-12. Andersen argues that plaintiffs were placed on inquiry notice in April of 2002, and that even more information became available in May of 2002. See Andersen's Motion to Dismiss, Docket Entry No. 332, pp. 3-7.
[65] DI's and DHI's Motion to Dismiss, Docket Entry No. 324, pp. 11-12 & n.10 (citing SEAC ¶¶ 244-245). The Wall Street Journal article appears as Exhibit B in Appendix to Outside Directors' Motion to Dismiss, Docket Entry No. 337.
[66] DI's and DHI's Motion to Dismiss, Docket Entry No. 324, p. 12 (citing SEAC ¶ 251). The April 25th Form 8-K is Exhibit 8 in the Appendix to DI and DHI's Motion to Dismiss, Docket Entry No. 330; the April 25th press release is attached thereto and quoted at length in SEAC ¶ 251.
[67] DI's and DHI's Motion to Dismiss, Docket Entry No. 324, p. 12 (citing Original Complaint filed in this action on April 26, 2002, Docket Entry No. 1, on behalf of Pirelli Armstrong Tire Corporation Retiree Medical Benefits Trust by the law firm now representing Lead Plaintiff). The April 29th Form 8-K is Exhibit 9 in the Appendix to DI and DHI's Motion to Dismiss, Docket Entry No. 330.
[68] DI's and DHI's Motion to Dismiss, Docket Entry No. 324, p. 12 & n.11.
[69] Id.
[70] Exhibit B in Docket Entry No. 337 at p. 1.
[71] Id.
[72] Id.
[73] Id.
[74] See April 25, 2002, press release attached to Exhibit 8 in Docket Entry No. 330, p. 11. See also SEAC ¶ 251.
[75] Exhibit 8 in Docket Entry No. 330, p. 3.
[76] Id.
[77] Exhibit 9 in Docket Entry No. 330.
[78] Id.
[79] See DI's and DHI's Motion to Dismiss, Docket Entry No. 324, pp. 11-12. See also Memorandum and Points of Authorities in Support of Dynegy Outside Directors' Motion to Dismiss, Docket Entry No. 336, pp. 11-12. Andersen argues that plaintiffs were placed on inquiry notice in April of 2002, and that even more information became available in May of 2002. See Andersen's Motion to Dismiss, Docket Entry No. 332, pp. 3-7.
[80] See Form 10-Q for the quarterly period ending March 31, 2002, Exhibit 10 in Docket Entry No. 330, at pp. 14-15. Because that Form 10-Q is a public disclosure document that was required by law to be filed with the SEC and actually was filed with the SEC, it is a document that the court may consider for purposes of ruling on the pending motions to dismiss as long as it is considered solely for the purpose of determining what statements it contains and not for proving the truth of those statements. See Lovelace, 78 F.3d at 1018 & n. 1 (citing and adopting rule of Kramer, 937 F.2d at 774).
[81] Complaint for Violation of the Federal Securities Laws, Docket Entry No. 1, in Civil Action H-02-2374, at p. 14 ¶¶ 32-33. See also Form 10-Q for the quarterly period ending March 31, 2002, Exhibit 10 in Docket Entry No. 330, at pp. 14-15.
[82] See DI's and DHI's Motion to Dismiss, Docket Entry No. 324, p. 11 & n.10.
[83] The two registration statements alleged to contain misrepresentations about Project Alpha are those for DI's stock offering of December 20, 2001, and DHI's debt offering of February 15, 2002. Because the pleadings make clear that Project Alpha did not close until after DHI's debt offering of March 15, 2001, the court concludes that the registration statement for that offering could not have included misrepresentations about Project Alpha.
[84] Because the pleadings make clear that DHI's debt security offering of March 15, 2001, occurred before Project Alpha closed in April of 2001 and before the CMS round-trip trades occurred in November of 2001, the registration statement for this offering could not have contained misrepresentations about Project Alpha or the CMS trades.
[85] See Memorandum and Points of Authorities in Support of the Dynegy Outside Directors' Motion to Dismiss, Docket Entry No. 336, p. 16; Reply Memorandum in Support of the Dynegy Outside Directors' Motion to Dismiss, Docket Entry No. 380, pp. 5-6.
[86] Opposition of Lead Plaintiff to Motions to Dismiss Filed by the Outside Directors and Kenneth Randolph, Docket Entry No. 359, p. 4 n.2 (acknowledging that Capellas, Johnson, and Riley did not execute tolling agreements).
[87] Memorandum and Points of Authorities in Support of the Dynegy Outside Directors' Motion to Dismiss, Docket Entry No. 336, p. 17 (citing Jackson National Life Ins. Co. v. Merrill Lynch & Co., 32 F.3d 697, 702 (2d Cir.1994) (affirming dismissal of § 11 claim after concluding that plaintiff was on inquiry notice of the falsity of the challenged representation more than one year before the tolling date)).
[88] Id. at pp. 17-18.
[89] Opposition of Lead Plaintiff to Motions to Dismiss by the Outside Directors and Kenneth Randolph, Docket Entry No. 359, pp. 4-7.
[90] Reply Memorandum in Support of Dynegy Outside Directors' Motion to Dismiss, Docket Entry No. 380, p. 16.
[91] Opposition of Lead Plaintiff to Arthur Andersen LLP's Motion to Dismiss the 1933 Act Complaint, Docket Entry No. 355, p. 14 n.9.
[92] Id. at pp. 3-4. The tolling agreement executed by Andersen is Exhibit 4 included in Appendix in Support of Plaintiffs' Oppositions, Docket Entry No. 362.
[93] Opposition of Lead Plaintiff to Arthur Andersen LLP's Motion to Dismiss, Docket Entry No. 355, p. 14 n.9.
[94] See Form 10-Q for the Quarterly Period ending March 31, 2002, Exhibit 10 in Docket Entry No. 330, at p. 15 ("the Company will restate its 2001 results of operations, stockholders' equity and cash flow ... [a]s a result, the previously issued financial statements for the year ended December 31, 2001, and the auditors' report thereon, should no longer be relied upon as it relates to [Project Alpha]").
[95] Lead Plaintiff admits that "[b]y mistake Andersen was omitted from the table of defendants who executed tolling agreements at paragraph 154 of the 1933 Act Complaint. This omission, however, does not diminish the effect of the tolling agreement." Opposition of Lead Plaintiff to Arthur Andersen's Motion to Dismiss, Docket Entry No. 355, p. 4. n.4. See also Arthur Andersen LLP's Reply Brief in Support of Its Motion to Dismiss, Docket Entry No. 377, pp. 10-15. Andersen's Agreement is Exhibit 4 attached to Docket Entry No. 362.
[96] Arthur Andersen LLP's Reply Brief in Support of Its Motion to Dismiss, Docket Entry No. 377, pp. 10-15. Although Andersen also argues that the tolling agreement is unenforceable because Hawaii Ironworkers and WVIMB are not intended beneficiaries of it, because Hawaii Ironworkers and WVIMB have not alleged that they purchased common stock pursuant to the registration statement for DI's stock offering of December 20, 2001, this argument is not relevant to Andersen's assertion that a limitations bar applies to claims asserted against it by Lead Plaintiff on its own behalf and on behalf of other stock purchasers for misrepresentations included in the stock offering's registration statement.
[97] See id. at p. 11.
[98] Id. at pp. 12-15.
[99] Memorandum of Law in Support of the Motion to Dismiss by Defendants Lehman Brothers Inc., et al., Docket Entry No. 340, p. 3 n.3.
[100] Id.
[101] See Tolling Agreement executed by DI, Exhibit 31 included in Appendix in Support of Plaintiffs' Oppositions to Defendants' Motions to Dismiss, Docket Entry No. 362.
[102] DI's and DHI's Motion to Dismiss, Docket Entry No. 324, p. 13.
[103] Opposition of Lead Plaintiff to Motion to Dismiss 1933 Act Complaint Filed by Defendants Dynegy Inc. and Dynegy Holdings Inc., Docket Entry No. 357, pp. 2-3.
[104] DI's and DHI's Motion to Dismiss, Docket Entry No. 324, p. 13.
[105] See Tolling Agreement executed with "Dynegy Individuals," including these defendants, and Randolph, and the Director Defendants, Exhibit E attached to Defendant Kenneth E. Randolph's Motion to Dismiss, Docket Entry No. 329.
[106] DI's and DHI's Motion to Dismiss, Docket Entry No. 324, p. 14.
[107] Opposition of Lead Plaintiff to Motion to Dismiss 1933 Act Complaint Filed by Defendants Dynegy Inc. and Dynegy Holdings Inc., Docket Entry No. 357, p. 3.
[108] Exhibit E attached to Defendant Kenneth E. Randolph's Motion to Dismiss, Docket Entry No. 329.
[109] Opposition of Lead Plaintiff to Motion to Dismiss 1933 Act Complaint Filed by Defendants Dynegy Inc. and Dynegy Holdings Inc., Docket Entry No. 357, p. 3.
[110] Exhibit E attached to Defendant Kenneth E. Randolph's Motion to Dismiss, Docket Entry No. 329 (emphasis added).
[111] Complaint for Violation of the Federal Securities Laws filed by The Regents of the University of California in Civil Action No. H-02-2374, Docket Entry No. 1, p. 1.
[112] See Memorandum and Order of October 28, 2002, appointing Lead Plaintiff at pp. 11-14, discussing "niche" plaintiffs (Docket Entry No. 88).
[113] See Exhibits 4, and 14-21 included in the Appendix in Support of Plaintiffs' Oppositions to Defendants' Motions to Dismiss, Docket Entry No. 362.
[114] DI's and DHI's Motion to Dismiss, Docket Entry No. 324, p. 4.
[115] Id. at pp. 4, 17.
[116] Id. at p. 17.
[117] Opposition of Lead Plaintiff to Motion to Dismiss 1933 Act Complaint filed by Defendants DI and DHI, Docket Entry No. 357, pp. 21-22; Opposition of Lead Plaintiff to Motions to Dismiss Filed by the Outside Directors and Kenneth Randolph, Docket Entry No. 359, pp. 37-38.
[118] Memorandum and Points of Authorities in Support of the Dynegy Outside Directors' Motion to Dismiss, Docket Entry No. 336, p. 24 & n.16. Asserting that the 1933 Act Complaint bars any § 11 claim based on Black Thunder or technical accounting deficiencies, the Director Defendants assert that "there is no need for [them] to demonstrate their reasonable investigation as to those issues."
[119] Id. at 25.
[120] Id.
[121] Opposition of Lead Plaintiff to Motions to Dismiss Filed by the Outside Directors and Kenneth Randolph, Docket Entry No. 359, p. 32.
[122] Memorandum and Points of Authorities in Support of the Dynegy Outside Directors' Motion to Dismiss, Docket Entry No. 336, p. 21.
[123] Id. at pp. 21-22.
[124] Id. at p. 23.
[125] Opposition of Lead Plaintiff to Motions to Dismiss Filed by the Outside Directors and Kenneth Randolph, Docket Entry No. 359, p. 29.
[126] Id. at 30.
[127] Id.
[128] Memorandum of Law in Support of Certain Underwriter and Related Defendants' Motion to Dismiss, Docket Entry No. 343, p. 6.
[129] Id. at p. 7.
[130] Id. at pp. 9-10.
[131] Id. at p. 8.
[132] Opposition of Lead Plaintiff to Motion to Dismiss Filed by Certain Underwriter Defendants, Docket Entry No. 360, p. 7.
[133] Memorandum and Points of Authorities in Support of the Dynegy Outside Directors' Motion to Dismiss, Docket Entry No. 336, p. 20.
[134] Opposition of Lead Plaintiff to Motion to Dismiss, Docket Entry No. 357, p. 2.
[135] DI's and DHI's Motion to Dismiss, Docket Entry No. 324, p. 15.
[136] The Fifth Circuit, together with the Third, Fourth, Sixth, Seventh, and Eleventh Circuits, adhere to the two-part transaction/loss causation requirement under which plaintiffs must plead and prove facts establishing both that they would not have purchased the securities had they known the truth (reliance or "transaction causation"), and that the defendants' misrepresentations caused them to suffer an economic loss (proximate cause or ("loss causation"). See, e.g., Robbins v. Koger Properties, Inc., 116 F.3d 1441, 1447 (11th Cir.1997)(recognizing that both before and after passage of the PSLRA, the majority of courts have required plaintiffs to allege facts establishing both reliance or "transaction causation," and proximate cause, or "loss causation." In these circuits plaintiffs' allegations that they purchased a security at an artificially inflated price may suffice to plead reliance or "transaction causation," but will not suffice to plead proximate cause or "loss causation." Pleading proximate cause or "loss causation" requires plaintiffs to point to some causal link between the alleged misrepresentations and a concrete decline in the value of their securities. Plaintiffs in fraud-on-the-market cases filed in the Ninth and Eighth Circuits, however, can satisfy the loss causation requirement merely by pleading that they purchased securities at a price that was artificially inflated by the defendants' misrepresentations. See Gebhardt v. ConAgra Foods, Inc., 335 F.3d 824, 832 (8th Cir.2003)("[P]laintiffs were harmed when they paid more for the stock than it was worth."). See also Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 97-98 (2d Cir.2001)("[P]laintiffs may allege ... loss causation by averring ... that the defendants' misrepresentations induced a disparity between the transaction price and the true `investment quality' of the securities at the time of the transaction."). To resolve the conflict among the circuits on this issue, the Supreme Court has recently granted certiorari in Broudo v. Dura Pharmaceuticals, Inc., 339 F.3d 933, 938 (9th Cir.2003), petition for cert. granted, ___ U.S. ___, 124 S.Ct. 2904, 159 L.Ed.2d 811 (June 28, 2004).
[137] January 16, 2004, is the date on which plaintiffs filed their Motion for Leave to File Amended Complaint, Docket Entry No. 306. When a plaintiff moves to amend to add a new defendant to a pending suit, the date of the filing of the motion for leave to amend is the date the action was commenced for purposes of determining whether the claims asserted against the newly added defendant are timely. See In re Enron Corp. Sec., Derivative & "ERISA" Litig., 2004 WL 405886, *19 (S.D.Tex. February 25, 2004) (citing Northwestern National Ins. Co. of Milwaukee v. Alberts, 769 F.Supp. 498, 510 (S.D.N.Y.1991)).
[138] Opposition of Lead Plaintiff to Motion to Dismiss 1934 Act Complaint, Docket Entry No. 356, p. 64 & n.52. Lead Plaintiff argues that

[t]he claims asserted against Dynegy Holdings in the 1934 Act Complaint arise out of the same conduct, transaction, and occurrence as the claims asserted against Dynegy Holdings in plaintiffs' Consolidated Complaint filed on June 6, 2003, and therefore, the 1934 Act Complaint relates back to the filing date of the Consolidated Complaint pursuant to Rule 15 of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 15(c)(2). Indeed, in the Consolidated Complaint, plaintiffs allege Dynegy Holdings was liable for Securities Act violations for false and misleading statements in Registration Statements based on Project Alpha, Black Thunder, and numerous other improprieties, all of which plaintiff base their current claims upon in the 1934 Act Complaint.
Id.
[139] Id. at pp. 64-67.
[140] See § IV.C.3.(c).(2).(iii), above, explaining that because the CMS trades are not alleged to have occurred until November of 2001, i.e., the fourth-quarter of 2001, misrepresentations about them could not have been incorporated into the registration statement for either the March 15, 2001, debt offering, which occurred long before the CMS trades, or the February 15, 2002, debt offering, which is alleged to have incorporated financial statements from the third but not from the fourth-quarter of 2001.
[141] See Reply of Defendants Dynegy Inc. and Dynegy Holdings Inc., Docket Entry No. 375, pp. 37-39, arguing only that these claims cannot relate back to the original complaint that Lead Plaintiff filed in June of 2002.
[142] See DI's and DHI's Motion to Dismiss, Docket Entry No. 325, p. 60.
[143] Opposition of Lead Plaintiff to Motion to Dismiss 1934 Act Complaint, Docket Entry No. 356, p. 65.
[144] Id.
[145] Although plaintiffs cite In re AOL Time Warner, Inc. Securities and "Erisa" Litig., 2004 WL 992991, *6 (S.D.N.Y. May 5, 2004), as another case where Sarbanes-Oxley's extended limitations period was applied to a consolidated complaint filed after July 30, 2002, the court finds that case distinguishable because at least one of the original complaints was filed in September of 2002, i.e., after Sarbanes-Oxley took effect.
[146] DI's and DHI's Motion to Dismiss, Docket Entry No. 325, p. 2.
[147] Although plaintiffs allege in the 1934 Act Complaint that Dynegy also improperly accounted for leases (SEAC ¶¶ 302-304), implied deferred dividends (SEAC ¶ 305), loss on impaired investment (SEAC ¶¶ 306-307), income taxes (SEAC ¶¶ 308-311), acquisitions (SEAC ¶¶ 312-313), and assets (SEAC ¶¶ 315-323), these allegations lack any semblance of factual particularity, and plaintiffs do not even try to defend them in their briefing.
[148] DI's and DHI's Motion to Dismiss, Docket Entry No. 325, p. 27.
[149] GAAP are those principles recognized by the accounting profession as the conventional rules and procedures necessary to define accepted accounting practice at a particular time. (SAC ¶ 64)
[150] DI's and DHI's Motion to Dismiss, Docket Entry No. 325, p. 40.
[151] Because the court has already concluded that plaintiffs' allegations regarding improper accounting for natural gas contracts, forward power contracts, and trading losses are subject to dismissal because they have not been pleaded with particularity, the court's analysis of scienter is limited to misrepresentations about Black Thunder, Project Alpha, and the round-trip trades with CMS.
[152] For purposes of resolving defendants' motions to dismiss, the court assumes as true plaintiffs' allegations that Dynegy's SEC filings for 1999-2001 incorporated financial statements that were falsified by misrepresentations about Black Thunder, Project Alpha, and the round-trip trades with CMS. See Goldstein, 340 F.3d at 249.
[153] Corrected Opposition by Lead Plaintiff, Docket Entry No. 363, p. 7 n.3.
[154] See also SEAC ¶ 325 which identifies the Dynegy employees with knowledge of Project Alpha as: Robert Doty, CFO; Gene Foster, Vice-President of Tax 2000-2002; Richard Gould, Director of Project Alpha; Wendy Ho, in-house counsel; Michael Mott, Controller; Tammy Norman, in-house counsel; Jaime Olis, Senior Director of Tax Planning & International 1999-2001, Vice-President of Finance 2002; David Roth, in-house counsel; Helen Sharkey, Manager Risk Control Group; and Charles Watson, CEO.
[155] Corrected Opposition of Lead Plaintiff, Docket Entry No. 363, p. 78.
[156] Id.
[157] These statements include the rebuttal cited in the April 3, 2002, Wall Street Journal article (SEAC ¶ 246), and the April 9, 2002, letter that Doty posted on the Company's website addressed to the "investment community." (SEAC ¶ 248)
[158] Exhibit 1 attached to Mott's Motion to Dismiss, Docket Entry No. 377.
[159] Corrected Opposition of Lead Plaintiff to the Insider Defendants' Motions to Dismiss, Docket Entry No. 363, p. 82.
[160] Although plaintiffs have alleged that Schatzman also violated § 10(b) and Rule 10b-5 by participating in Dynegy's improper accounting for natural gas and forward power contracts, the court has already concluded that plaintiffs' allegations of these improper accounting practices are not sufficiently particularized to support claims for violation of § 10(b) and Rule 10b-5.
[161] See Corrected Opposition of Lead Plaintiff to Insider Defendants' Motions to Dismiss, Docket Entry No. 363, pp. 26-28, 65-68, where plaintiffs do little more than restate their pleadings.
[162] Because the court has already concluded that claims arising from Project Alpha asserted against DHI are barred by limitations, this conclusion relates only to DI and not to DHI.
[163] Because the court has already concluded that claims arising from the CMS trades asserted against DHI are barred by limitations, because they do not relate back to the Consolidated Complaint, this conclusion relates only to DI and not to DHI.
[164] Reply of Defendants Dynegy Inc. and Dynegy Holdings Inc., Docket Entry No. 375, p. 34.
[165] DI's and DHI's Motion to Dismiss, Docket Entry No. 325, pp. 59-60; Reply of Defendants Dynegy Inc. and Dynegy Holdings Inc., Docket Entry No. 375, pp. 40-41.
[166] Opposition of Lead Plaintiff to Motion to Dismiss by Defendants Citigroup, Inc., Salomon Smith Barney Inc., and Citibank, N.A., Docket Entry No. 364, p. 1.
[167] Id. at p. 2.
[168] Defendants' Citigroup Inc., Salomon Smith Barney Inc. and Citibank, N.A.'s Motion to Dismiss the First Amended Consolidated Complaint for Violations of the Securities Exchange Act of 1934, Docket Entry No. 347, p. 3.
[169] Corrected Opposition of Lead Plaintiff to the Insider Defendants' Motions to Dismiss, Docket Entry No. 363, p. 95. See also Opposition of Lead Plaintiff to Motion to Dismiss 1934 Act Complaint Filed by Dynegy Inc. and Dynegy Holdings Inc., Docket Entry No. 356, p. 68, and Opposition of Lead Plaintiff to Motion to Dismiss 1933 Act Complaint Filed by Defendants Dynegy Inc. and Dynegy Holdings Inc., Docket Entry No. 357, p. 23, asserting that "[t]he case pleaded is based on what plaintiffs believe is sufficient under the law. If this Court disagrees, plaintiffs should be allowed to amend their allegations to respond to this Court's application of the applicable pleading standards."
[170] The law firm representing Lead Plaintiff in this case has previously been warned by the Fifth Circuit and by at least one other circuit court against this kind of "wait and see" approach to requesting leave to amend. See, e.g., Goldstein, 340 F.3d at 255 & n. 6 (citing Morse v. McWhorter, 290 F.3d 795, 800 (6th Cir.2002) ("As to the district court's characterization of plaintiffs' maneuvering, we share the district court's frustration with the plaintiffs' apparent `cat and mouse' class action gamesmanship. And [ ] we agree that a district court's responsibilities do not include instructing ostensibly sophisticated securities class action counsel how to plead an actionable complaint...")).
[171] The court has allowed the parties extraordinary leeway in submitting lengthy briefs and other written materials in connection with the pending motions. As the length of this Memorandum and Order indicates, the court has expended considerable time reading these papers and performing a significant amount of independent research to be as fully informed as possible when addressing the parties' arguments. While, because of the sheer volume of information presented, it is not impossible that some arguments were overlooked, the parties should assume that failure to expressly address a particular argument in this Memorandum and Order reflects the court's judgment that the argument lacked sufficient merit to warrant discussion. Accordingly, the court strongly discourages the parties from seeking reconsideration based on arguments they have previously raised or that they could have raised.